Roy WILLIAMS and Marvin Crenshaw, Plaintiffs,

and

The Ledbetter Neighborhood Association, Plaintiff–Intervenor,

v.

The CITY OF DALLAS, Defendant.

No. CA 3–88–1152–R.

United States District Court,
N.D. Texas,
Dallas Division.

March 28, 1990.

Roy Williams, Thelma E. Sanders, Jonathan W. Vickery and Elizabeth K. Julian, Legal Services of North Texas, and Michael M. Daniel, Dallas, Tex., for plaintiffs.

Analeslie Muncy, Paul Pearce, Jr., Kenneth C. Dippel, Carroll Graham, John Schumann, Sam A. Lindsay and Kathryn Bendor–Samuel, City Attys., Dallas, Tex., Francis X. Wright, Roger D. Redden, Kurt J. Fischer, Piper & Marbury, Baltimore, Md., and Gerrit M. Pronske, Hale, Spencer, Stanley, Pronske & Trust, Dallas, Tex., for defendant.

Rolando L. Rios, San Antonio, Tex., and William L. Garrett, Garrett, Thompson & Chang, Dallas, Tex., for plaintiff-intervenor.

MEMORANDUM OPINION

BUCHMEYER, District Judge.

This is a voting rights case.

It concerns the "8–3 system" for the election of members of the Dallas City Council—i.e., 8 single-member districts and 3 "at-large" places. Under this system, no African–American has ever been elected to one of the at-large seats; only one Mexican–American has been elected at-large under the 8–3 system but, as discussed below, this was due to some very unusual circumstances that will not be repeated. Accordingly, this opinion holds:

   (i) that the 8–3 system violates § 2 of the Voting Rights Act, 42 U.S.C. § 1973, because it dilutes the votes of politically cohesive African–Americans *and* of politically cohesive Mexican–Americans in Dallas; and

(ii) that a special Council election must be held to remedy the adverse effects of the 8–3 system—*the denial of equal access to the City's political process*—which blacks and Hispanics have suffered under this system for almost 15 years.

The Fifth Circuit has repeatedly emphasized that there is a "special need for detailed findings of fact in vote dilution cases"[1] in which the district court performs a "searching and practical evaluation of 'past and present reality' [based] on a functional view of the political process."[2]

"Because the resolution of a voting dilution claim requires close analysis of unusually complex factual patterns, and because the decision of such a case has the potential for serious interference with state functions, we have strictly adhered to the rule 52(a) requirements in voting dilution cases and have required district courts to explain with particularity their reasoning and the subsidiary factual conclusions underlying their reasoning ... *Perhaps in no other area of the law is as much specificity in reasoning and fact finding required, as shown by our frequent remands of voting dilution cases to district courts.*" (872 F.2d at 1203) (emphasis added).

Accordingly, the Findings of Fact in this opinion are *exhaustive.*[3] Because of their length, this Memorandum Opinion—for convenience[4]—will begin with a brief discussion of *the applicable law* (pp. 1319–1320), followed by a *summary of the opinion* (pp. 1320–1330) and its reasons for holding that:

(i) under the 8–3 system, African–Americans and Hispanics are denied access to the 3 at-large seats because they cannot raise—*from their own communities*—the enormous amount of money (at least $150–200,000) that is required for an effective at-large, city-wide campaign in Dallas;

(ii) under the 8–3 system, blacks have been unfairly prohibited from electing more than two single-district Council Members by the "packing" of African–Americans into two districts with 75–87% concentration and 85–91% total minority population (Districts 6 and 8)—and by splitting the remaining African–American population in Dallas between Districts 1 and 7, to prevent the creation of a third black district; and

(iii) these discriminatory effects of the 8–3 system, which clearly violate § 2 of the Voting Rights Act, must be remedied by a special City Council election to be held *as soon as possible.*

The opinion summary will be followed, of course, by the specific, detailed Findings of Fact required in voting dilution cases. Specifically, these comprehensive findings will cover the following topics:

| | | |
|---|---|---|
| A. | General: | *Findings 1–8* |
| B. | History of the 8–3 System (1856–1980): | *Findings 9–131* |
| C. | The Continuing Reapportionment Controversy (1980–1989): | *Findings 132–225* |
| D. | History of the 10–4–1 Plan (1989–1990): | *Findings 226–276* |
| E. | Specific Findings on Critical Issues: | *Findings 277–311* |
| | (1) safe districts & packing: | *Findings 278–282* |
| | (2) at-large seats: | *Findings 283–293* |
| | (3) the supposed "city-wide" view: | *Findings 294–299* |
| | (4) the "two people to call" argument: | *Findings 300–304* |
| | (5) the mayor's at-large place: | *Findings 305–311* |
| F. | The *Gingles* Threshold: | *Findings 312–378* |
| | (1) Blacks—size & compactness: | *Findings 313–314* |
| | (2) Blacks—politically cohesive: | *Findings 315–335* |
| | (3) Blacks—white bloc voting: | *Findings 336–357* |
| | (1) Hispanics—sized compactness: | *Findings 357–364* |
| | (2) Hispanics—politically cohesive: | *Findings 365–378* |
| | (3) Hispanics—white bloc voting: | *Findings 365–378* |
| G. | The *Zimmer* Factors: | *Findings 379–429* |
| H. | The Totality of the Circumstances Test: | *Findings 430–441* |
| I. | Observations About the 10–4–1 Plan: | *Findings 442–449* |
| J. | The Delay & The Remedy: | *Findings 450–461* |

The Findings of Fact will, of course, be followed by the Conclusions of Law (1–18)

---

**1.** *Westwego Citizens For Better Govt. v. Westwego,* 872 F.2d 1201, 1203 (5th Cir.1989); *Velaquez v. City of Abilene,* 725 F.2d 1017, 1020 (5th Cir.1984) (quoting *Cross v. Baxter,* 604 F.2d 875, 879 (5th Cir.1979), *vacated on other grounds,* 704 F.2d 143 (5th Cir.1983).

**2.** *Overton v. City of Austin,* 871 F.2d 529, 529–30 (5th Cir.1989); *Westwego,* 872 F.2d at 1204.

**3.** *And exhausting.*

**4.** *See footnote 3.*

(pp. 1413–1415), and by the Conclusion of this opinion (pp. 1415–1416).

## I. THE APPLICABLE LAW

The basic question in this § 2 vote dilution case is whether, as a result of the challenged 8–3 system for Dallas City Council elections, the African–American plaintiffs and the Mexican–American intervenors *"do not have an equal opportunity to participate in the political processes and to elect candidates of their choice."* *Thornburg v. Gingles*, 478 U.S. 30, 44, 106 S.Ct. 2752, 2762, 92 L.Ed.2d 25 (1986) (emphasis added).

### the Act

Specifically, § 2 of the Voting Rights Act, 42 U.S.C. § 1973, provides:

"(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color ...

"(b) A violation of subsection (a) of this section is established if, *based on the totality of circumstances,* it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." [5]

### the Gingles threshold

Under *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, Dallas' use of the 8–3 system—with the 3 at-large seats [6]—would not impede "the ability of minority voters to elect representatives of their choice" unless there is a white bloc voting majority that would *"usually* be able to defeat candidates supported by a politically cohesive, geographically insular minority group." 478 U.S. at 48–49, 106 S.Ct. at 2765. Therefore, the black plaintiffs and the Hispanic intervenor in this case must first meet the *Gingles* three-part threshold:

"Under *Gingles,* plaintiffs must establish *first* that the group is sufficiently large and geographically compact to constitute a majority in a single-member district; *second,* that it is politically cohesive and *third,* that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. 478 U.S. at 50–51, 106 S.Ct. at 2766–67; *Campos* [*v. City of Baytown*], 840 F.2d [1240] at 1243. The second and third elements are *usually* established by statistical evidence of racially polarized voting by the voters in the relevant political unit." *Westwego,* 872 F.2d at 1205–06.

### the Zimmer factors

If this threshold is met, then this Court must determine if the 8–3 system violates § 2 of the Voting Rights Act by conducting a "searching practical evaluation" of the list of factors first set forth in *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973)

---

**5.** "Congress amended section 2 of the Act in 1982, largely in response to the plurality opinion of the Supreme Court in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which held, in part, that in order to establish a violation of section 2 of the Act, plaintiffs had to prove that the challenged electoral scheme was intentionally adopted or maintained by state officials for a discriminatory purpose. The 1982 amendments revised section 2 to make clear that a showing of discrimina-

tory effects alone would be sufficient to establish a violation of section 2...." *Westwego,* 872 F.2d at 1204, fn. 3.

**6.** "It has been widely recognized that 'multimember district and at-large voting schemes may operate to minimize or cancel out the voting strength of racial minorities in the voting population.' ... Such schemes are not, however, per se violations of section 2." *Westwego,* 872 F.2d at 1205.

*(en banc)*, and later in the Senate Report of the 1982 amendments to the Act:

"1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

"2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

"3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

"4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

"5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.

"6. whether political campaigns have been characterized by overt or subtle racial appeals;

"7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

"Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

"whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

"whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedures is tenuous." *Westwego*, 872 F.2d at 1204–05; S.Rep. No. 417, 97th Cong., 2d Sess. 28–29 (1982), *reprinted in* 1982 U.S.Code *Cong. & Admin.News* 177, 206–07.

*totality of the circumstances*

However, the final determination by this Court concerning the 8–3 system must "be made by an evaluation of the totality of the circumstances"—including the *Gingles* threshold and the *Zimmer* factors. *Westwego*, 872 F.2d at 1206; *Terrazas v. Clements*, 581 F.Supp. 1329, 1344–45 (N.D.Tex. 1984) (three-judge court). In the evaluation, this Court must adhere to two themes: *first*, that "courts have not tolerated political systems that effectively exclude minority voters from the democratic processes," but *second*, that "courts have consistently eschewed the notion that [the Voting Rights Act] secures to any group of citizens the right to obtain political representation in proportion to its numbers." *Terrazas v. Clements*, 581 F.Supp. at 1341.

## II. SUMMARY OF THE OPINION

The history of minority participation in the political process of Dallas is not one of *choice;* it is a record of what blacks and Hispanics have been *permitted* to do by the white majority.

This history has three distinct periods: *the century* of total exclusion when intentional discrimination prevented any minorities from serving on the Dallas City Council; *the decade* of the Citizens Charter Association's selection of those blacks and Hispanics who would be permitted to serve as at-large members of the Council; and, *the 15-year period of the 8–3 system*, which permitted two blacks to serve as single-district representatives on the City Council ... but which (with the exception of 1980–83) denied minorities the right to elect any other single-district Council Members ... and which denied both blacks and Hispanics access to any of the 3 at-large seats without the support, and permission, of the white majority in North Dallas.

### (1) *The Century of Exclusion (1856–1969)*

*African–Americans and Hispanics were not permitted to serve as members of the City Council for almost 100 years after Dallas was chartered in 1856.* The discrimination against blacks and Mexican–Americans—during most of this period—

was intentional, open, and even official. Shameful as it now seems, until 1968 the Dallas City Charter contained a *"Segregation of the Races"* section which authorized the Council to segregate the City into totally separate areas for whites and for the "colored races." Under this ordinance (or in accord with its spirit):

> ... the City Manager specified the areas of Dallas that were reserved for whites, for "Negroes," and for "Mexicans"; and the City Council passed a number of racially-motivated ordinances (1942, 1961), including one that required blacks to sit in a "special section" in the back of City buses (1937).

> ... the Council tried to solve "the Negro" housing problem, and keep blacks from moving into the "white areas" of Dallas, by having DHA construct the massive, 3500 unit West Dallas Housing Project (1950).

> ... even as late as 1960 the DISD's resistance to desegregation was bolstered by a federal judge who wrote that most of the whites and Negroes in the City of Dallas do not favor integration of the schools because this is, "in all probability, the most direct and surest route to amalgamation" of the races.

Under conditions like these, it is not surprising that a black never ran for election to the Dallas City Council until 1959—and that there was only one African–American candidate in each of the next three Council elections (1961–1965).[*] *Of course, since all 9 members of the City Council were elected "at-large, city-wide," all of these black candidates—even though they carried minority areas of Dallas with over 80% of the vote—were defeated by massive white bloc voting in North Dallas and in the other white areas of the City.*

In addition, the Citizen's Charter Association ("CCA") controlled City Council elections as an all-white, "non-partisan slating group." *Since its beginning in the 1930's, the CCA had never endorsed a black or Hispanic candidate for City Council.*

[*] Based upon the trial records in this case and in *Lipscomb v. Wise*, 399 F.Supp. 782 (N.D.Tex.

## (2) *The Decade of Permission by the CCA (1968–77)*

By 1967, Dallas had a minority population of almost 35% (25% black, 8–10% Hispanic). In that year, the CCA struck a political campaign bargain in order to get the black community's support of CCA-endorsed candidates; in return for that support, the size of the City Council would be increased by two seats—from 9 to 11—and these two seats would be reserved for minorities.

Accordingly, in the 1969 elections—with the CCA providing financial support and making sure there was no viable white opponent—*George Allen (African–American) and Anita Martinez (Mexican–American) became the first minorities who were permitted to serve on the Dallas City Council.* In the next two Council elections (1971, 1973), the CCA selected one black and one Hispanic to serve on the City Council; then in the 1975 elections, it permitted two African–Americans (George Allen, Lucy Patterson) and one Hispanic (Pedro Aquirre) to serve as Council Members.

## (3) *15 Years Under the 8–3 System (1975–90)*

In 1971, Al Lipscomb (and other African–Americans) filed a voting rights case in federal court in Dallas, claiming "that the all at-large system of electing Council Members unconstitutionally diluted the vote of racial minorities." *Lipscomb v. Wise*, 399 F.Supp. 782 (1975), *reversed* 551 F.2d 1043 (5th Cir.1977), *but affirmed* 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978).

Origin of the 8–3 System (1971–75)

*Four years later*, this case was tried and Judge Mahon found that the "city-wide, at-large" system of electing members to the "Dallas City Council" was unconstitutional because:

> *"... when all members of the City Council are elected at-large, the significance of this pattern of blacks carrying their own areas and yet losing on a city-wide basis [because of a white bloc*

1975).

*vote] is that black voters of Dallas do have less opportunity than do the white voters to elect councilmen of their choice."*

However, when he considered the remedy for this *intentional discrimination* against minorities by the "all at-large system," Judge Mahon accepted the plan proposed by the City, a mixed 8–3 system—i.e., 8 single-member districts and the continuation of 3 at-large places (including the mayor). He did this for two reasons: *First,* since no single-member district could be drawn for Hispanics, the "operation of white-dominated slating groups," like the CCA, permit "Mexican–American citizens ... to operate in a "swing-vote" manner [*in the 3 at-large places* of the 8–3 system] and give them opportunity they might not otherwise have had"—because they must, with "lesser numbers" and "their diffuse resident patterns," form coalitions with "either blacks or whites in order to maintain political stability"; and *second,* there is "legitimate governmental interest to be served by having *some* at-large representation" on the Council to provide a "city-wide, non-sectional" view.

The 8–3 system has been used for all Dallas City Council elections since Judge Mahon's decision in March 1975 through the 1979 Council elections (although the single-district lines were redrawn in 1979 and in 1982). This is how *African–Americans* have fared under the 8–3 system:

... two African–Americans have been elected to single-member districts in every election, but they were—*as expected*—from the two predominately black districts: *District 6* (under the 1980 census, 84.92% total minority and 74.91% black) and *District 8* (under 1980 census, 91.05% total minority, 87.39% black);

... with this "packing" of black population in Districts 6 and 8, and with the splitting or "cracking" of the remaining African–American population between District 1 and District 7—in order to assure that Oak Cliff (*District 1*) has a white representative on the Council—there has been no black candidate elected in any other single-member district in the past 15 years (besides Districts 6 and 8);

... no African–American has ever been elected to one of the 3 at-large seats; indeed, in all of the at-large races since 1975, there has been only one serious black candidate (whose race is discussed below).

Similarly, this is how *Mexican–Americans* have fared under the 8–3 system in the City Council elections during the past 15 years:

... despite the hopes in Judge Mahon's opinion that Mexican–Americans would, under the 8–3 system, have a "heretofore unavailable flexibility and greater opportunity to participate in the political life of Dallas" in view of the 3 at-large seats—*every Hispanic candidate was defeated in the April 1975 elections;* since then, no Hispanic even ran for an at-large seat in any election until 1987 (this race is also discussed below).

... after refusing repeated requests by blacks and Hispanics, the City Council—at the insistence of the Justice Department in 1979—did create a third minority district by redrawing the lines of District 2 (under the 1980 census, 76.73% total minority, 43.38% black, 33.34% Mexican–American); and a Hispanic (Ricardo Medrano) was elected to this single-member district in the 1980 and 1981 elections; however, the lines of this district were redrawn in 1982 (64.98% total minority, 33.20% Hispanic, 31.78% black)—and since then, Hispanic candidates have not won an election in District 2 or any other single-member district.

... one of the two reasons stated by Judge Mahon for approval of the 8–3 "mixed system"—the "greater opportunity" for Mexican–Americans to be elected to at-large seats with CCA support—no longer existed; the CCA did not endorse or support any candidates in the 1977 elections; it was defunct, and it has never been replaced by any other "slating group" in Dallas.

... only one Mexican–American has been elected to an at-large seat under the 8–3 system but, as discussed below, this was due to some very unusual circumstances that will not be repeated.

The Black Reapportionment War (1981–82)

The 1980 census showed that Dallas had a minority population of 41.67% (29.38% African–American and 12.29% Mexican–American). African–American members of the Council (and others) had repeatedly asked for the creation of a third black district, which would give them a 27.2% representation on the City Council (reflecting the increased black population of almost 30%). Indeed, as demonstrated by plans prepared by the City staff, *it was possible for the Council to create three districts with a black majority of 60–65% and a fourth "swing district" with a minority population in excess of 53%.*

However, there was vehement opposition to any such change—particularly from Council Members Don Hicks (*District 1—* Oak Cliff), Max Goldblatt (*District 7—* Southeast Dallas), and Ricardo Medrano (*District 2*)—who did not "intend to have a third [black] district carved from their districts." The reapportionment war, which resulted in 1981–82 from this controversy, was marked with acrimony and racial tension. Credible testimony at trial established that statements like these were made at Council work sessions and meetings:

> ... Oak Cliff (District 1) had to have a white representative on the Council because "Anglos felt extremely uncomfortable being represented by blacks," and if District 1 did not have an Anglo member on the City Council, there would be "white flight" and "Oak Cliff would be black within two years";

> ... that there could be a third black City Council member without another single-district for African–Americans if a "qualified" black would just run for one of the 3 at-large seats;

> ... *it is unfair to have five Council members (including all three at-large representatives) from just two districts in North Dallas,* and the mayor's reapportionment plan passed by the Council is a "scheme to continue to oppress

blacks in the City of Dallas and to deny them representation."

The net result of the 1981–82 reapportionment war was this: the five white majority districts remained basically unchanged; *District 6* had its black population reduced to 74.91% from 82.61% (but its total minority population increased from 83.68% to 84.92%); *District 8* had only insignificant changes in its black and total minority population; and *District 2* had its total minority population reduced to 64.98% from 76.73% (but with little reduction in its Hispanic population, which dropped only to 33.20% from 33.34%). *These changes to District 2 were made with the approval of the incumbent, Ricardo Medrano*—who was subsequently defeated in the April 1983 elections.**

The At-Large Race by a "Qualified Black"

In early 1983, African–American leaders in Dallas met with the objective of finding "a consensus candidate to run at-large out of the black community because [they] *had continuously been informed that a black could win an at-large race with the right credentials.*" This group sought "one of the best candidates that we could put up, one who had been well-educated, who had [held] very high positions, who had participated in [respected] civic organizations around the City at every level." At this meeting, Marvin Robinson was selected as the "test case" for the black community.

Marvin Robinson was an *excellent* choice as the "consensus black candidate." He was well-educated, he was a veteran and a successful business executive, and he had "paid his dues" by being *very active* in civic and communities affairs in Dallas. The group of African–American leaders that selected Marvin Robinson as the "consensus black candidate" in early 1983 was also realistic:

> "We took a good look at our involvement in the black community and the lack of funds to run the race. *We knew*

** With hindsight, Medrano's defeat was attributed to three "political blunders" he committed during the 1982 reapportionment: agreeing to the reduction of the total minority population of District 2; adding precincts to the district which

Medrano thought were heavily Mexican–American, but which were not; and by alienating black voters by opposing their 1982 efforts to obtain a third black district.

*that a black in this town would need $200–250,000 [for an at-large race]. We also knew that we lacked the capacity in the black community to raise those kind of funds.* And the only way we were going to raise those funds was to go back to those [white] individuals who we worked with and [with whom] we had tried to develop a rapport or cadre of support ..."

However, Robinson and his supporters found out that this assistance and financial backing—which they expected from Anglo business and community leaders, and other whites they had known and worked with in a myriad of civic and community efforts—was not there. *Although they went back for white support "continuously, time and time again," Robinson's campaign was able to raise only $15,739—and most of that "came out of poor black folks' pockets." This $15,739, plus another $15,000 borrowed from a bank, was the total amount that Robinson had for his city-wide, at-large campaign for Place 9.*

Robinson's main opponent in the 1983 Place 9 race was Jerry Rucker, a white candidate; Rucker lived in North Dallas, and he raised and spent over $160,000 in this race. In the general election, Rucker received 45.45% of the total vote. Marvin Robinson was second with 21.23%, and the other black candidate—the plaintiff Marvin Crenshaw—was third with 12.15%. *Robinson and Crenshaw together had received some 90% of the black vote, but only 20% of the white vote.* In the runoff on April 16, 1983, Marvin Robinson—the consensus at-large candidate of the black community—was soundly "drummed." *Although Robinson received almost 100% of the black votes, he got only 11% of the white vote;* this translated in 31.78% of the total vote, and Jerry Rucker won with 68.22%.

*Since this race by Marvin Robinson in 1983, no _serious_ black candidate has ever run for an at-large seat in the Dallas City Council elections* because blacks are convinced that "this town is not ready ... to elect an African–American in an at-large race"—and that no "African–American in this town is going to [be able to] acquire the $250,000 that he or she needs to run that kind of race."

### The Hispanic Reapportionment War (1986)

There had been no Mexican–American on the Dallas City Council since the lines to District 2 had been redrawn in 1982—and since Ricardo Medrano had been defeated in the 1983 Council elections. This led Mexican–Americans to petition the City Council for reapportionment in 1986 and for a redrawing of the district lines in the 8–3 system to create a possible Hispanic district. As they had before, African–Americans asked for the creation of a third black district.

*In 1986, just as in 1982, the Dallas City Council could have drawn three districts with a black majority of 60%–65% and a fourth "swing district" with a total minority population in excess of 53%.* However, after heated and racially-charged discussions, the Council decided, by a 6–5 vote, to take no action to reapportion the 8 single-member districts in 1986.

### The At–Large Race by A "Qualified Hispanic" (1987)

Credible testimony established that, after this Council vote, Mayor Starke Taylor met with some Mexican–American leaders; that he told them he would support and endorse a Mexican–American for one of the at-large seats in the 1987 elections; and that he would agree "to do everything he could" to see that the Hispanic candidate won, including helping the candidate get financial backing and votes from North Dallas. Credible testimony also established that this offer of support was made by Mayor Taylor because "he felt strongly that the Hispanic community was going to sue the City. He felt that they would have a case," and that "one of the reasons why he was supportive of a Hispanic candidate was to try to delay or prevent a Hispanic challenge to the 8–3 system."

This lead to Al Gonzalez being the sole Mexican–American candidate in the Place 10 at-large race in the 1987 Council elections. With reference to his selection, Gonzalez testified that he had been very successful as co-chair of an important 1985 City bond campaign and very active in the Hispanic Chamber of Commerce; that he met with Mayor Taylor and businessman

Norman Brinker about running for Place 10; that Brinker agreed "to be my chair" and "to try to raise money from the business community"; that businessman W.L. Bankston agreed to serve as his treasurer; *that he knew he couldn't raise the money for an at-large race from the black or Hispanic communities; but that he hoped to be able to raise some "$150,000 from the Dallas establishment."*

Gonzalez did, in fact, raise over $173,000 —almost all from "the North Dallas establishment." *With this white support and with no serious white opponent—*the other candidates were 4 African–Americans and a 76 year old white male (Martin)— Gonzalez won the 1987 Place 10 race without a runoff. He received 57.59% of the vote; the white candidate (Martin) received 10.89%; and the four black candidates split the remaining votes.

History of the 10–4–1 Plan

In early 1988, following a long-period of complaints by minorities over the "deadly force policy" of the Dallas Police Department and the powers of the Police Review Board, two Dallas police officers were shot and killed within a two-week period. The Chief of Police, after the death of the two officers, accused the two black City Council Members (Al Lipscomb, Diane Ragsdale) of creating an atmosphere of "hate and hostility" in the City which fostered violence. As this racial tension was described later:

> "In early 1988, Dallas experienced a chain of events that devastated the City. The anguish which accompanied the loss of life—of both citizens and police—made it clear that racial tensions were high and that without some method to openly address those tensions, our City was in danger of continued crisis."

### the Dallas Together commission

This lead to the mayor's appointment of the *"Dallas Together"* commission, which she charged with the "difficult task of finding ways to reduce the racial tensions in our community" by breaking down barriers of "prejudice, racism and classes"—and *"with the task of bringing Dallas together* by identifying the root causes of the racial tensions being experienced in our City."

On May 18, 1988, shortly after *Dallas Together* started its work, this lawsuit was filed. The black plaintiffs charged that the City's 8–3 mixed system for electing Council members was unconstitutional and was in violation of § 2 of the Voting Rights Act because it dilutes the votes of African–Americans. (The Ledbetter Neighborhood Association intervened on August 25, 1988, claiming that the 8–3 plan also discriminates against Mexican–Americans.)

### City Council: the 8–3 system is fair

It was with this background of racial tension, hostility, crisis and this lawsuit— and with *Dallas Together* studying, among other things, the issue of minority representation in City government—that the depositions of eight members of the City Council (including the mayor) were taken in this case in September of 1988. *Of the eight Council Members deposed in September of 1988, there were six who testified that the 8–3 system was "fair" or "equitable" and that it afforded equal access to minorities—*and that they believed a "qualified black" could be elected to one of the 3 at-large places, even though it would be much more expensive to run for an at-large seat than a single-member district.

In January 1989, the Final Report of *Dallas Together* was submitted to the Mayor, to the "City of Dallas and to the citizens of Dallas." *Contrary to the views of the City Council majority*, the Political Participation Committee of Dallas Together had concluded that the 8–3 system was unfair:

> *"By most standards* (numerical, demographic, population and racial distributions) *our City Council districts, as presently structured, do not provide sufficient opportunity for all of our citizens to be properly and fairly represented in a system that is designed to meet the needs of contemporary Dallas.*
>
> "The committee noted, with some alarm, the sense of hopelessness and despair by many of our citizens of all races. *Much of their concern is founded in a sincere belief, rightly or wrongly, that they are systematically excluded from*

the political process. The committee recognized that deeply felt emotions such as these provide a breeding ground for crisis ..." (Final Report, p. 21) (emphasis added).

Accordingly, *Dallas Together* recommended—*"with a sense of urgency"*—that the Dallas City Council appoint a "Charter Review Committee" to consider "the proper number, population size, and demographic make-up of our single-member City Council districts ... in conjunction with an evaluation of the proper role of [at-large] districts in our municipal system."

### the Charter Review Commission

On March 8, 1989, the Council established the Dallas Citizens Charter Review Committee ("CRC"), as recommended by *Dallas Together.* Ray Hutchison, the Chairman of CRC, had also chaired the Political Participation Committee of *Dallas Together;* at trial, he explained that CRC concluded that the 8–3 system was unfair to minorities—and that 18% (i.e., 2 out of 11 members) "was not fair representation on the Dallas City Council for blacks"— particularly since *the Council could "achieve 27.3% African–American representation" (i.e., 3 out of 11 members) at any time by redrawing the 8–3 lines to create a third "safe seat for blacks."*

On June 13, 1989—two weeks after the deadline that had been set by the City Council—the CRC met to make final decisions on recommendations to the Council. *The meeting opened with some civility, but it degenerated into acrimony and bitterness that matched the animosity that had taken place seven years earlier, during the 1982 reapportionment war.* By its first vote, the CRC unanimously condemned the 8–3 system. After this vote, the CRC considered the 12–1 plan (mayor at-large) versus a 10–4–1 plan (10 single-districts, 4 quadrants or "super districts" and the mayor elected at-large). In a racially-charged atmosphere, the CRC— by a 10–4 vote—decided against any plan that was all single-member districts; and, the committee decided to recommend 4 quadrant districts (by a 10–4 vote) and 10 single-member districts with the mayor elected at-large (by a 9–5 vote).

The CRC projected that, under the 10–4–1 plan, there would be 4 "safe seats" for blacks (3 local districts and 1 quadrant, with each having 75 +% concentration")— but that there would be no "safe seat" for Hispanics (only a 44% Hispanic concentration in a 65% "majority minority" local district). By their "safe seats," African–Americans were expected to achieve 26.67% representation of the expanded City Council (i.e., 4 out of 15 seats). *This, then, was the net result of the efforts of CRC: it proposed a plan for the structure of City government—the 10–4–1 plan—that actually projected a lower percentage of African–American representation (26.67%) than the City Council could have achieved simply by redrawing lines under the existing 8–3 plan to create a third black district (27.3%)* and a fourth "swing district" with a total minority concentration in excess of 50%.

### the 10–4–1 referendum

On June 28, 1989—the last day on which an August referendum could be set on the Charter amendments required by CRC recommendations—the City Council voted 7–4 to adopt the CRC recommendation concerning the 10–4–1 plan, and to set it (and other matters) for a referendum election on August 12, 1989. However, the City Council rejected one recommendation of the CRC. Instead of using the 10–4–1 plan for the regular May 1991 elections (based on 1980 census data), *the Council voted to delay these elections until at least November 1991 or later depending on when the City was able to obtain preclearance from the Attorney General under § 5 of the Voting Rights Act.*

In the August 1989 election, the 10–4–1 plan passed with 65% of the total vote. However, *95% of the African–Americans who voted, and over 70% of the Hispanics who voted, were opposed to the 10–4–1 plan—which passed only because it received 85% of the white vote.* In view of this bloc voting *the 10–4–1 referendum in August 1989 was probably the most racially divisive election in the history of the City of Dallas.* The well-intentioned *Dallas Together* commission—and the tor-

tured efforts of the CRC—had ended after the August 1989 referendum with severe racial tension, a divided community, and a racially charged atmosphere—conditions that were no better, and were perhaps even worse, than when *Dallas Together* had been conceived in early 1988.

### City Council: the 8–3 system is not fair

However, *Dallas Together* and CRC did have a definite impact upon the attitude of the members of the City Council about the fairness of the 8–3 system. Unlike the depositions taken in September 1988— where 6 of 8 Council Members testified that the 8–3 system was "fair and equitable and afforded equal access to minorities"—when they testified at trial or by depositions in September 1989, 9 members of the present Council either (i) agreed with the unanimous conclusion of CRC that the 8–3 system was racially unfair and should be condemned, or (ii) felt that the 8–3 system should be abandoned for some other reason.

Specific Findings on Critical Issues

This put the City in an unusual position, to say the least, at trial. *Dallas Together*, the CRC, and a sizable majority of the Council Members had all concluded that the 8–3 system was unfair. Yet, the City attempted to defend the 8–3 system at trial. This may partially explain why the City lost on each critical issue raised by the trial testimony and the law.

### at-large seats

Minorities are denied access to the 3 at-large seats in the 8–3 system. No African–American has ever been elected to one of these at-large seats. Only one Hispanic (Al Gonzalez) has been elected at-large under the 8–3 system but, as discussed above, that was due to very atypical circumstances which will not reoccur.*** 

An effective campaign for a single-member district under the 8–3 system costs approximately $15–30,000, and minority candidates have been able to raise enough money to run successful campaigns in Dis-

tricts 6 and 8. In contrast, *a campaign for an at-large place would cost at least $100,000; would probably range from $150–200,000; and may well require from $200–250,000 for a viable minority candidate to succeed in an at-large race.* Most of the money raised for these at-large races comes from the non-minority areas of Dallas. *There is an obvious reason for this: the substantial economic disparities between white and minority residents of Dallas.*

Because of this, it is simply not possible for black or Hispanic candidates to raise—*from their communities*—the large amounts of money needed for an at-large City Council race. With only small amounts of money available, *a black or Hispanic at-large candidate is not able to purchase radio or television advertising—an essential for any city-wide campaign in Dallas.* Indeed, most cannot even find the $20,000 that would be required for one city-wide mailing of political material. And, the "door-to-door" campaigning that can be effective for single-member districts is not a viable alternative, because it is simply impossible for a candidate to "walk" the entire City of Dallas in an at-large campaign.

Accordingly, the only way that a minority candidate can win an at-large race in Dallas under the 8–3 system is to obtain substantial support from the white community. Yet, it was obvious from the trial testimony that a minority candidate elected with overwhelming white support—even an excellent at-large member, like Al Gonzalez—does not have the confidence of the black or Hispanic communities. Minorities have the right to be able to choose their own candidates; indeed, as Judge Mahon wrote in 1975, "meaningful participation in the political process must not be a function of grace, but rather is a matter of right."

### the supposed "city-wide" view

Therefore, under the 8–3 system, minorities are denied equal access to the three at-large seats. This severe, adverse impact

---

*** That is, there is no more *threat* of a lawsuit against the 8–3 system to engender white support for an at-large minority candidate since this case has been filed and tried.

upon blacks and Hispanics *is not* justified by the argument that at-large seats are necessary so there will be some members with a "city-wide view" on the Dallas City Council. The CRC unanimously rejected this supposed justification when it voted against any system with at-large seats. CRC Chairman Ray Hutchison correctly stated that "parochial views don't come with single-member districts; they come with the individual." During a CRC meeting, former Council Member Lee Simpson put it very directly: *"It is baloney that single-district members do not vote on a city-wide basis."*

Moreover, the testimony established that many of the at-large members of the Council—almost all of whom were from North Dallas—*had not* provided any "city-wide view"; instead, they simply ignored the minority areas of the city and represented the interests of North Dallas that contributed the money for the at-large races. In addition, the "city-wide view" argument totally ignores the fact that Dallas has had a council-manager form of government since 1931—and a City Manager who has the responsibility to provide a "city-wide" view on policy issues being determined by the Council.

### the "two people to call" argument

The City also argues that the at-large seats in the 8–3 system are justified because they give a person with a complaint about City services "two people to call instead of one"—an at-large member in addition to the single-district representative. *This is not an argument to be tossed aside lightly; it should be thrown away with great force.*\*\*\*\*

Dallas citizens do not have only "one person" (their district representative) to call about a complaint. The City Manager and his staff run the day-to-day business of the City. Accordingly, persons with complaints about City services can call the City Manager, the City department involved, "Action Center," someone who represents another single-member district, or even ex-

council members—just as well as an at-large representative. Indeed, credible evidence established that it would be very unlikely for a black or Hispanic in South Dallas or another minority area to ask for assistance from one of the at-large Council Members in North Dallas.

### the mayor's at-large place

The cost of running for mayor—which has almost become prohibitive in recent years—excludes many people (whites, blacks, Hispanics, and other minorities) from a viable campaign for *Place 11* (mayor). Although it is a close question, because of several factors—e.g., the serious split in credible testimony; a sincere concern about accountability of a mayor elected by colleagues on the Council, instead of all of the voters; the role of the mayor as the spokesperson for the City of Dallas; the recognition of the special position of the mayor by this Court in the *Walker III* opinion (public housing desegregation case) —there is justification for the continued election of the mayor at-large.

However, the Court specifically notes that CRC—after considering a myriad of possibilities—determined "that 15 was the maximum operating size" of the Dallas City Council (including the at-large election of the mayor). The City Council agreed, and a 15-person Council was approved in the August 1989 referendum. This means, of course, that there would be more single-member district seats available for minorities under a 14–1 plan—even if the substantial expense of campaigning for mayor should have a disproportionate impact upon African–Americans and Hispanics.

### the § 2 violation

As to the legal and factual elements involved in a vote dilution case, it is not necessary—*and it is probably impossible*—to summarize the statistical (and other) evidence that establishes that white bloc voting in Dallas *usually* defeats the preferred candidate of blacks and Hispanics in

---

\*\*\*\* And with apologies to Dorothy Parker. Frewin, *"The Late Mrs. Dorothy Parker,"* p. 149

(Macmillan 1986).

Dallas City Council elections. Suffice it to say that the African–American plaintiffs and the Hispanic intervenor successfully crossed the three-part *Gingles* threshold; then they progressed through the *Zimmer* factors; and, finally, they established under the "totality of the circumstances" that 8–3 system impermissibly denies African–Americans and Hispanics the equal opportunity to participate in the political process, and to elect candidates of their choice in the City of Dallas, in violation of § 2 of the Voting Rights Act.

Observations About The 10–4–1 Plan

This Court is precluded from ruling on the validity of the 10–4–1 plan until it has received "preclearance" under § 5 of the Voting Rights Act. However, the evidence presented at trial does permit this Court to make a few preliminary observations concerning the 10–4–1 plan.

It seems obvious that a minority candidate will not be able to raise the money needed for an effective quadrant campaign *from the black and Hispanic communities.* This means that a black or Mexican–American quadrant candidate would not be able to purchase radio, television, or newspaper ads; could only do limited political mailings; and would not be able to run a "door-to-door" campaign in a quadrant—which will necessarily have over 250,000 people (a greater population than all but the seven largest cities in Texas).

Any such adverse impact upon blacks and Hispanics (i.e., denial of access to at least 3 of the 4 quadrant seats) *would not* be justified by the claim that some members with a quadrant or "quasi-city wide view" are needed on the Council—or that people need "2 representatives instead of 1" to call about City services—any more than these same tenuous arguments justified denying African–Americans and Hispanics access to the three at-large seats in the 8–3 system.

Without question, there are people and organizations who support the 10–4–1 plan in good faith, and for non-discriminatory, well-intentioned reasons. But it is also without question that most African–American and Hispanic individuals and major organizations vehemently oppose the 10–4–1 plan—and feel, also in good faith and not without reason, that the adoption of 10–4–1 reflected "a callous disregard" of their views on the critical issue of what would remedy the past discriminations of the 8–3 system. This schism is, of course, what prevented the bringing of *"Dallas together"*—and what lead to the most racially divisive election in the history of Dallas, the 10–4–1 referendum in August 1989.

The Delay & The Remedy

Because the City Council rejected the contrary recommendation of the CRC, there will be no Council elections in May 1991 under the 10–4–1 plan. Instead, these elections have been delayed *until November 1991* "to allow 1990 census data to be used in redistricting" *or until January 1992* "if the new districts do not get approval from the United States Department of Justice by August 1, 1991." The City asks this Court to delay and "to just give the 10–4–1 a chance" since it will just be a delay of some 6–9 months.

The City's estimate of the length of the delay of the May 1991 elections *is not* correct. In fact, the delay may be—*and probably will be*—for an unknown, but much longer period of time. The City's request for preclearance of the 10–4–1 plan, which will be bitterly contested by African–American and Hispanic representatives, could take as long as 16 months. In addition, once the preclearance issue has been resolved, the parties will no doubt return to this Court for a determination of the validity of the 10–4–1 plan. There would be another trial and additional delay —and, although the period is uncertain, *it is easy to see that the May 1991 elections could very well be delayed for two years or longer (until sometime in 1993).*

In the meantime, during this 1½–2 year delay, the 8–3 system (which has been condemned as "unfair" by the CRC and the City Council, and which has been found by this Court to be in violation of § 2 of the Voting Rights Act) would continue—despite the fact that blacks and Hispanics in Dallas have been waiting for some 15 years for the voting rights to which they are so clearly entitled, but which have been denied them by the 8–3 system.

*In no way will this Court tell African–Americans and Hispanics that they must wait any longer for their voting rights in the City of Dallas.* Therefore, an interim City Council election must be held as *soon as possible* in order to remedy the adverse effects of the 8–3 system—the denial of equal access to the City's political process—which African and Mexican–Americans have suffered in Dallas since 1975, when the 8–3 system first began.

## III. FINDINGS OF FACT

This voting rights case was filed on May 18, 1988 by the two African–American plaintiffs against the City of Dallas. On August 25, 1988, the Mexican–American intervenor joined as a party plaintiff. The case was tried from Sept. 5, 1989 through Sept. 14, 1989. Each party presented expert witnesses and statistical evidence, testimony from other witnesses and by depositions, *volumes of exhibits*, and the usual § 2 material showing findings established in similar or related cases. *Terrazas v. Clements*, 581 F.Supp. at 1349.

Most of the evidence was undisputed. However, some of the testimony—particularly that concerning several critical issues—was conflicting. In judging credibility and the weight to be given to this conflicting evidence, this Court considered all of the circumstances surrounding the testimony, such as: What was the demeanor of the witness on the stand? Did the witness have any particular reason to be less than candid? Did the witness have a good memory, understand the questions, and answer them directly? Was the testimony inconsistent with something the witness had said or done earlier? Was the witness' testimony supported, or contradicted, by other credible evidence?

Based upon these factors, as well as all other factors surrounding their testimony, this Court:

(i) specifically credits the testimony of Council Member Al Lipscomb, State Senator Eddie Bernice Johnson, State Representative Fred Blair, Marvin Robinson, Dr. Yvonne Ewell, Commissioner John Wiley Price, Council Member Diane Ragsdale, Adelfa Callejo, Diana Orozco, Domingo Garcia, Roy Williams, Marvin Crenshaw, Council Member Lori Palmer and Pettis Norman (except for any testimony by these witnesses which is inconsistent with this opinion);

(ii) credits that testimony given by Mayor Annette Strauss, and Council Members Jim Buerger, Harriet Miers, Charles Tandy, Max Wells, John Evans, Glenn Box and Jerry Bartos, and CRC Chairman Ray Hutchison, which is consistent with this opinion;

(iii) credits the testimony of Dr. Charles Cotrell, the plaintiffs' expert, and of Dr. Robert Brischetto, the intervenor's expert—but discounts the testimony of the City's expert, Prof. Delbert Taebel, because it was not credible; and

(iv) credits the testimony of all other witnesses who appeared at trial or by deposition only to the extent that their testimony does not conflict with the findings of fact in this opinion.

Finally, some of the findings of fact in this opinion are included to show the local atmosphere and context of particular City Council elections.[7] This is because the required § 2 determination—the *"searching practical evaluation of the past and present reality [based] ... on a functional view of the political process"* (*Gingles*, 478 U.S. at 45, 106 S.Ct. at 2763; *Westwego*, 872 F.2d at 1204)—is not satisfied merely by examining evidence about specific elections or "regression models and numbers" in isolation. Instead, as the plaintiffs' expert (Dr. Charles Cotrell) testified, elections "take place in a fabric of politics" that must be viewed with common sense in the local "atmosphere and environment within which the dynamics of politics take place." TR. II (158–59).[8] In addition,

---

7. Some examples are Findings of Fact 17, 21–23, 25, 27, 40–43, 94, 205, 270–71, and 406–07. However, *this Court emphasizes that the same decisions would be reached in this case even if these findings were deleted from this opinion.*

8. In making these Findings of Fact, this Court has considered all of "the *substantial* contrary evidence" in the record. *Velaquez v. City of Abilene*, 725 F.2d 1017, 1020 (5th Cir.1984). Although some of this "contrary evidence" may not be addressed at length in this opinion, there

these "local atmosphere and context" findings are directly related to matters that must be considered under the *Gingles* threshold and the *Zimmer* factors.

A. *General*

### the plaintiffs

1. Plaintiffs Roy Williams and Marvin Crenshaw are residents of the City of Dallas. They are of African–American descent and race. Both are registered voters. Each has run for election—*unsuccessfully*—to one of the three "at-large" places on the Dallas City Council. Each has a long history of civic and political involvement.

2. Williams, who resides in Council District 3, ran for Place 9 (at-large) in 1987 and 1989. Crenshaw, who resides in Council District 8, ran for Place 9 (at-large) in 1983, for District 8 in 1984 (in a special election), and for Place 11 (mayor) in 1987 and 1989. Williams and Crenshaw were defeated in these elections.[9]

### the intervenor

3. The plaintiff-intervenor Ledbetter Neighborhood Association ("LNA") is an organization composed largely of Mexican-American residents of Dallas. The Ledbetter area is in "far West Dallas" in Council District 1; it is approximately 85% Mexican–American, and is the largest Hispanic neighborhood in Dallas.[10]

4. Henry Martinez and Domingo Garcia are Mexican–American residents and registered voters of the City of Dallas. Martinez is the president of LNA, and Garcia is a member.

### the defendant & past cases

5. The defendant in this voting rights case is the City of Dallas. This is not, of course, the first time that federal courts have considered charges that Dallas' system for electing members of its City Council is unconstitutional or that it violates the Voting Rights Act. See *Lipscomb v. Jonsson,* 549 F.2d 335 (5th Cir. April 27, 1972); *Lipscomb v. Wise,* 399 F.Supp. 782 (N.D. Tex. March 25, 1975) (Judge Mahon); *Lipscomb v. Wise,* 551 F.2d 1043 (5th Cir. May 9 and July 13, 1977); *Wise v. Lipscomb,* 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (June 22, 1978); *Lipscomb v. Wise,* 583 F.2d 212 (5th Cir.1978); *Heggins v. City of Dallas,* 469 F.Supp. 739 (N.D.Tex. Feb. 20 and 22, 1979) (three-judge court); and *City of Dallas v. United States,* 482 F.Supp. 183 (D.D.C. Dec. 7, 1979 and Feb. 25, 1980) (three-judge court).

### census data

6. According to the 1970 census, the City of Dallas had 844,401 citizens; 65% were white; 25% were black; and 10% were Mexican–American. 551 F.2d at 1045 (5th Cir.1977); 399 F.Supp. at 784–85 (Judge Mahon 1975).[11] In 1975, 93% of all African–Americans in the City of Dallas resided within the "inner-city area" (or "ghetto") described by Judge Mahon in *Lipscomb v. Wise,* 399 F.Supp. at 785. However, the Mexican-Americans were "diffused and spread out through all areas of the City." 399 F.Supp. at 792–93.

7. According to the 1980 census, the City of Dallas had a total of 904,078 residents; 61.42% were white (555,270), 29.38% were African–American (265,594), and 12.29% were Mexican–American (111,083). The City's "18–years and over" voting-age population was 67.04% white, 25.34% African–American, and 10.10% Mexican–American.

---

are citations to this evidence—and it has been specifically rejected because it is not credible and because it is inconsistent with the findings of fact and credibility determinations made in this opinion. *Westwego,* 872 F.2d at 1203–04; *Overton,* 871 F.2d at 533.

9. TR. V (96–98, 101, 130–37).

10. TR. VI (5–6, 30–31); Def.Exh. 30 (Martinez Dep., pp. 9–11); Def.Exh. 31 (Ortiz Dep., pp. 10, 17); and see the description of the "Ledbetter area" in *Terrazas v. Clements,* 581 F.Supp. at 1335–36.

11. Actually, Judge Mahon first found that "Mexican–American citizens ... represent *approximately 8%* of the population of the City of Dallas" under the 1970 census (399 F.Supp. at 784–85); then he later stated that the Mexican–American population "represents *some 8–10%* of the total (399 F.Supp. at 792); but the figure of *10%* was used by the Fifth Circuit (551 F.2d at 1045).

8. In 1986, according to the Census population estimate for that year, Dallas had a total of 1,003,511 residents; 47% were white (471,650), 30% were African–American (301,053), 18% were Mexican–American (180,632), and 5% were Native & Asian–American (50,176). Theoretically, the 1986 combined black and Hispanic population would form almost 4 of the 8 single-member districts under the 8–3 systems and almost 7 districts under a 14–1 plan; naturally, this calculation "takes no account of the geographic distribution of the minority population" in the City. *Terrazas,* 581 F.Supp. at 1334.[12]

B. *History of the 8–3 System (1856–1980)*

9. The City of Dallas was chartered in 1856. From at least 1876 until 1907, Dallas was governed by a City Council with a mayor elected at-large and with "aldermans" who were either elected at-large or from single-member districts.[13]

*1907: the commission form of government*

10. In 1907, the Dallas City Charter replaced the "alderman-single member ward" system with a "commission" form of government. Under it, the mayor and four commissioners were elected at-large for terms of two years.

11. This charter contained a section entitled "*Segregation of the Races*"—which authorized the City Council to pass ordinances "to provide for the use of separate blocks for residence, places of abode, places of public amusement, churches,

schools, and places of assembly by members of the white and colored races." 399 F.Supp. at 787 (Judge Mahon 1975).

12. *Under the commission system established by the 1907 Charter—which lasted for some 24 years—no "blacks [were] elected to the Dallas City government."* 399 F.Supp. at 787 (Judge Mahon 1975). The same was true with respect to other minorities, including Mexican–Americans.

*1931: the council-manager form of government and the "6–3 at-large system"*

13. In 1931, Dallas adopted a home rule charter which established a "council-manager" form of government. Under it, "City government is administered by a City Manager," who is the "chief administrative and executive officer of the City." The mayor "merely presides over council meetings and represents the City. He has no legislative powers *qua* mayor. He has no veto powers." 551 F.2d at 1048, fn. 2 (5th Cir.1977).[14]

14. Under this 1931 Charter, there were 9 members of the City Council; all of these were elected for two-year terms on at-large, city-wide basis—but the "candidates for Districts 1, 2, 3, 4, 5 and 6 [were] required to be bona fide residents of the corresponding six districts of the City." The 9 at-large members of the Council elected the mayor.

15. Under this "6–3 at-large system," City Council election ballots contained nine

**12.** Pls.Exh. 31, p. 4; Pls.Exh. 32. This Court emphasizes at the outset that any calculations like this one—and any references in this opinion to the percentage of council seats that blacks or Hispanics might have under certain plans and numbers—are used only as analytical tools, and *are not being used with any intent to require "proportionate representation" for blacks or Hispanics in violation of the explicit mandate of § 2 of the Voting Rights Act.*

**13.** *The 1856 Charter* provided for "the annual election of a mayor and six ward aldermen." *The 1876 Charter* provided for the election of "two aldermen from each ward" and the at-large election of the mayor. Under *the 1889 Charter,* the mayor was elected at-large and two alderman were elected "from each of the 12 wards." *The 1897 Charter* provided for the election of

one alderman from each ward and the at-large election of the mayor. Under *the 1899 Charter,* the mayor was elected at-large and one alderman was elected from each ward and one alderman was elected from each "aldermanic district" (with a maximum of 10 wards and 5 aldermanic districts). Pls.Exh. 37A, pp. 36–38.

**14.** The change of Dallas' form of government in 1931 "grew out of a reform movement ... aimed at correcting abuses of the old commission form of government" 399 F.Supp. at 786, fn. 4 (Judge Mahon 1975). The City's "poor efficiency ratings and fiscal situation" led to the "formation of the Citizens Charter Association" —which was "dedicated to establishing council-manager government," and which "achieved success when the change in government was made in 1931." Pls.Exh. 37A, pp. 36–38.

numbered "places," one for each council seat, and all qualified voters in the City could cast one vote for each place. To be elected, a candidate had to receive a majority of the votes cast for his place.

16. This 1931 Charter also contained the "*Segregation of the Races*" section, under which the City Council could provide for segregation of the "negro race" with respect to housing, churches, schools, parks, etc. And, in 1937, the all-white City Council passed an ordinance requiring "separate spaces in commercial motor vehicles for white and black passengers." 399 F.Supp. at 787 (Judge Mahon 1975).

17. In 1938, a survey by the Dallas City Manager specified the areas of the City that were reserved for whites, for "Negroes," and for "Mexicans." This 1938 survey recommended "one of the Negro slum areas" for the first low-income public housing project in Dallas (a "Negro housing project"). And, it made this recommendation concerning a low-income "Mexican housing project":

> "Due to the zoning classification, the high value placed on the property and its future use as industrial property, this [*the 'Little Mexico' area] is not a desirable location to house the Mexican slum dwellers.* The Mexican project should be removed from this immediate area but should be located as near as possible to the district in which they now reside." [15]

18. *Under the 6–3 at-large, city-wide system established by the 1931 Charter—which continued for some 37 years—no "blacks [were] elected to the Dallas City government."* 399 F.Supp. at 787 (Judge Mahon 1975). The same was true with respect to other minorities, including Mexican–Americans.

### 1949: direct election of mayor

19. From 1931 to 1949, the mayor was elected by vote of the 9 at-large members of the City Council. Then, in 1949, the Charter was amended to provide for direct election of the mayor by the voters—just as Dallas had done in the first 75 years of its history (1856–1931). In 1951, the first mayor was elected under this 1949 amendment. [16]

20. This Charter amendment in 1949 *did not* delete the "*Segregation of the Races*" section from the Dallas City Charter. In 1942, the all-white City Council adopted a resolution listing "the requirements which a taxi cab owner must have met before the cab would be permitted to carry Negro passengers." And, in 1961, the all-white Council "agreed to contract for the engaging of ambulance service and burial of Negro paupers." 399 F.Supp. at 787 (Judge Mahon 1975). [17]

### 1950: joint report on Negro housing

21. In 1950, the "Report of Joint Committee on Negro Housing"—prepared by the Dallas Chamber of Commerce, the Dallas Citizens Council, and the Dallas Inter–Racial Committee—found that "the shortage of housing for Negroes in Dallas is acute and critical"; that "serious tension has resulted, not only among the colored people, but also among a considerable portion of our white population"; that some of the "present Negro residential districts are 'hemmed in' and cannot possibly be expanded" without the consequent "displacement of white residents"; that this "makes for forced sales and losses, disturbed and dis-

---

**15.** See the *Walker III* opinion (*Walker v. HUD*), 734 F.Supp. 1289 (N.D.Tex.1989) (Memorandum Opinion, pp. 1293–1294). This 1938 "General Survey of Housing Conditions" was admitted into evidence in *Walker III* without any objection from the City of Dallas—and, indeed, "none of the material facts shown by the exhibits and testimony at the Dec. 12, 1988 Hearing were disputed" (Memorandum Opinion, p. 1291 at fn. 8).

**16.** Pls.Exh. 37A, pp. 35–49.

**17.** Judge Mahon emphasized that "*there are other similar [racial] ordinances included by stipulation,*" but these—i.e., Findings of Fact 11, 16, 20—"will suffice for example. There was additional testimony from several witnesses concerning this history and the negative impact it made on the black community generally and specifically on the political life of that community." 399 F.Supp. at 787 (Judge Mahon 1975). See *City of Dallas v. Liberty Annex Corp.,* 19 S.W.2d 845 (Tex.Civ.App.–Dallas 1929); *Housing Authority of the City of Dallas v. Higginbotham,* 143 S.W.2d 95 (Tex.Civ.App.–Dallas 1940).

tressed communities, unrest, tension and trouble"; and that "portions of South Dallas particularly have been subjected to this kind of disturbance." [18]

22. This Joint Report, in expressing "sincere approval" of recently-announced plans for a West Dallas housing project that would solve the "Negro Housing Problem," stated that:

> "(a) The Negro housing sections, if carefully zoned and properly restricted by the City or county, will attract Negro families of good character, people who, under proper environment, will make citizens of whom our community can be proud.
>
> "(b) We remind the people of Dallas that if we do not provide home sites for Negroes who want to, and can afford to, buy or rent suitable and decent homes, the alternative is terrible overcrowding, dissatisfaction, disease, tension resulting from Negroes buying into white neighborhoods, and many other serious consequences....
>
> "...
>
> "*The Committees feel that the only satisfactory and permanent solution to this problem can be realized where there is racial segregation.* It is the opinion of the Committees that this basic factor is recognized by the Negro leadership of our community, *so long as segregation in the sense that it is applied here does not mean discrimination.*"

The 1950 Joint Report also stated "that Dallas is fortunate in having a very high type of Negro leadership, the leaders being men of intelligence, vision, and a fine sense of civic responsibility." [19]

23. Accordingly, the mayor of Dallas—in a letter dated Sept. 25, 1950—requested the Dallas Housing Authority ("DHA") to annex the "West Dallas slums" for the construction of the largest low-rise public housing complex in the nation: the 3500 unit West Dallas Project. The City Council authorized the mayor to send this request.[20]

### *1959–1965: defeat of black candidates because of white bloc voting in "city-wide, at-large" elections*

24. In 1959, less than 10 years after this Joint Report on Negro Housing, a black candidate ran for election to City Council District 3. His opponent was white. The black candidate "polled some 87% of the votes from the above-described inner city [in which 93% of all blacks in Dallas reside]. His white opponent polled some 73% of the vote from the non-minority area. The result, when translated into vote totals, gave the white candidate a 65% total of all votes cast and made him the election winner." 399 F.Supp. at 785–86 (Judge Mahon 1975).

25. Some context is given to this 1959 election by the 1960 decision of a Dallas federal judge in *Borders v. Rippey*, 184 F.Supp. 402 (N.D.Tex.1960). In this school desegregation case, the judge—five years after *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)—considered only those plans for the integration of Dallas public schools "that will call for the least worry and confusion." This extraordinary opinion underscores Judge Mahon's finding that white bloc voting defeated the black candidate in the District 3 race in 1959:

> "We have those among the whites of our City of Dallas who favor integration and are fairly enthusiastic in favor of it. That number is not so great, but they are here. We have some of our Negroes who are being used and are in good faith no doubt plaintiffs in this litigation. We

---

**18.** See the *Walker III* opinion (*Walker v. HUD*), 734 F.Supp. at 1294–96. This "Joint Report" was admitted into evidence in *Walker III* without any objection from the City of Dallas—and, indeed, "none of the material facts shown by the exhibits and testimony at the Dec. 12, 1988 Hearing were disputed" (Memorandum Opinion, p. 1291 at fn. 8).

**19.** This 1950 Joint Report on Negro Housing also noted that "Negro School students" could "by special arrangements" use the Dallas Public Library—and *it recommended that "a study be made relative to adult Negroes being given access to the Dallas Public Library for the securing of books they desire."*

**20.** See the *Walker III* opinion (*Walker v. HUD*), 734 F.Supp. at 1296 at fns. 21, 22.

don't think they represent a majority of the Negro population. But let's give integration in Dallas a chance that it is not having elsewhere.

"Some educator has advanced the following plan which has an appeal: That the *school authorities set aside schools within the city limits in which all those of either race who desire integration may be enrolled by placement arrangement and transportation given them to that school* and that other like schools for different grades be set aside maybe elsewhere in the city.... If the plan proved popular, then additional integrated schools would through the years follow, not more than 12 years.

"... This plan [of desegregation by choice] would ... give a test of the success or failure of integration. There is at present a good feeling among the two races in Dallas, somewhat impaired by the recent agitation over the nation, but we have not so far had any open eruption and good will is perhaps here to a better degree than at many other places." (184 F.Supp. at 417).[21]

See *Tasby v. Wright,* 520 F.Supp. 683, at 687 and fn. 1 (N.D.Tex.1981), for the history of the *Borders* case and other early Dallas school desegregation suits.

26. In 1961, a black candidate ran against two white opponents in Council District 3. "Here, the black candidate played the role of spoiler, forcing a run-off between his two white opponents. In the first election the black candidate garnered 81% of the black area's votes. In the white areas he gathered a scant 15%. The relative percentages left him as low man in the three-way race and eliminated him from the run-off." 399 F.Supp. at 786.

27. Some context is given to this 1961 election by a referendum called in 1962 in opposition to the construction of an additional 3,000 units of low-income public housing in Dallas. The City Council endorsed this referendum, and opposed any new public housing for Dallas, despite the fact that housing was critically needed for the poor in this City. In the resulting campaign, there were objections because the 3,000 units *were not* going to be placed in West Dallas—and numerous ads raised the specter that this housing would be integrated and placed in "white neighborhoods." This anti-public housing referendum passed.[22]

28. In 1963, a black candidate (George Allen) ran for City Council against a white opponent. Although "he carried overwhelmingly all the black votes," he got "almost no white votes"—so the white candidate won.[23]

29. In 1965, a black candidate ran against a white opponent in Council District 8. "This was a two-way race, black versus white. The black candidate carried the black area with 86% of the vote; the white candidate carried the white area with 75% of the vote. The total vote percentage gave the white candidate 62% making him the winner of the election." 399 F.Supp. at 786.[24]

21. These are other excerpts from this extraordinary 1960 opinion: "Why so urgent and imperative is speedy action? What has integration itself accomplished in the lands where it has existed for centuries? ... *Integration has not helped either race. It has retarded the development of every land where it has occurred.*" (184 F.Supp. at 403) ... "Since most of the whites in the South desire to maintain their racial integrity, they would for that reason alone oppose integration in the schools." (184 F.Supp. at 415) ... "The Anglo–Saxon race anywhere it is found, like the Jewish race, favors racial integrity. And this is true of many of the Negro race" (184 F.Supp. at 416).... "The white Southerner is proud of the fact that he has many Negro citizens among his neighbors who also have racial pride and do not look forward with any special desire to amalgamation of the two races." (184 F.Supp. at 416) ... *"This plan of starting with the lower grade [in all Dallas schools] and in 12 years completing the integration is in all probability the most direct and surest route to amalgamation which in the long run is the most objectionable of all features of integration."* (184 F.Supp. at 415).

22. See the *Walker III* opinion (*Walker v. HUD*), 734 F.Supp. at 1297. *This 1961 referendum <u>did not</u> delete the "Segregation of the Races" section from the Dallas City Charter.* See Finding of Fact 36.

23. Cts.Exh. A–2 (*George Allen* testimony from 1975 *Lipscomb* trial, p. 46).

24. George Allen testified that he ran for City Council in 1965, carrying the "black votes" over-

30. The result of the city-wide, at-large voting for Dallas City Council—in the four elections from 1959–1965 discussed by Judge Mahon and George Allen (see fns. 23, 24)—"was that, *even though candidates carried black districts by huge majorities, they were regularly defeated by opponents who carried the majority white vote city-wide.*" 551 F.2d at 1045 (5th Cir.1977). See also 399 F.Supp. at 790 (Judge Mahon 1975).

### 1967: the CCA and the "political bargain" concerning the 8–3 at-large system

31. By 1967, the minority population of Dallas was approaching 25% black and 10% Mexican–American. (Finding of Fact 6). Still, *there had not been a single African–American (or any other minority) elected to the City Council under the various "at-large" systems which had continued for over 60 years.* (Findings of Fact 12, 18).

32. This was due, in large part, to the Citizens Charter Association ("CCA")—which had dominated City elections since the 1930's, as a "non-partisan slating group." 399 F.Supp. at 786 (Judge Mahon 1977). As found by Judge Mahon:

"[The] CCA has enjoyed considerable success with its candidates. Testimony shows that in the eight elections held since 1959, CCA endorsed candidates have won in 82% of the races involved. This history shows that of seventy-five CCA endorsed candidates, sixty-four triumphed at the polls. This is an 85% success rate." (399 F.Supp. at 787).[25]

33. *From its beginning "in the 1930's" through 1967, the CCA had never endorsed a minority candidate for city council.* Then, during the 1967 elections, there was a campaign bargain "to the effect that the black support for CCA endorsed candidates would be linked to support for a Charter Amendment increasing the size of the City Council from 9 to 11 and that one of the two new seats would go to a black person." 399 F.Supp. at 787 (Judge Mahon 1975).

34. As Judge Mahon found, "this bargain was apparently kept by all parties. The Charter Amendment was passed, the size of the City Council was increased," and the CCA supported a black candidate (George Allen) and a Mexican–American candidate (Anita Martinez) in the 1969 Council elections. 399 F.Supp at 787.

### 1968–1970: the 8–3 at-large system

35. In 1968, the Dallas City Charter was amended by referendum to create the 8–3 at-large system. The City was "divided into eight residential districts"; eight seats on the Council ballot were reserved for candidates who resided in each of the respective districts [Districts 1–8]; three additional Council members, including the mayor, ran without regard to the residence requirement [Places 9, 10, 11]; but voting for all 11 seats was on an "at-large, city-wide basis." 551 F.2d at 1045 (5th Cir. 1977). A "majority of all votes cast for the councilmen, for the place for which the person [was] running, [was] required for election" under the 8–3 at-large, city-wide system. 399 F.Supp. at 785 (Judge Mahon 1975).

36. *By this 1968 referendum, the "Segregation of the Races" section was finally deleted from the Dallas City Charter.*[26] (Findings of Fact 11, 16, 20, and 27 at fn. 16).

37. *In 1969, George Allen became the first African–American to be elected to the Dallas City Council.* However, this was only because of the CCA support; with the CCA endorsement, there was no white opponent—and Allen was elected, over another black candidate, with 71% of the total

---

whelmingly, but getting "almost no white votes." Cts.Exh. A–2, p. 46. This is probably the 1965 election discussed in Judge Mahon's opinion. 399 F.Supp. at 786.

**25.** Judge Mahon also found that: "Uncontradicted testimony shows that CCA is an election year phenomenon and is only concerned with Dallas Council elections.... Historically, CCA grew out of a reform movement in the 1930's which was aimed at correcting abuses of the old commission form of government by infusing citizen participation into governmental affairs." 399 F.Supp. at 786. See Pls.Exh. 37A, pp. 35–49.

**26.** See the *Walker III* opinion (*Walker v. HUD*), 734 F.Supp. at 1294 at fn. 18.

vote. 399 F.Supp. at 787 (Judge Mahon 1975). *Also in 1969, Anita Martinez became the first Mexican–American to be elected to the City Council;* however, this was only with the support of the CCA— which resulted in Martinez's defeat of another Hispanic candidate.[27]

38. However, another Council race in 1969 indicated that there was no change in the pattern of racial bloc voting in elections involving black candidates who ran without CCA support. The Place 10 race "was three-way involving one black against two whites. The black carried the black area with 42%. The two whites together pulled about 83% of the white area's vote. No run-off was necessary however because here one of the whites received 59% of the total votes within the City." 399 F.Supp. at 787.

39. *The 1970 census showed that Dallas was now one-third minority—25%* black and 10% Hispanic. (Finding of Fact 6). Therefore, as soon as George Allen became a member of the City Council, he "tried to get the Council to agree to put on a Charter amendment ballot a single-member district plan, and the 8–3 plan was the one [he] suggested." Allen was not successful in this attempt.[28]

*1970: the city's refusal to stop the loss of $31 million for public housing* [29]

40. In 1970, HUD advised DHA that it would provide no more federal funding because DHA's "tenant assignment plan" had, in effect, segregated low-income public housing in Dallas by assigning whites to all-white projects and assigning blacks to all-black projects. HUD specifically asked the City of Dallas for its assistance in forcing DHA to stop this blatant discrimination.

41. However, the City—which was not threatened with any loss of its own federal funds—refused to do anything (even though it forced DHA to change its tenant assignment plan in 1968 when both it and DHA had been threatened with loss of federal funds).

42. Because of this conduct—by both *DHA and the City*—DHA forfeited in excess of $31 million, from 1969 through 1974, because of the refusal to do anything to stop racial segregation in public housing in Dallas. As the City recognized later, in its Report of the Task Force on Public Housing (Jan. 1983), this had a devastating effect upon the condition of low-income public housing in Dallas:

"Until 1969 the Dallas Housing Authority maintained its properties in a reasonable manner and kept its financial reserves high. During this period DHA accepted no federal money for modernization and much equipment and structural components (roofs, doors, windows, etc.) were near the end of their economic life and would soon need replacement. From 1969 to 1974, DHA did not participate in federal modernization programs. Faced with declining real income, *DHA management attempted to preserve financial soundness at the expense of physical maintenance. The physical condition of DHA properties deteriorated rapidly and most projects have never been returned to the condition they were in before ...*"

43. In 1974, the first minorities—Adelfa Callejo (Hispanic), Don Johnson (African-American)—were appointed to the DHA Board of Directors. After their appointment, changes were made in DHA's tenant assignment plan, and HUD resumed DHA's federal funding.[30]

---

27. Credible testimony at trial established that the CCA recruited Anita Martinez to run against "a militant [Hispanic] attorney," Frank Hernandez, who had "the unmitigated gall to announce he was going to run for City Council." TR. VI (122–23) (Callejo); Cts.Exh. A–3 (*Pedro Aquirre* testimony from 1975 *Lipscomb* trial, pp. 74, 86); Cts.Exh. A–2 (*George Allen* testimony from 1975 *Lipscomb* trial, pp. 46–47).

28. Cts.Exh. A–2 (*George Allen* testimony from 1975 *Lipscomb* trial, p. 9).

29. Findings of Fact 40–42 are based upon exhibits which were introduced into evidence in *Walker III*—without objection from the City— because the facts shown by these exhibits were undisputed. See the *Walker III* opinion (*Walker v. HUD*), 734 F.Supp. at 1296–1299.

30. TR. VI (107, 127) (Callejo).

*1971: Lipscomb v. Jonsson—the filing & speedy dismissal*

44. On March 10, 1971, a suit styled *Lipscomb v. Jonsson* (CA 3–4571) was filed in federal court by African–American residents of Dallas—including *present City Council Member Al Lipscomb*—who claimed "that the at-large system of electing Council Members unconstitutionally diluted the vote of racial minorities." 437 U.S. at 538, 98 S.Ct. at 2496 (1978).

45. The plaintiffs in *Lipscomb* sought to enjoin the City Council elections scheduled for April 6, 1971. The district court denied a temporary restraining order on March 11, 1971; then, after a hearing on March 27, 1971, the court "denied the preliminary injunction and, on its own motion, dismissed the plaintiffs' entire cause of action, presumably for failure to state a claim upon which relief could be granted." 459 F.2d at 337 (5th Cir.1977). The Fifth Circuit refused to enjoin "the holding of the April 6 [Dallas City Council] elections," but "without prejudice to the merits of the appeal." 459 F.2d at 337 (5th Cir.1972).

46. In these 1971 Council elections, the CCA again endorsed George Allen (black) and Anita Martinez (Mexican–American), and they were re-elected. However, just as in 1969 (Finding of Fact 38), the Place 10 at-large race demonstrated that the "voting pattern" had not changed. "Here, two black candidates ran against a single white candidate. Together the black candidates received 60% of the black area vote. The white candidate received 68% of the vote from the white area, which was 63% of the city-wide total. This, of course, made him the winner without the necessity of a run-off. *The Court feels that it is this voting pattern which is the key factor to understanding the dilution present in Dallas.*" 399 F.Supp. at 786 (Judge Mahon 1975).

*1972: Lipscomb—the reversal; elections & racial appeals*

47. On April 27, 1972, the Fifth Circuit reversed the district court's dismissal of the *Lipscomb* suit—and remanded the case for trial. *Lipscomb v. Jonsson*, 459 F.2d 335 (5th Cir.1972). In doing so, the Fifth Circuit stated: "We rest our holding on the possibility that the plaintiffs might succeed in proving that the Dallas City Council [at-large] election plan is a purposeful attempt by the white majority or the Dallas City fathers to fence ghetto area residents out of the City Council." 459 F.2d at 338.[31]

48. In addition, the Fifth Circuit specifically noted that the plaintiffs may be able to prove "that the interests of the Ghetto Area are substantially ignored in determining a slate of endorsees"—and that "*it may also be that ghetto candidates ... are effectively fenced out of the City Council election process by the high cost of city-wide campaigning.*" 459 F.2d at 339 (emphasis added).

49. However, the Fifth Circuit ended its April 1972 opinion with a statement which, in effect, told minorities that they would probably have to wait for years before there would be any change in the city-wide, at-large system of electing members of the Dallas City Council:

"... Finally, we need not consider the complex remedial problems conceivably arising from an ultimate determination in the plaintiffs' favor. There will be time enough to resolve such problems should they ever actually arise." (459 F.2d at 339).

50. In 1972, George Allen—the sole black member of the City Council—presented the Council with an 8–3 plan for electing Council members. Under it, there would be three at-large seats and 8 single-member districts; three of these districts had in excess of 60% black population (and one of these had in excess of 65% black population). *This plan was not accepted by the*

---

**31.** The Fifth Circuit noted that: "In the recent *Texas Legislative Apportionment Cases,* a three-judge district court of Texas federal judges has recalled the 'innumerable instances covering virtually the entire gamut of human relationships, in which the State [of Texas] has adopted and maintained an official policy of racial discrimination against the Negro.' *Graves v. Barnes* and consolidated cases, 343 F.Supp. 704 (W.D.Tex.1972), *affirmed in part sub nom., White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973)." 459 F.2d at 338.

*City Council.*[32] Also in 1972, Paul Ragsdale—a black State Representative from Dallas—presented a 10-1 plan to the Council, which had 4 districts with combined minority population of from 66–77% (and black population of from 57.5–62.5%). This plan, too, "fell on deaf ears." [33]

51. During this period, elections in the Dallas area were marked by overt racial appeals.[34] For example, in 1972, Rose Renfroe, then a candidate for state representative—*and subsequently a member of the Dallas City Council* (Finding of Fact 93)—stated in the League of Women Voter's "Voters Guide" that:

"Evidence of my proven ability is the fact that a white male has not filed against me in this race. My opposition consists of 5 black males." [35]

52. Similarly, in the Precinct 7 Constable's race, the incumbent used ads describing his African–American opponent in this manner:

"*A black man*
(no qualifications of any kind)
" . . .
"*A Black Revolutionary*
(War on Poverty Board in South Dallas)." [36]

53. The City does not dispute the fact that there were racial appeals in elections in the Dallas area from 1970–1972. In response, it claims that these were not campaigns for City Council—and that "there is no evidence in the record of racial appeals in City Council elections for at least 14 years." [37] This is not true; in addition, it is

proper for this Court to consider racial appeals in other elections in the Dallas area besides races for City Council in order to conduct the "searching and practical evaluation of past and present reality" required in a § 2 vote dilution case. *Westwego*, 872 F.2d at 1203, 1209 (fns. 10–11).

### *1973–74: Lipscomb—waiting for trial; elections & racial problems*

54. After the remand—while the plaintiffs waited for trial—elections continued under the "at-large, city-wide" system for electing members of the Dallas City Council. (Findings of Fact 35, 45.)

55. Before the 1973 elections, the CCA made a "concerted effort to broaden its base," and a committee "was appointed to seek out qualified candidates that would represent the population of Dallas." [38] It was necessary for the CCA to select a Hispanic candidate because "it would be pretty difficult to see the idea of a broad-base CCA without a Mexican–American." The committee chose Pedro Aquirre and he was elected to Place 9 (at-large). Like Anita Martinez, Pedro Aquirre lived in North Dallas.[39]

56. In the 1973 elections, the CCA also supported George Allen for an "unprecedented" third term and he was elected. In addition, another African–American—Lucy Patterson—received the endorsement and support of the CCA. She ran "in an all-black contest for [Council District 8] in

**32.** Pls.Exh. 13; Court's Exh. A–2 (*George Allen* testimony from 1975 *Lipscomb* trial, pp. 8–10, 14–19); Pls.Exh. 13 (George Allen Dep. from *Lipscomb* case, pp. 46–47).

**33.** Pls.Exh. 19; Pls.Exh. 18 (Exh. G).

**34.** During the run-off election for two State Representative districts in June of 1970, the "Democratic Committee for Responsible Government" attacked a white candidate (Bill Stehr) because he was "running in South Dallas ... as a team" with a black candidate (Berland Brashear)—and because he had raised money "for voter registration activities, mostly in predominately Black or Latin–American neighborhoods." This material also warned of the "Mass Block Voting Tactics" in the black areas of South Dallas. Pls.Exh. 83, pp. 4–6.

**35.** Pls.Exh. 83, pp. 0–1.

**36.** Pls.Exh. 83, pp. 1–3.

**37.** Defendant's Response (Jan. 29, 1990) to Plaintiffs' Proposed Findings of Fact and Conclusions of Law, pp. 61–62 (*"Defendant's Response"*). Presumably, the City's reference is to the racial appeals made about 14 years ago during the 1975 or 1976 Council elections (Findings of Fact 93, 96–98). But see Findings of Fact 102, 168, 169 at fn. 119, 191, 204).

**38.** Adelfa Callejo, Onesimo Hernandez and Trini Garza were invited to become members of the CCA Board and to search for "qualified Mexican–Americans that the CCA could support to run for City Council." At the same time, three or four African–Americans were also invited to join the CCA Board. TR. VI (123).

**39.** Cts.Exh. A–3 (*Pedro Aquirre* testimony from 1975 *Lipscomb* trial, pp. 74, 80–82, 84).

1973. She had a plurality in the general election and went on to win in the run-off with 53% of the vote total." 399 F.Supp. at 787 (Judge Mahon 1975).

57. After the 1973 elections, Council Member Aguirre—as the result of the racial tension and emotions that followed the shooting death of a Mexican–American (Santos Rodriquez) by a Dallas policeman—introduced a resolution, which was passed by the City Council, recognizing *that there is "unequal law enforcement, dual justice and unequal treatment for the different segments of the community and different races in Dallas."* 399 F.Supp. at 787.[40]

58. Also during 1973 (or early 1974), Judge Mahon entered an order dismissing all of the Mexican–American plaintiffs from the *Lipscomb* case because of their failure to respond to written interrogatories. 399 F.Supp. at 784.

### 1974–75: Lipscomb—the trial

59. On July 15, 1974—*over three years after suit was filed*—the trial was begun in *Lipscomb v. Wise.*[41] However, after less than two days of testimony, Judge Mahon—out of an abundance of caution—"suspended testimony pending resolution of the possibility that the matter might have been one of state-wide rather than local concern, and therefore appropriate for a three-judge court determination." 399 F.Supp. at 783 (Judge Mahon 1975).

60. On July 16, 1974, a group of Mexican–Americans (Adelfa Callejo, et al.) filed a motion to intervene "on behalf of the Mexican–American citizens in the City of Dallas"—who then represented 8–10% of the total population of Dallas. 399 F.Supp. at 784.

61. On July 22, 1974, Chief Judge Brown of the Fifth Circuit advised Judge Mahon that the case was "appropriate for a single judge" to hear and that no three-judge court would be convened. 399 F.Supp. at 783.

62. The trial "was reset for hearing for the week of Dec. 9, 1974." On the day the trial resumed after the five-month delay, Judge Mahon:

(i) entered an order certifying the case as a class action, with the class "consisting of all blacks residing within the corporate limits of the city of Dallas";

(ii) denied the pending motion to intervene filed by the Adelfa Callejo group of Mexican American citizens—but with the "specific right of the proposed intervenors to participate in any subsequent hearing that may be held concerning the matter of appropriate relief if the present [city-wide, at-large 8–3] election system was held to be constitutionally defective." 399 F.Supp. at 783–84.

63. Testimony was then resumed. And, on Jan. 17, 1975—*almost 4 years after the lawsuit was filed*—Judge Mahon issued an oral opinion. In it, he found that the city-wide, at-large "system of electing members to the Dallas City Council"—which had continued, in different forms, for almost 70 years (from 1907 to 1975)—was unconstitutional because this system was intentionally adopted and maintained to dilute the voting strength of African–Americans. 399 F.Supp. at 784.

64. On the same day (Jan. 17, 1975), Judge Mahon also announced that the City had 20 days "to come forward with an apportionment plan which would meet constitutional standards"—and to present it at "the remedy stage" hearing set for Feb. 5, 1975. 399 F.Supp. at 784.

65. At the time of this trial, "two blacks and one Mexican–American were serving on the eleven-person City Council. *All three had been supported by the CCA. No black or chicano had ever won a Council seat without CCA backing;* few whites had, although Mayor Wise did win as an independent." 551 F.2d at 1045 (5th Cir.1977) (emphasis added).

---

**40.** Cts.Exh. 2–A (*Pedro Aguirre* testimony from 1975 *Lipscomb* trial, pp. 91–92).

**41.** The case had been renamed following the election of Mayor Wes Wise. 551 F.2d at 1045 (5th Cir.1977) (Wise had been elected "as an independent in 1973," without CCA backing).

*Jan.–Feb. 1975: Lipscomb—the remedy phase*

66. On January 20, 1975, the Dallas City Council passed Resolution No. 75–0207, which provided:

"Section 1. That the City Attorney ... is hereby directed to notify the Judge of the United States District Court for the Northern District of Texas, Dallas Division, that it is the intention of the majority of this City Council to pass an ordinance ... *which will adopt the present eight residential districts as single member districts*, with one individual Councilman to be elected from each of the districts and living in the district, *and with three individuals, including the Mayor, to be elected at-large with no residential requirements* other than that the candidate live within the City limits of Dallas."

67. On January 24, 1975, this resolution—and an accompanying breakdown of population by district and race—was filed with Judge Mahon as the City's proposed remedial plan. Under the resolution, eight Council Members were to be elected from single-member districts of equal population, drawn according to the existing residential district lines (Districts 1–8); the remaining three council members (including the mayor) were to be elected at large (Places 9, 10, 11); and all council members were to be elected by majority vote.

68. In response, the plaintiffs presented two plans. The first ("Plan D") was a 10–1 plan. Under it, there were "ten single-member districts and a mayor who would be elected at large. Each council person would reside in and be elected by a majority vote of his respective district. The mayor would have no residency restriction." 399 F.Supp. at 791 (Judge Mahon 1975).

69. Under the plaintiffs' alternative, the 11–0 plan, "each of the eleven council members were to be elected from a district and ... the mayor would be selected by the

council members themselves from one of their number." 399 F.Supp. at 791.

70. The Mexican–American intervenors "presented no plan as such, which in their view would alleviate their situation. Generally, they supported the single-member district concept, but testimony clearly showed that in order to have a single-member district plan in Dallas wherein Mexican–American citizens constitute a majority in a single-member district at least twenty districts would be required. Other suggestions included some form of cumulative voting for Council seats, concentric districts around the City and non-contiguous Council districts." 399 F.Supp. at 792.[42]

71. During this period in 1975, George Allen again presented a plan to the City Council which would create 8 single-member districts, three of which would have black population in excess of 60%.[43] The City Council did not accept this plan. Accordingly, this plan was not presented to Judge Mahon, although he did hear evidence concerning it. 399 F.Supp. at 796, fn. 20.

72. The *Lipscomb* remedy hearing began on February 5, 1975, with Judge Mahon's statement that the purpose of the hearing was "to determine the constitutionality of the new proposed plan by the City of Dallas."

73. The population variance of the 8 single-member districts under the City plan was not in issue. However, there was "objection as to the lack of precision in district boundaries." The City "made certain changes in the district lines" and, on Feb. 8, 1975—the final day of the remedy hearing—tendered its modified plan "to meet these objections." 399 F.Supp. at 791, fn. 9.

74. The demographic pattern of the eight single-member districts in the City's reapportionment plan finally submitted to Judge Mahon (and later the subject of a

---

42. Judge Mahon ruled that these suggestions by the Mexican–American intervenors were "completely void of merit and would do nothing constructive for either the political interest of minorities or the constitutional interests of all citizens of Dallas." 399 F.Supp. at 792, fn. 10.

43. Pls.Exh. 14; Cts.Exh. A–2 (*George Allen* testimony from 1975 *Lipscomb* trial, pp. 8–10, 14–19); Pls.Exh. 13 (George Allen Dep. from *Lipscomb* case, pp. 46–47).

"preclearance" lawsuit under the Voting Rights Act) was as follows:

| District | Total Population | Percent Black | Percent Mexican–American |
|---|---|---|---|
| 1 | 105,559 | 2.08 | 7.63 |
| 2 | 105,529 | **25.90** | **20.00** |
| 3 | 105,759 | 5.96 | 7.00 |
| 4 | 105,676 | 3.63 | 3.20 |
| 5 | 105,433 | .26 | 10.60 |
| 6 | 105,604 | **73.60** | 7.20 |
| 7 | 105,353 | .40 | 5.00 |
| 8 | 105,448 | **87.30** | 3.44 |

75. On February 8, 1975, at the conclusion of the *Lipscomb* remedy hearing, Judge Mahon announced in an oral opinion that he would accept the City's mixed plan of 8 single-member districts and 3 at-large seats (including the mayor). However, Judge Mahon stated: *"I'm not saying it's the best plan. It's not even the plan that this Court would have drawn. But this Court's not in the plan-drawing business. That's the legislative duty."* 437 U.S. at 543, fn. 7, 98 S.Ct. at 2499, fn. 7.

76. On February 10, 1975, the Dallas City Council passed Ordinance 14800, which provided:

"Section 2. As a result of the decision of the United States District Court for the Northern District of Texas in the case of *Albert L. Lipscomb, et al. v. Wes Wise, et al.*, CA3–4571–E, [399 F.Supp. 782] and this Ordinance enacted pursuant thereto, only the qualified voters residing within Districts 1, 2, 3, 4, 5, 6, 7 and 8 shall be eligible to vote for a candidate for Member of Council, Place Numbers 1, 2, 3, 4, 5, 6, 7 and 8, respectively. Every qualified voter of the City shall, in addition, be eligible to vote for a candidate for Place Numbers 9, 10 and 11."

*March 1975: Judge Mahon's opinion*

77. On March 25, 1975, Judge Mahon issued a written opinion which elaborated upon his earlier oral findings concerning both liability and remedy. *Lipscomb v. Wise*, 399 F.Supp. 782 (N.D.Tex.1975).

78. *As to liability*, Judge Mahon—*without using these exact terms*—clearly held that the black plaintiff class in *Lipscomb* had established the three "threshold" requirements that were later defined in *Thornburg v. Gingles*, 478 U.S. 30, 106

S.Ct. 2752, 92 L.Ed.2d 25 (1986). Specifically, Judge Mahon held:

(i) That the black population of Dallas was "sufficiently large" (25% of the total population) and was "geographically compact" (93% reside in the "minority or inner-city area") to constitute a majority in one or more single-member districts. 399 F.Supp. at 785.

(ii) That the black population was "political cohesive," as demonstrated both by testimony and by the analysis of voting patterns in the City Council elections discussed in his opinion.

(iii) That the white majority in Dallas votes as a bloc to enable it—in the absence of "special circumstances" (*such as the CCA endorsement of George Allen and Lucy Patterson (blacks) and Anita Martinez and Pedro Aquirre (Hispanics)*)—to defeat the preferred candidate of the black citizens of Dallas. See Findings of Fact 24 (1959), 26 (1961), 28 (1963), 29–30 (1965), 37–38 (1969), 46 (1971). 399 F.Supp. at 785–87.

79. Therefore, Judge Mahon specifically concluded: "This lesser degree of opportunity [for blacks to meaningfully participate in the election process in Dallas] is best shown by the voting pattern I have found to exist for the City:

'Black voters, that is, those residing in the inner-city area, vote for black candidates, giving them at least a plurality, and usually a majority of their votes, and the white community, the non-minority voter tends not to vote for the black candidates.'

"This is dilution. In other words, *when all members of the City Council are elected at-large, the significance of this pattern of blacks carrying their own areas and yet losing on a city wide basis is that black voters of Dallas do have less opportunity than do the white voters to elect councilmen of their choice."* 399 F.Supp. at 790.

80. In contrast, Judge Mahon made no such findings with respect to the Mexican–American intervenors. Instead, he stated that their motion to intervene *as to the liability issues* had been denied because:

"The testimony previously presented to this Court shows that this [Mexican–American] class represents approximately 8% of the population of the City of Dallas, the housing pattern is such that they are spread throughout the city limits of Dallas, and are not a predominant factor in any concentrated census tract groups." 399 F.Supp. at 784.

81. *As to remedy,* Judge Mahon recognized "that while single-member districts are not constitutionally mandated, they are definitely the preferred approach"—but that *"this preference may yield, however, where particular circumstances justify a variation."* 399 F.Supp. at 792 (emphasis added).

82. Then, Judge Mahon found two factors that "would justify such a variation" and his approval of the City's mixed 8–3 plan: (i) a "consideration of the impact that any plan would have on the Mexican–American citizens of Dallas, intervenors in this cause," and (ii) "the legitimate governmental interest to be served by having a city-wide viewpoint on the City Council." 399 F.Supp. at 792.

83. As to the first factor, Judge Mahon reasoned that Mexican–Americans would realize a greater "benefit" under the City's 8–3 mixed system than in a pure single-member district plan *because of the existence of the CCA and its slating process for City Council elections.* Specifically, he reasoned:

(i) That "Mexican–American citizens of Dallas have suffered some restrictions of access to the political processes within the City, but that this restriction does not amount to present dilution [as in the case of blacks]"—and it "would not be alleviated by the institution of exclusive single-member district voting."

(ii) That the "operation of white-dominated slating groups," like the CCA, permit "Mexican–American citizens ... to operate in a 'swing-vote' manner and give them opportunity they might not otherwise have had"—because they must, with "lesser numbers" and "their diffuse resident patterns," form coalitions with "either blacks or whites in order to maintain political stability." [44]

(iii) That, therefore, "Mexican–American citizens will, under the [at-large seats in the] 8–3 plan, have a heretofore unavailable flexibility and greater opportunity to participate in the political life of Dallas." 399 F.Supp. at 792–94. [45]

84. Judge Mahon's opinion *did not* give any consideration as to whether the "high cost of city-wide campaigning" would preclude blacks or Mexican–Americans from running successful campaigns in the three at-large districts without CCA backing. (Finding of Fact 48). [46] However, the following testimony [47] was presented to Judge Mahon on this issue:

(i) Council Member *Adlene Harrison* (white) testified that she favored the 8–3 mixed plan because she "wanted some at-large seats" realizing that Mexican–Americans don't have "enough population ... or registered voters in any one district to insure themselves a place on the Council." She also testified that she thought a Mexican–American candidate could win an at-large seat without the CCA endorsement—but she could not cite any instance where this had been

---

44. At the time of Judge Mahon's decision, there were "only four census tracts which [had] a majority Mexican–American population, that is, over 50%" because "in their case, geographic assimilation has been in large measure achieved." 399 F.Supp. at 793.

45. Judge Mahon recognized that "Mexican–Americans have to some degree entered into the policy-making structure of the CCA." See Findings of Fact 37, 46, 55–57.

46. The only reference to the "high costs of city-wide campaigning"—which had been specifically noted in the Fifth Circuit's remand opinion, 459 F.2d at 339 (5th Cir.1972)—is in the "liability" portion of Judge Mahon's opinion, where he quotes the Fifth Circuit's discussion of "several factors by which plaintiffs could show lack of participation in the political processes of the life of Dallas." 399 F.Supp. at 788, fn. 6.

47. This Court requested the parties to file the transcripts of the testimony of all City Council members and the City Manager from the 1975 *Lipscomb* trial before Judge Mahon. The only transcripts that could be located were filed as Courts' Exhibits *A–1* (Adlene Harrison), *A–2* (George Allen), *A–3* (Pedro Aguirre), *A–4* (Mayor Wes Wise), and *A–5* (City Manager George Schrader).

done, and *she acknowledged that "minority groups would be in fact taking a chance to assume that they could, in fact, have a shot at one of those three at-large seats."* [48]

(ii) Council Member *George Allen* (African–Ameican) testified that he could not have won an at-large election without the support of the CCA; *that he was sure that no black or Mexican–American could be elected to an at-large seat without CCA endorsement;* that the City's 8–3 plan would guarantee two black representatives from Districts 6 and 8, but that a Mexican–American would have to be "in the good graces of the CCA" to be elected at-large; *that the "main reason that [he] wants single-member districts that guaranteed" two black members on the City Council was because there was no "guarantee" what the CCA might do in the future;* and that, because of this uncertainty about the CCA, it was "not unreasonable for the Chicanos to want single-member districts that would guarantee brown representation" on the City Council.[49]

(iii) Council Member *Pedro Aguirre* (Mexican–American) testified that Hispanics needed "some at-large spots" because no single-member district could be drawn for them; that "obviously, [he] couldn't have been elected [at-large] without [the] support and endorsement" of the CCA; and *that no Mexican–American could be elected to a Council at-large seat without the help of the CCA.*[50]

(iv) Mayor *Wes Wise* testified that Aguirre convinced him in a Council meeting that "the two *other* at-large places

would give a better opportunity for a Mexican–American to be elected" to the Council; and that he felt that a *black or Mexican–American could win an at-large council seat only with the CCA support or with the endorsement of a mayor who actively supported the minority candidate* (and who "won [the mayor's race] overwhelmingly").[51]

Accordingly, the testimony before Judge Mahon was really established that no black or Mexican–American could win an at-large seat without the endorsement and support of the CCA. This, of course, is consistent with Judge Mahon's approval of the 8–3 mixed plan because Mexican–Americans could be represented on the City Council only with the assistance of "the CCA and other slating groups." 399 F.Supp. at 794.[52]

85. With respect to the second factor which "justified" an exception to the "definite preference" for single-member districts, Judge Mahon stated:

(i) That "several members of the present Council and the present City Manager presented the view that having some members of the City Council elected on a city-wide basis would be desirable ... because of the need for a non-sectional viewpoint in resolving matters such as zoning, budgetary considerations, and city planning."

(ii) That the fact for *"some need* for a city-wide interest to be maintained in the government of Dallas is admitted by plaintiffs in their presentation of the 10–1 plan."

(iii) That this "Court believes and so finds that there is a legitimate govern-

---

**48.** Cts.Exh. A–1 (*Adlene Harrison* testimony from 1975 *Lipscomb* trial, pp. 198–99, 201–02, 205, 206–07). Harrison explained that she felt a black or Hispanic could win an at-large race without CCA endorsement because she thought "times are changing and I certainly hope they are. And I think that if people have been involved in many things in the City and gather a reputation for good work, *that hopefully,* their exposure will help them win an [at-large] election." Cts.Exh. A–1, p. 204. *This hope would prove to be hollow for Marvin Robinson, the "black concensus candidate," in his loss in the 1983 Place 9 at-large race.* Findings of Fact 170–78.

**49.** Cts.Exh. A–2 (*George Allen* testimony from 1975 *Lipscomb* trial, pp. 9–10, 26, 29–31, 33, 39–40, 46–47).

**50.** Cts.Exh. A–3 (*Pedro Aguirre* testimony from 1975 *Lipscomb* trial, pp. 71–72, 80, 82, 84, 87).

**51.** Cts.Exh. A–4 (*Wes Wise* testimony from 1975 *Lipscomb* trial, pp. 121, 125–26, 133).

**52.** Judge Mahon specifically noted the fact that there were two blacks (Allen, Patterson) and one Hispanic (Aguirre) on the 1975 City Council *because of the support of the CCA.* 399 F.Supp. at 787, fn. 5.

mental interest to be served by having some at-large representation on the Dallas City Council ... and that three at-large members do not render the City's plan constitutionally infirm." 399 F.Supp. at 794–95.

86. However, there had been no single-member districts in Dallas since 1907, so the testimony presented to Judge Mahon on this second factor was necessarily general. It was also somewhat conflicting. In particular:

(i) City Manager *George Schrader* testified that there is a need "for some on the City Council to possess the perspective which has a political state across the breath of the entire community"; that there were "city-wide issues" in **garbage, waste disposal,** downtown revitalization, convention centers, libraries, transportation, water systems; *that he would not speculate on whether there was something "intrinsic in the nature" of a single-member district representative that caused an "unwillingness to recognize the needs of the community as a whole";* but that "logic and experience in other cities indicates that it sure does condition the position" of district representatives.[53]

(ii) Council Member *Adlene Harrison* testified that there was a need for a broader view on issues such as land use planning, zoning, bond issues; that she disagreed with many zoning decisions made by the "all at-large council"; that she thought it would be "a more implorable situation" where everyone represented a single district; but that this was "just a presumption on her part," and you could find that "people elected from single-member districts" would be "very responsive" to city-wide issues like zoning.[54]

(iii) Council Member *George Allen* (African–American) testified that "at-large people on the council [could] conceivably have a broader view of zoning," but he didn't know if this was a "major benefit"; *that City planning is already done "on a city-wide basis" by the City staff;* that it would be of "extreme public interest" to have at-large people looking at the budget process on a city-wide basis; and that he saw the at-large members "helping a single-district representative" succeed with a program that might otherwise fail.[55]

(iv) Council Member *Pedro Aquirre* (Hispanic) testified that zoning cases may require at-large seats because "if it were a complete single-member district, there would be only one councilman in the hot seat" when the case came before the Council; and that at-large representatives are necessary because "I am firmly convinced that [Mexican–American] needs are going to be met only after the needs of the others have been satisfied."[56]

(v) Mayor *Wes Wise* testified that a city-wide, overall look "is absolutely essential for the mayor" in terms of budgeting, services, state and national legislation—"but I think it is less good [needed] for those other two [at-large] people."[57]

*Mayor Wise also testified that "if you have to sacrifice ... the advantages of the at-large system" in having a city-wide view on the Council "in order to get the*

---

**53.** Cts.Exh. A–5 (*George Schrader* testimony from 1975 *Lipscomb* trial, pp. 141, 146, 148–49). *Schrader conceded that he was not judging "the balance or the number" of at-large seats that would be required—nor was he giving any consideration to the fact that the high cost of city-wide campaigning may preclude minority candidates from running for at-large seats.* Cts.Exh. A–5, pp. 146, 153.

**54.** Cts.Exh. A–1 (*Adlene Harrison* testimony from 1975 *Lipscomb* trial, pp. 198–99, 202–03).

**55.** Cts.Exh. A–2 (*George Allen* testimony from 1975 *Lipscomb* trial, pp. 10–12, 21–25, 58, 65).

**56.** Cts.Exh. A–2 (*Pedro Aguirre* testimony from 1975 *Lipscomb* trial, pp. 75–76, 87). Aguirre also testified that he didn't know how many at-large members of the Council were needed to provide this "city-wide" view. Cts.Exh. A–2, p. 78.

**57.** Cts.Exh. A–4 (*Wes Wise* testimony from 1975 *Lipscomb* trial, pp. 121–22). Wise also testified that he did not believe "that single-member districts might result to ward politics in Dallas" under the council-manager type of government. Cts.Exh. A–4, pp. 122, 131.

*advantages over here of the single-member district system, I ... favor the single-member district":*

"I feel and have said so to the media ... that the single-member district system is not only going to benefit the blacks and Mexican–Americans, *it is going to benefit the white Anglo–Saxon Protestant like myself of average means who will now be able to go out and wear out some shoe leather and knock on some doors and win a campaign rather than on money.* So I think it is going to have some other side advantages that people don't even really fully recognize yet." [58]

87. With this conflicting testimony, it is not surprising that there was no discussion in Judge Mahon's opinion concerning the exact number of at-large seats that would be required to satisfy the "need for a city-wide" on the 11–person Council—except, perhaps, for the statement that the plaintiffs had "admitted" that there was *"some need for a city-wide"* view by their presentation of a 10–1 plan. Findings of Fact 68–69, 85.

88. After discussing these two factors (Findings of Fact 82–83, 85), Judge Mahon approved the City's mixed 8–3 plan—despite "some initial concern [about] the relatively high concentration of black voters in District 6 *(73.60%)* and District 8 *(87.30%)"* and despite the fact *that "it is apparent that different district lines could be drawn under an 8–3 plan to give black voters a majority in three districts."* 399 F.Supp. at 796.[59] His opinion concludes:

"The Court is not unmindful of its role in apportionment cases. Absent particularly pressing circumstances justifying at-large voting schemes, I would not hesitate to approve only single-member districts.... In Dallas, under the factual situation presented here, neither all single-member districts or exclusive at-large voting offers the balance which is necessary so that all citizens may have equal opportunity of access to the political process. Both plans offer advantages to each minority group as well as to the white majority. The eight/three plan allows the benefits of both schemes without the potential for mischief which is present under each exclusive plan." (399 F.Supp. at 797–98).

### April 1975: first elections under 8–3 mixed system

89. On April 1, 1975, the first Dallas City Council elections were held under the 8–3 mixed plan. Two blacks and nine whites were elected to the Council. *Despite the hopes in Judge Mahon's March 25, 1975 opinion*—that Mexican–Americans would, under the 8–3 system, have "a heretofore unavailable flexibility and greater opportunity to participate in the political life of Dallas"—*every Hispanic candidate was defeated in the April 1975 elections.*

90. As expected, the two black candidates elected to the City Council in April 1975 were from the two predominantly black districts—*District 6* (73.6% black) and *District 8* (87.3% black). They were the same African–Americans—George Allen and Lucy Patterson—who had been endorsed in previous Council elections by the CCA.[60]

91. In *District 2* (20% Hispanic, 25.90% black), the two Mexican–American candidates together received only 36.67% of the vote—and the white candidate (Nicol) won

---

**58.** Cts.Exh. A–4 (*Wes Wise* testimony from 1975 *Lipscomb* trial, pp. 120, 132–33). *Fourteen years later, Al Lipscomb (District 8) made exactly the same point during his testimony at the trial in this case.* TR. I (54–55).

**59.** The only specific plan discussed by Judge Mahon was one "which gave black voters a majority in three districts (one with approximately 66%; one with 62% and one with 61%). 399 F.Supp. at 796, fn. 20. However, he also noted that the "Dallas City Council has had many redistricting plans before it in the last two or three years." 399 F.Supp. at 797. As found

above (Findings of Fact 50, 71), *it is a fact* that George Allen presented apportionment plans to the Council in 1972 and in 1975 which would have created three single-member districts with black population is excess of 60%. Cts.Exh. A–2 (*George Allen* testimony from 1975 *Lipscomb* trial, p. 19, 26–27).

**60.** Allen resigned from the City Council sometime after the April 1975 election, and another African–American (Juanita Craft) was elected to replace him in a Dec. 6, 1975 special election for District 6. Pls.Exh. 82, pp. 4–5.

without a runoff with 58.2%. And, in *Place 9* (at-large), the Mexican–American incumbent (Pedro Aquirre) was, despite his CCA support, opposed by a white candidate (Gary Weber). Both local newspapers endorsed Weber. Aquirre received only 35.94% of the vote—while Weber received 65.05% (the largest percentage in any *contested* race in the April 1975 elections.[61]

92. After these results, the Mexican–American intervenors filed a "motion for further hearing" before Judge Mahon. In it, they stated:

"Intervenors would show the Court that under the approved 8–3 plan Mexican–Americans are restricted in their access from entering into the political life of Dallas. It is clear that at-large voting does not offer features which allow greater participation in the political process within Dallas for Mexican–American voters, but in fact dilutes the vote of the Mexican–American citizen and makes it impossible for a Mexican–American to participate meaningfully in the election process. Intervenors would show the Court that the results of the election of April 1, 1975, and other additional evidence will establish that Mexican–Americans are being denied representation and do suffer from the present dilution of their voting strength and do not benefit to a significant extent from at-large voting." 551 F.2d at 1048 (5th Cir.1977).

93. Overt racial appeals were made in the *District 1* race in the April 1975 elections. Rose Renfroe campaigned on a platform that opposed the location of any multi-family or low-income housing in this district. (See Findings of Fact 27, 51.) Her opponent, incumbent Charles Storey, who also opposed any more low-income housing in District 1, publicly condemned the raising of the low-income housing issue as a racial appeal, "a subtle way of saying that more minorities will be moving into the area." He also accused Mrs. Renfroe of running *an anti-busing campaign*. Renfroe defeated Storey in a runoff election for District 1.[62]

94. Other Dallas elections besides this one (April 1975) would involve racial appeals, as the school desegregation case— *Tasby v. Wright*—followed a frustrating, tortured path between the district court and the Fifth Circuit.[63] As Judge Barefoot Sanders described in *Tasby v. Wright,* 520 F.Supp. 683, 687 (N.D.Tex.1981), shortly after he had assumed responsibility for this case:

"The DISD was no stranger to desegregation litigation when this action was initiated [in October 1970] having been involved in [five] similar lawsuits since the 1955 U.S. Supreme Court decision in *Brown II. Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). A 'stair-step' (one grade per year) plan for desegregation was ordered by the federal court in 1960. Implementation began at the first grade level in the 1961–62 school year ... until 1965, when the Fifth Circuit ordered the process accelerated to include all six elementary grades as well as the twelfth grade. Dual zones were eliminated for junior high schools in 1966 and for remaining grades ten and eleven in 1967. The 'stair-step' plan merely called for the elimination of racial criteria from the school system's admission policies. The courts did not direct DISD (and DISD did not volunteer) to take affirmative action to eradicate the vestiges of the former statutory segregated system. *So, while it can fairly be said that DISD, like many another school district, moved with maximum deliberation and minimum speed to carry out the 1955 desegregation mandate of the U.S. Supreme Court, it should also be said that the federal court moved at the same pace; DISD did what the Court ordered—no more, no less.*" (520 F.Supp. at 687).

---

61. Pls.Exh. 82, pp. 1–3; Tr. VI (125–26).

62. Pls.Exh. 84; Pls.Exh. 82, pp. 1–2.

63. *Tasby v. Estes,* 342 F.Supp. 945, *aff'd in part, rev'd in part, and remanded with directions, Tasby v. Estes,* 517 F.2d 92 (5th Cir.1975); *tried again in 1976, Tasby v. Estes,* 412 F.Supp. 1192; and *remanded again in 1978, Tasby v. Estes,* 572 F.2d 1010 (5th Cir.), with directions to make "findings to justify the maintenance of any one-race schools that may be a part of" a new student assignment plan. 572 F.2d at 1018." 520 F.Supp. at 687.

### *1976: special elections & more racial appeals*

95. On April 13, 1976, the 8–3 mixed plan was approved in a referendum, and it became part of the Dallas City Charter. 437 U.S. at 539, fn. 3, 98 S.Ct. at 2496, fn. 3.

96. On April 24, 1976, there was a special runoff election to fill vacancies on the Council for Place 11 (mayor) and for Place 9 (at-large).[64] In *Place 9*, Jesse Price campaigned against Bill Blackburn on a platform that included opposition to busing for school desegregation—and opposition to any court order requiring busing—saying he intended to "hang Blackburn's stand on busing around his neck." Blackburn defeated Price in the runoff with 67.13% of the vote.[65]

97. In *Place 11* (mayor), Robert Folsom campaigned against Gary Weber on a platform that included support for a City Council resolution calling for a constitutional amendment to end busing for school desegregation purposes, as well as City support for private white schools as a way to prevent white flight from the City.[66]

98. Folsom also distributed a leaflet charging that Weber was attempting to win the election with a "massive black turnout," and threatening that "Garry Weber's South Dallas Machine is going to elect the next mayor" thanks to the efforts of "professional black campaigners who will turn out unprecedented numbers of blacks voting for Weber." The leaflet charges that Weber's campaign had been "planting lies and rekindling old fires that

could set Black/White relations back 20 years." The same leaflet tells black voters "No one, Black or White, will benefit from the hostilities between the Races [that] Garry Weber's hate-campaign is trying to force." Folsom defeated Weber in the runoff with 50.64% of the vote.[67]

### *1977 Lipscomb appeal; next elections under 8–3 plan*

99. Although the plaintiffs appealed from Judge Mahon's decision,[68] no stay was issued—so the April 2, 1977 City Council elections were held under the 8–3 mixed system. Just as in 1975, two blacks and nine whites were elected to the Council.

100. Again, the two African–Americans were from the two predominately black districts—*District 6* (Craft, the incumbent, won over four other black candidates), and *District 8* (Patterson, the incumbent, defeated one other black candidate). Another black candidate (Emerson Emory) lost in an at-large race for *Place 11* (mayor), receiving 62% of the black vote—but only 17.23% of the total vote—with the white winner (Folsom, the incumbent) receiving 70.74%.[69]

101. *In these April 1977 elections, there were no Mexican–American candidates.* Just two years earlier, Judge Mahon's opinion had relied heavily upon the opportunity of Mexican–Americans to work with "white-dominated slating groups"—*like the CCA*—in order to be elected to the Dallas City Council. However, the CCA "did not endorse or support candidates ... in the 1977 election." It was defunct—and it has never been replaced by any other "slating group in Dallas."[70]

---

**64.** Gary Weber, who defeated the Mexican–American candidate (Aquirre) in the *Place 9* race in April 1975, resigned to run for mayor after Wes Wise stepped down from that position in early 1976. Pls.Exh. 85, p. 1.

**65.** Pls.Exh. 85, pp. 7, 12, 15, 19, 23; Pls.Exh. 82, p. 6.

**66.** Pls.Exh. 85, pp. 1–4, 16, 19, 23.

**67.** Pls.Exh. 85–A; Pls.Exh. 82, p. 6. One-half of this leaflet contained reproductions of pages from *The Dallas Weekly*, a minority newspaper in Dallas, which endorsed Weber for mayor; these pages contain six pictures showing Weber with various leaders in the African–American community. See also TR. I (194–96) and TR.

VII (22–23) for the testimony of John Wiley Price and Pettis Norman concerning the racial nature of Folsom's campaign against Weber.

**68.** The City of Dallas *did not* appeal Judge Mahon's "holding that the all at-large system unconstitutionally diminishes the voting strength of Dallas' black citizens." 551 F.2d at 1043 (5th Cir.1977).

**69.** Pls.Exh. 82, pp. 7–9.

**70.** Pls.Exh. 17, p. 10 (¶ 67); Pls.Exh. 15, p. 6 ("The City Charter Association did not sponsor or support candidates in the election of 1977, *and apparently will not sponsor or support candidates in future elections*") (City's answers to interrogatories).

102. Circumstantial evidence supports a finding that Rose Renfroe, the incumbent in *District 1*, continued to make overt racial appeals concerning school busing in this election—just as she had done in 1975 and in her support of Folsom in his 1976 race against Weber.[71] She was defeated in a runoff by Don Hicks, who received 64.72% of the vote.

103. There was also a special election for *Place 10* (at large) on Nov. 8, 1977. The black candidate (Wilkerson) received 8.73% of the total vote; the two Mexican–American candidates (Montemayor, Medrano) together received 14.16%; and the two leading white candidates (Bartlett, Baldwin) together received 68.44% of the total vote. Bartlett won the runoff with 56.8%.[72]

*1977–78: Lipscomb—the reversals*

104. On May 9, 1977, Judge Mahon's decision—under which City Council elections had been held in 1975, 1976 and 1977—was reversed by the Fifth Circuit. *Lipscomb v. Wise*, 551 F.2d 1043 (5th Cir.1977). The Fifth Circuit held that the "mixed" 8–3 plan was not *per se* unconstitutional, but that there was no evidence to support Judge Mahon's finding that the "special circumstances" concerning the Mexican-American population in Dallas warranted an exception to the "preference for single-member" districts in court-ordered reapportionment plans. Accordingly, Judge Mahon's approval of the 8–3 system was reversed as "an abuse of discretion." 551 F.2d at 1047. In this regard, the Fifth Circuit emphasized:

"The major difficulty with the district court's decision that a mixed plan would improve Mexican–American access to the political process is that there has never been a determination that their access

has been unconstitutionally impaired. At the liability stage of the trial, there was no evidence presented concerning the voting rights of the dismissed chicano plaintiffs....

" . . .

" . . . Shortly after the trial court judgment an election was held at which a member of the [Mexican–American] class was defeated for one of the at-large posts.[73] Thereafter, counsel for the Mexican–American intervenors filed a motion with the trial court for a further hearing as to the correctness of the trial court's order approving the eight/three City Council . . .

"Thus, *it will be seen that by pleadings filed by them, a class for whose benefit the trial court sought to act, has not only disclaimed the 'benefit' but also denied the basis of which it rests.*"

(551 F.2d at 1047–48) (emphasis added).

105. Accordingly, the Fifth Circuit "reversed and remanded with instructions for the district court to require the City to reapportion itself into an *appropriate* number of single-member districts for the purpose of holding City Council elections. Should the City fail to propose an acceptable plan, the court shall formulate its own plan." 551 F.2d at 1049.[74]

106. Unlike Judge Mahon, the Fifth Circuit discussed the method by which the Dallas mayor was to be elected. It stated: "No showing has been made as to the City's preference for the election of a mayor if the City is to operate with an 11 member council chosen by districts. Under the present plan, he is required to be the city-wide candidate for 'position' No. 11 of one of the at-large posts. *The City may provide for the election of the mayor by*

---

**71.** Findings of Fact 93–94, 97–98; Pls.Exh. 85, pp. 4–5 ("Mrs. Renfroe's main claim to fame has been her avid anti-busing activities").

**72.** Pls.Exh. 82, pp. 10–30. The black candidate (Wilkerson) won both of the predominately black districts, with 37.5% of the vote in District 8 and 27.37% of the vote in District 6.

**73.** This, of course, refers to Pedro Aquirre's defeat by Gary Weber in the April 1975 City Council elections. Findings of Fact 91–92.

**74.** *Judge Mahon's second reason for approving the mixed 8–3 system—the need for some city-wide view of the part of some members of the Council—was not even discussed by the Fifth Circuit.* Apparently, that Court felt that this "need for a city-wide view" was not sufficient to overcome "the preference for single-member districts in court-ordered plans." 551 F.2d at 1046–47.

**1350**

*general city-wide election or by election by City Council."* 551 F.2d at 1048–49.

107. However, on August 30, 1977, the Supreme Court stayed the Fifth Circuit's mandate, leaving Judge Mahon's decision in effect pending the appeal before the Supreme Court. Then, on June 22, 1978— *over seven years after the Lipscomb case had first been filed* (March 10, 1971)—the Supreme Court reversed the Fifth Circuit, holding that it erred in viewing the 8–3 system as a "court-ordered plan" instead of a "legislative plan." *Wise v. Lipscomb,* 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978). The Court reasoned:

(i) in the absence of exceptional circumstances, a federal court which imposes a remedial reapportionment plan *must* use single-member districts only;

(ii) but a "legislative body," such as a City Council, may use a mixed system— like the Dallas 8–3 plan—when it tries to remedy an at-large system which has been declared unconstitutional. (437 U.S. at 539–41, 543 [98 S.Ct. at 2496–97, 2498) ].

Therefore, the Supreme Court concluded that Judge Mahon was approving the 8–3 system as a "legislatively enacted plan"— although "there are some indications in the District Court's opinion that it was striving to satisfy those rules governing federal courts when they devise their own reapportionment plan." (437 U.S. at 543, 98 S.Ct. at 2498).[75]

108. During this appeal, the State of Texas had become subject to § 5 of the Voting Rights Act.[76] 42 U.S.C. § 1973c. Accordingly, the Supreme Court remanded to the Fifth Circuit for consideration of these issues: whether § 5 of the Voting

Rights Act applied to Dallas City Council elections; and, if so, the impact of this Act upon the 8–3 "legislative" system approved by Judge Mahon.

109. In view of this disposition of *Lipscomb,* the Supreme Court did not consider the plaintiffs' claims that the Fifth Circuit "also erred in holding that the alleged effect of all single-member districts on the representation of Mexican–American voters and the desirability of permitting some city-wide representation *did not* constitute special circumstances justifying departure from the preference for single-member districts in remedial reapportionments conducted by federal courts." 437 U.S. at 546, fn. 9, 98 S.Ct. at 2500, fn. 9.

110. The case returned to the Fifth Circuit. There, the parties "consented to the entry of an order ... to the effect that section 5 of the Voting Rights Act *did apply*" to the 8–3 system adopted by the Dallas City Council, so that "preclearance" was required under the Act. Accordingly, on Nov. 6, 1978, the Fifth Circuit remanded *Lipscomb* to the district court. *Lipscomb v. Wise,* 583 F.2d 212 (5th Cir.1978).

111. This meant that, *after eight years of hotly-contested litigation, the City of Dallas could not "legally" put the 8–3 system into effect until it obtained the "preclearance" required by § 5 of the Voting Rights Act.* Of course, this was somewhat academic—to say the very least—since City Council elections had been held under the 8–3 plan in 1975, in 1976 and in 1977 in accordance with Judge Mahon's decision.[77]

---

**75.** The dissent written by Justice Marshall states: "Where the very nature of the underlying violation of dilution of the voting power of a racial minority results from the effects of at-large voting in a particular political community, I believe that it is inappropriate either for the local legislative body or a court to respond with *more of the same."* 437 U.S. at 554, 98 S.Ct. at 2504 (emphasis added).

**76.** Under § 5 of the Voting Rights Act, 42 U.S.C. § 1973c, the City of Dallas could not "enact or seek to administer" any "different" voting qualification or procedure with respect to voting— like the 8–3 plan approved by Judge Mahon—

"without either obtaining a declaratory judgment from the United States District Court for the District of Columbia that the proposed change 'does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color' or submitting the change to the Attorney General and affording him an appropriate opportunity to object thereto." (437 U.S. at 542, 98 S.Ct. at 2498).

**77.** Findings of Fact 89–91 (regular elections), 95–98 (special elections), 99–101 (regular elections), 103 (special election).

*1978–79: the "preclearance"*

112. There were two alternatives for obtaining the required "preclearance" under the Voting Rights Act. 42 U.S.C. § 1973c. The first was to obtain approval from the Attorney General. The second was to file suit in the United States District Court for the District of Columbia seeking a declaratory judgment from a three-judge court. *City of Dallas v. United States,* 482 F.Supp. 183, 184 (D.D.C.1979).

113. The City of Dallas, choosing the second alternative, filed a declaratory judgment suit in the District of Columbia on Sept. 5, 1978. It sought approval of the 8–3 mixed plan adopted by the City Council on Feb. 10, 1975 (Finding of Fact 76) and approved as a Charter amendment on April 3, 1976 (Finding of Fact 95).[78] As would be expected from the controversial history of the 8–3 plan, representatives of black and Mexican–American citizens of Dallas intervened in this suit to oppose the City's request for preclearance. 469 F.Supp. at 740–41 (three-judge court).

114. In this declaratory judgment suit, the City specifically admitted that blacks were sufficiently large and compact to constitute a majority in *at least* two of the single-member districts. Specifically, the City stipulated:

(i) that according to 1970 census data, "approximately 93% of all the black residents of Dallas are concentrated in a predominately black inner-city area."

(ii) that "approximately 85% of Dallas' minority residents live in council district [6 and 8] represented by minority council members." [79]

115. In addition, in this declaratory judgment action, *the City admitted that the white majority votes as a bloc to enable it to defeat the minority's preferred candidate.* Specifically, the City stipulated:

"In Dallas City Council elections in which black candidates participated, racial bloc voting resulted in their defeat.

"Black City Council candidates who carried the innercity area by large majorities were defeated by white opponents who obtained majorities in the more populous white residential areas of the city." [80]

116. The City of Dallas filed a motion for summary judgment in this declaratory judgment suit—on the grounds that no "preclearance" was required for the 3 at-large places in the 8–3 mixed system, because these districts were unchanged from the 8–3 "citywide, at large" system held unconstitutional by Judge Mahon. 482 F.Supp. at 184. After this motion was denied, the City—at the suggestion of the D.C. Court—began negotiations with the Attorney General concerning a "new" 8–3 plan. 482 F.Supp. at 185.

117. The regular City Council elections were scheduled for April 1979. However, on Feb. 1, 1979, suit was filed in Dallas to enjoin these elections until the City had obtained preclearance of the 8–3 mixed plan. *Heggins v. City of Dallas,* 469 F.Supp. 739 (N.D.Tex.1979). In this suit, the City conceded that it could not "hold elections for the 8 single-member places without § 5 preclearance." However, it contended (as it had before the D.C. Court):

"... *that no preclearance is necessary for the three at-large places,* and that it may, therefore, proceed to hold elections for those three seats. Prior to

**78.** This 8–3 plan—*the same one presented to Judge Mahon* (Findings of Fact 67, 74)—was not submitted to the Attorney General. See 482 F.Supp. at 184 (D.D.C.1989) (This "first plan was never submitted to the Attorney General for approval, but instead preclearance was sought from this Court ...").

**79.** Pls.Exh. 15, p. 13 (City's answers to interrogatories); Pls.Exh. 17, p. 3 (¶ 13) (statement of undisputed facts in support of City's Motion for Summary Judgment, executed Jan. 1979); Pls. Exh. 16, p. 2 (¶ 13) (joint stipulation of facts, filed July 1979).

**80.** This is taken *verbatim* from City's statement of undisputed facts in support of its Motion for Summary Judgment filed in January 1979 (Pls. Exh. 17, p. 3, ¶ 16–17); the joint stipulation of facts filed by the parties in July 1979 is virtually identical, with the only change being a recitation in the first paragraph that racial bloc voting was a "significant factor contributing to" the defeat of black candidates—instead of "racial bloc voting resulted in their defeat" (Pls.Exh. 16, p. 10, ¶ 75–76).

the decision in *Lipscomb v. Wise*, Dallas elected all of its eleven council members to at-large places. *The City contends that the current at-large places are unchanged from three at-large places that were in effect* before *Lipscomb v. Wise* and before November 1, 1972, and that, therefore, these three places are not subject to the Voting Rights Act." (469 F.Supp. at 741–42) (emphasis added).

118. On Feb. 20, 1979, the Dallas three-judge court rejected this contention—and the City's attempt to bifurcate the 8 single-member districts from the 3 at-large places—and enjoined the April 1979 City Council elections. 469 F.Supp. at 742–43. The *Heggins* court stated:

"We feel certain that the District of Columbia court will proceed with all due speed toward resolution of the claims before it, and pending that resolution, we feel that the status quo should be maintained." (469 F.Supp. at 742).

Despite this judicial optimism, the Dallas City Council elections would be delayed for nine months. (Findings of Fact 127, 134).

119. On August 15, 1979, the City Council passed two resolutions. In the first, the Council reaffirmed "its strong commitment to and support of the 8–3 plan of electing members" to the Dallas City Council; in the second, the City Attorney was instructed to negotiate with the Attorney General "on the subject of possible boundary negotiations which might in the opinion of the Department of Justice" meet the standards of the "Voting Rights Act." [81]

120. During the negotiations with the Attorney General, *the City Attorney was advised that the 8–3 mixed system could meet the Voting Rights Act standards "provided council boundaries are redrawn so there are 3 districts with at least 68% minority population."* [82]

121. On Sept. 5, 1979, a public hearing was held "to receive comments on the alter-natives for reapportionment of City Council district boundaries." Various black and Mexican-American representatives objected to the continuation of *any* at-large districts. An alternative 10–1 plan, with four minority districts of more than 65% total minority population was presented by State Representative Paul Ragsdale (African-American). MALDEF submitted a 11–0 plan, which had 4 districts with over 65% minority population (with one of these having 29.3% Hispanic and 67.73% total minority population).[83] A number of other alternatives were presented at this public hearing.

122. In support of his 10–1 plan, Representative Ragsdale stated:

"The same arguments used to break up the at-large system of voting for State Representatives, the Dallas Independent School District, and the Dallas County Community College District are applicable in the case of the City of Dallas. *There are several arguments which militate against the at-large system of voting. For one thing, it is expensive, which results in basically a media campaign, and therefore, discriminates against candidates with lesser means to run a race....* A 10–1 plan maximizes the ability of all citizens—in accordance with their numbers—to have their views reflected on the City Council. Our citizens, under our representative form of government, deserve no less." [84]

123. After this public hearing, the City Council selected one of the plans which had been prepared by the City Attorney. It created a third minority district (besides Districts 6 and 8) by increasing the minority population of District 2 from 45.90% (25.9% black and 20% Hispanic) to 69.41% minority (45.11% black and 24.30% Hispanic).[85]

---

**81.** Pls.Exh. 18 (Exhs. F, G).

**82.** Pls.Exh. 18 (Exh. I, Ragsdale Documents). The first 8–3 plan had two districts (6 and 8) which met this standard, and a third district (2) that was 45.90% total minority (25.9% black, 20% Hispanic). Findings of Fact 74, 88 at fn. 59.

**83.** Pls.Exh. 18 (Exh. I, Ragsdale and MALDEF documents).

**84.** Pls.Exh. 19.

**85.** Pls.Exh. 18.

124. On Sept. 19, 1979, the City submitted this "new" 8-3 mixed plan to the Attorney General for preclearance, stating that:

"The submitted changes [in the 8-3 plan] have been adopted to prevent dilution of minority voting strength and to increase minority representation on the City Council. *It is anticipated that the submitted changes will result in the election of three minority representatives to the City Council.*" [86]

125. Under the 1970 Census, the racial composition of the 8-single member districts in the 8-3 plan submitted to the Attorney General was:

| District | Percent Black | Percent Mexican– American | Combined |
|---|---|---|---|
| 1 | 0.35% | 8.40% | 8.75% |
| 2 | 45.11 | 24.30 | 69.41 |
| 3 | 0.49 | 7.60 | 8.09 |
| 4 | 3.74 | 3.41 | 7.16 |
| 5 | 0.45 | 8.21 | 8.66 |
| 6 | 80.63 | 3.04 | 83.68 |
| 7 | 0.31 | 4.57 | 4.88 |
| 8 | 67.48 | 4.26 | 71.7 |

126. On Nov. 19, 1979, the Attorney General granted "preclearance" to the "new" 8-3 plan. His letter stated that "some 12 alternative plans drawn by other parties" have been considered; that "we have considered information concerning post-1970 population shifts" as well as the 1970 census; and "we have noted the changing role of slating groups in city elections as they bear on minority influence." [87]

"As a result of our investigation, we do not find support for the conclusion that the 8-3 plan now before us was adopted for the purpose of discriminating against minority groups on account of their racial or language minority status. Nor can we find that the plan adopted has the effect of discriminating against those groups since, in our view, the position of minorities is enhanced over what it was under the previously existing at-large system. See *Beer v. United States*, 425 U.S. 130 [96 S.Ct. 1357, 47 L.Ed.2d 629] (1976). The plan provides

the minority community a fair opportunity to elect three members of the council and our review of more recent election results suggests that minority voters will have a reasonable expectation of influencing the election of persons to the at-large seats." (482 F.Supp. at 187).

127. Following this preclearance, the City Council withdrew the "original" 8-3 plan, "by repealing a City ordinance, and the new [8-3] plan was enacted." 482 F.Supp. at 184. The City Council elections were scheduled for Jan. 19, 1980 (482 F.Supp. at 184)—a delay of almost 9 months because of the stay entered by the three-judge court in Dallas. 469 F.Supp. at 742-43.

128. The City then moved to dismiss the declaratory judgment suit in the District of Columbia, arguing—with the support of the Attorney General—that the case was now moot. The black and Mexican–American intervenors objected, but to no avail. The D.C. Court held:

"... we determine that *the case is moot because as between the parties, the City of Dallas and the United States, there exists no dispute....* The City of Dallas had invoked our jurisdiction to determine the legality of the first voting plan [which has been repealed]. Subsequently, during the pendency of that proceeding in this court, the City successfully obtained approval by the Attorney General of the new voting plan (see letter appended hereto). Such approval is one of the two methods provided by the Voting Rights Act for instituting new voting procedures in affected States or political subdivisions. Under the statute the Attorney General's approval is not reviewable in this court." (482 F.Supp. at 185).

129. The D.C. Court also noted that the "Voting Rights Act expressly provides that neither approval by a three-judge court nor the Attorney General shall bar a subsequent action to enjoin enforcement" of the

86. Pls.Exh. 18, Transmittal Letter (p. 2).

87. Obviously, this refers to the demise of the Citizens Charter Association. *Yet, the Attorney General—unlike Judge Mahon's opinion of March 25, 1975—appeared to view this as a positive development, both for blacks and Mexican–Americans.*

new 8–3 plan. Moreover, it showed no sympathy for the intervenors' argument that "if they are required to bring a suit, it may take considerable time to obtain judicial evaluation of the new voting plan"— because any such delay would certainly not be the fault of the courts, but was merely "a function of the intervenor's failure to bring an action to test the first [8–3 mixed] plan on constitutional grounds." 482 F.Supp. at 185.

### Lipscomb: the conclusion

130. This was the conclusion of the decade of litigation over the "at-large system of electing council members in Dallas"— starting with *Lipscomb v. Jonsson* in March 1971 and ending with the D.C. Court's opinion in February 1980. 482 F.Supp. 183 (D.D.C. Dec. 7, 1979, as amended Feb. 25, 1980). By this time, under the 8–3 mixed system:

... two African–Americans had been elected to single-member districts both in the April 1975 and April 1977 elections, but they were—as expected—from the two predominately black districts (Districts 6 and 8);

... the only Mexican–American on the City Council at the time of Judge Mahon's decision had been defeated in April 1975 for Place 10 (at-large), and no Hispanic was even willing to run in the April 1977 election;

... after refusing repeated requests by blacks and Hispanics, the City Council—at the insistence of the Justice Department—did create a third minority district by redrawing the lines of District 2 (45.11% black, 24.30% Mexican–American); *and*

... one of the two reasons stated by Judge Mahon for approval of the 8–3 "mixed system"—the "greater opportunity" for Mexican–Americans to be elected to at-large seats with CCA support—no longer existed, because the CCA had be-

come defunct *before* the April 1977 elections.

131. However, the second reason stated by Judge Mahon—the need for some "citywide view" on the City Council—would continue to be asserted, now as *the primary basis* for the 8–3 "mixed" system. And, although there would be no more litigation until this case was filed in 1988, the controversy would continue about the three at-large seats and the lack of adequate minority representation on the Dallas City Council.

### C. The Continuing Reapportionment Controversy (1980–1989)

132. The 1980 census revealed that— when the 8–3 mixed system had been "precleared" by the Attorney General in November 1979—the two predominately black districts had much higher minority populations than they did under the 1970 census; *District 6* was 82.61% black and 92.49% total minority, and *District 8* was 87.61% black and 91.01% total minority.[88] And, *District 2* was 76.73% total minority (instead of 69.41%), with 33.34% Mexican–American population (instead of 24.30%).

133. Specifically, the 8–3 mixed system for Dallas City Council elections had the following racial composition *based on 1980 census:*

| District | Percent Black | Percent Mexican–American | Combined |
|---|---|---|---|
| 1 | 19.78 | 20.91 | 40.68% |
| 2 | 43.38 | 33.34 | 76.73 |
| 3 | 5.27 | 10.64 | 15.9 |
| 4 | 5.32 | 3.36 | 8.67 |
| 5 | 4.66 | 18.46 | 23.12 |
| 6 | 82.61 | 9.88 | 92.49 |
| 7 | 13.89 | 9.04 | 22.93 |
| 8 | 87.61 | 3.40 | 91.01 |

### 1980: the delayed elections [89]

134. On Jan. 19, 1980, Dallas held its first general City Council elections since April 1977.[90] (Findings of Fact 99–103).

**88.** In contrast, under the 1970 census, *District 6* was 80.63% black (83.68% total minority); *District 8* was 67.48% black (71.7% total minority). Finding of Fact 125.

**89.** Pls.Exh. 82, pp. 31–44.

**90.** The April 1979 general elections had been enjoined pending preclearance of the 8–3 system under § 5 of the Voting Rights Act. Findings of Fact 117–18.

Two blacks, one Hispanic, and eight whites were elected to the Council.

135. *Not a single minority candidate—black or Mexican-American—ran for any of the at-large places in these January 1980 elections.*

136. The two black members were from the two predominately black districts—*District 6* (Elsie Faye Heggins, who ran against four other black candidates, winning a runoff with 50.21% of the vote) and *District 8* (Fred Blair, who was unopposed). Two black candidates ran in *District 1* (40.68% minority), but they received only 5.70% (Lewis) and 6.10% (Davis) of the vote—and one of the two white candidates (the incumbent, Don Hicks) won without a runoff with 64.72%.

137. In *District 2* (43% Black, 33.34% Hispanic), two Mexican-American candidates (Medrano, Hernandez) ran against a 73-year old white candidate (who polled only 14.62%). Ricardo Medrano won the runoff with 54.99% of the vote.

### 1981: the last elections before reapportionment [91]

138. On April 4, 1981, before the final results of the 1980 census had been received, the regularly scheduled elections for City Council were held. For the second time, two blacks, one Hispanic, and eight whites were elected to the Council.

139. There was only one minority candidate for an at-large place. Marvin Watts, an African-American, ran against seven white candidates for *Place 11* (mayor); he received only 2.08% of the total vote—and a white candidate (Jack Evans) was elected without a runoff with 72.14%.

140. The two black members were, of course, from the two predominately black districts—*District 6* (Heggins, facing another black candidate, was re-elected with 68.18% of the vote), and *District 8* (Blair was re-elected with 80.29% over another black candidate). In the third "minority"

district, *District 2*, Ricardo Medrano (Hispanic) was unopposed and was re-elected.

141. Several months after these elections, Judge Sanders rendered his decision in the Dallas school desegregation case. *Tasby v. Wright*, 520 F.Supp. 683 (N.D.Tex. 1981). Basically, he held:

"Today the Court decides that vestiges of state-imposed racial segregation remain in the Dallas Independent School District (DISD). The Court holds that additional systemwide transportation is not a feasible remedy for the existing constitutional violation. The Court believes, however, that effective remedies can be fashioned and directs the parties to prepare and file desegregation plans for the Court's consideration." (520 F.Supp. at 686).

### 1981–82: the reapportionment war

142. Preliminary reports from the 1980 census indicated that the City of Dallas now had a minority population of 41.7%. (The final census showed a 41.67% minority population—29.38% African-American and 12.29% Mexican-American. Finding of Fact 7.)

143. Using this 41.7% estimate, in June of 1981 Council Member Elsie Faye Heggins (District 6) introduced a resolution to have the City staff prepare "studies and maps" which would create four City Council "minority districts"—and to have this information distributed to all members of the Council in preparation for the reapportionment of the eight single-member districts.[92] Don Hicks (District 1) immediately moved to table, arguing that (i) the staff did not have time to do this work, and (ii) the census information was not complete in any event.[93] After heated—and sometimes acrimonious—debate, the Heggins resolution was tabled by a 6–5 vote of the Council.

144. Despite this Council vote, the City staff—as early as May 1981—had already begun preparations for reapportionment of the single-member districts. A May 15,

**91.** Pls.Exh. 82, pp. 45–64.

**92.** Pls.Exh. 22 (cassette of June 24, 1981 City Council meeting).

**93.** Max Goldblatt (District 7) adamantly opposed the Heggins resolution because he "would not be on a Council that determines representation by color or race." Pls.Exh. 22.

1981 memorandum from City Manager George Schrader advised the City Council that it was required "to divide the City into 8 districts of substantially equal population. Under State law, however, the City *may not take any official action using the 1980 Federal Census before Sept. 1, 1981.*" [94]

145. Accordingly, on Oct. 9, 1981, a lengthy report was submitted to the Council which had been prepared by "the offices of the city secretary, the city attorney, and management services"—and which contained 11 reapportionment plans "to demonstrate the effects of the 1980 census data" and to "serve as a starting point enabling members of the City Council" to request additional information from the staff in connection with "the development and selection of a final plan." There were five groups of plans (entitled "A" through "E") attached to this October 1981 report.[95]

146. The three "Group A" plans focused "on the comments of the City Council members concerning what each believes to be important for his or her district" and attempted "to accommodate the desires of all of the City Council members to the greatest extent possible." In substance, they proposed:

(i) the continuation of two predominately black districts—with a slight reduction in the black population and the total minority population of both *District 6* and *District 8.*[96]

(ii) the continuation of the third minority district—with a more significant reduction of the total minority population in *District 2.*[97]

147. The two "Group B" plans attached to the Oct. 9, 1981 memorandum attempted

to "create three districts with maximum black concentrations while maximizing the Spanish percentage in District 2." Specifically:

(i) The *B–1 Plan* proposed three districts that were more than 60% black—by maintaining *Districts 6 and 8* (but with more substantial reductions in black and total minority percentages),[98] and by creating a third black district out of *District 1* (63.08% black, 68.04% total minority)—and a fourth (*District 2*) that would be 53.61% total minority (40.61% Hispanic).

(ii) Similarly, the B–2 Plan proposed three districts that were more than 60% black—although the black population percentages were slightly lower for Districts 1 and 6 than in Plan B–1—and a fourth (*District 2*) with slightly lower total minority population than in Plan B–1.

*However, both of the Group B plans would have drastically altered District 1—the Oak Cliff District of Council Member Don Hicks—which was 40.68% total minority (19.78% black, 20.91% Hispanic) in the existing 8–3 system, based on using 1980 census figures.*

148. The two "Group C" plans attempted "to create four districts in which the combined minority population is greater than 65%." Under these plans, *District 2* would have a slightly increased Hispanic population[99]—*Plan C–1* (34.77% Hispanic, 65.30% total minority), *Plan C–2* (38.31% Hispanic, 69.68% total minority)—but there would be only one district that had a black population over 57–58%.

149. There was little interest in the Group D and Group E plans attached to the

---

**94.** Pls.Exh. 24 (Exh. F).

**95.** Pls.Exh. 24 (Exh. G).

**96.** The black population of *District 6* would have been reduced from 82.61% to 80.90% (A–1) or 79.66% (A–2) or 81.36% (A–3), and the total minority population would have been reduced from 92.49% to 88.5% (A–1) or 88.08% (A–2) or 88.23% (A–3). The black population of *District 8* would have been reduced from 87.61% to 83.63% (A–1) or 84.71% (A–2 and A–3), and the total minority population would have been reduced from 91.01% to 87.53% (A–1 and A–2) or 88.91% (A–3). Pls.Exh. 24 (Exh. G).

**97.** From 76.73% under the existing 8–3 plan (using 1980 census figures) to 62.40% (Plan A–1) or 66.33% (A–2) or 69.78% (A–3).

**98.** Under Plan B–1, *District 6* would have been 73.78% black (80.24% total minority)—and *District 8* would have been 61.82% black (79.04% total minority). *Credible testimony established that three blacks could have been elected under this plan.* TR. I (186–87); TR. IV (66–68, 90, 98); see also Finding of Fact 228.

**99.** Under the existing 8–3 plan, *District 2* was 34.34% Hispanic and 76.73% total minority (1980 census).

October 1981 memorandum,[100] so the Group A, B and C plans became the focus of the reapportionment controversy.

150. As demonstrated by 7 of the 11 plans prepared by the City staff, *it was possible for the Council to create three districts with a black majority of 60–65% and a fourth "swing district" with a minority population in excess of 53%.* However, there was vehement opposition to any such change—particularly from Council Members Don Hicks (*District 1*—Oak Cliff), Max Goldblatt (*District 7*—Southeast Dallas), and Ricardo Medrano (*District 2*)—who did not "intend to have a third [black] district carved from their districts." [101]

151. On Jan. 20, 1982, a public hearing was held "for the purpose of receiving comment from the citizens of Dallas regarding adjustments" in the 8 single-member districts.[102] At this meeting:

(i) 40 people spoke in favor of the B–1 Plan, which would have created a third district with a black majority;

(ii) 26 people spoke "in favor of the concept of three black districts without specifying any particular plan";

(iii) one person spoke in favor of "an additional Hispanic district" and another person spoke "in favor of 4 black districts and 2 Hispanic districts"; and

(iv) *no one spoke in favor of the "Group A Plans,"* which would merely continue the two predominately black districts (6 and 8) and the third district (2) with a combined minority population of from 62.4% to 69.78%.[103]

152. The reapportionment controversy which resulted—and which lasted from March 1981 through March 1982, as the City Council held work sessions and meetings to "debate" reapportionment—is recorded in the audio cassettes introduced in evidence.[104] Although there is no transcript of these proceedings, the City's "preclearance" submission of March 27, 1989 contains a number of newspaper articles that report the bitterness recorded on these cassettes.[105] For example, these are examples of *some* of the acrimony and hostility that took place:

... Several blacks, including Council Member Elsie Faye Heggins, threatened "another lawsuit" if a third "safe" council seat was not created for blacks (April 22–29, 1981 articles).

... Several Council Members told "Ms. Heggins they have no intention of directing the City staff to try to create a third black council seat" and *that they knew this was "a ploy to strike down the three at-large seats"* (May 14, 1981 articles).

... Council Members "Don Hicks, Max Goldblatt and Ricardo Medrano, whose districts now surround the districts of the City's two black Council Members," Fred Blair and Mrs. Heggins, said *they will oppose any proposal that "tries to cut up, or destroy the present lines" of their districts* (Oct. 11, 1981 articles; Nov. 10, 1981 articles).

... After a "redistricting workshop punctuated by *sharp exchanges*," at which *"tempers occasionally flared,"*

---

**100.** Plan D–1 illustrated three districts with over 60% black population (from 67.5–86.3% total minority) by making *District 7* a minority district. Plan E–2 illustrated *Districts 2, 6 and 8* with over 65% black population (from 75.17%–84.54% total minority) if "the black population [were evenly distributed] among the three districts."

**101.** Pls.Exh. 24 (Exh. L). County Commissioner John Wiley Price testified that Oak Cliff has always been the cause of the disputes in "every redistricting battle"—whether for City Council, County Commissioner, State Senator, etc.—because the whites want "to preserve Anglo leadership for the white part of Oak Cliff." TR. I (185–87). CRC Chairman Ray Hutchison testified that Oak Cliff was a problem in their efforts

in 1989 because their representatives were opposed to any splitting of District 1, the Oak Cliff district. TR. IV (96–97); Findings of Fact 234, 240 at fn. 178.

**102.** Pls.Exh. 24 (Exh. J).

**103.** Pls.Exh. 24 (Exh. I); Pls.Exh. 25. At this meeting, the B–1 Plan was endorsed by (among others) the Dallas Black Chamber of Commerce, the Dallas Minority Business Alliance, the Frederick Douglass Voting League, the Coalition for Minority Representation and the Progressive Voters League.

**104.** Pls.Exhs. 23 A–G.

**105.** Pls.Exhs. 24 (Exh. M); Pls.Exh. 26.

most of the eleven "Council Members [said] they will not support any redistricting proposal that establishes three black-majority council districts" (Feb. 24, 1982 articles).

153. Credible testimony at the trial of this case—by persons who were present at these reapportionment proceedings—established that racial tension marked these meetings and that statements like these were also made:

... Oak Cliff (District 1) had to have a white representative on the Council because "Anglos felt extremely uncomfortable being represented by blacks";

... if District 1 did not have an Anglo member on the City Council, there would be "white flight" and "Oak Cliff would be black within two years";

... that there could be a third black City Council member if a "qualified" black would just run for one of the at-large seats.[106]

154. In early 1982, Fred Blair (District 8) and John Wiley Price (the first black County Commissioner in Dallas County) met with Mayor Jack Evans. Evans said he could not support the creation of a third black district, and that he "would much rather see an African-American run at-large." [107]

155. At a workshop on March 9, 1982, the City Council narrowed its alternatives to three plans derived from those presented by the City staff in October 1981—Plan A-4 (modified),[108] Plan B-1 (modified) and Plan C-3.

156. At the Council meeting on March 17, 1982, the reapportionment controversy was scheduled for final vote. The audio cassettes introduced in evidence record the

acrimony and racial tensions of this meeting.[109] Mayor Evans repeated several times his belief that a black could be elected to an at-large seat, usually in response to statements like these:

... a black cannot be elected at-large because a black candidate cannot raise the $200,000.00 required for an at-large race (Heggins, Blair, Price);

... it is unfair to tell us that a black can win an at-large race (Heggins);

... *it is unfair to have five Council members (including all three at-large representatives) from just two districts in North Dallas* (Heggins, Price);

... the Mayor's A-4 Plan is a "scheme to continue to oppress blacks and in the City of Dallas and to deny them representation" (Heggins).

Mayor Evans reacted angrily that he resented these accusations and that his modified A-4 plan did not discriminate against minorities.[110]

157. At this point, Ricardo Medrano (District 2) moved that the City Council vote on the three plans "at the same time, and no plan [can] be voted on separately." The results were:

*Plan A-4 (modified)*—7 votes (all white members but Simpson)

*Plan B-1 (modified)*—2 votes (the two blacks, Blair and Heggins)

*Plan C-3 (modified)*—2 votes (Medrano, Simpson) [111]

158. Then, this portion of the Council meeting ended with Mayor Evans expressing his "hopes that we will work together" —and *with Al Lipscomb, who was causing a disturbance because of the vote, being forcibly removed from the meeting by security guards.*[112]

**106.** TR. I (47–49) (*Lipscomb* testimony); TR. I (124–28, 135–36) (*Blair* testimony); TR. I (186–191) (*Price* testimony); TR. V (126–27) (*Crenshaw* testimony); TR. VII (124) (*Norman* testimony).

**107.** TR. I (pp. 190–91) (*Price* testimony).

**108.** This modification had been presented by Mayor Jack Evans. Pls.Exh. 24 (Exh. M, newspaper articles of March 14, 1972).

**109.** Pls.Exh. 23F (sides 1 and 2) and 23G (side 3).

**110.** Don Hicks (District 1/Oak Cliff) asked sarcastically why the black representatives (Heggins, Blair, Price) "did not go before the City Councils of Highland Park and University Park and talk to those white enclaves and see if you can get them to go along with integration." Pls.Exh. 23F and 23G.

**111.** Pls.Exh. 24 (Exh. J).

**112.** Pls.Exh. 23G.

159. On March 24, 1982, the City Council passed Ordinance 17346, reapportioning the 8 single-member districts on the basis of Plan A–4 (modified). This 8–3 plan had the following racial composition based on the final 1980 census:

| District | Percent Black | Percent Mexican– American | Combined |
|---|---|---|---|
| 1 | 20.91 | 20.56% | 41.47% |
| 2 | 31.78 | 33.20 | 64.98 |
| 3 | 3.27 | 4.90 | 8.17 |
| 4 | 6.21 | 2.85 | 9.06 |
| 5 | 5.74 | 15.51 | 21.25 |
| 6 | 74.91 | 10.01 | 84.92 |
| 7 | 5.42 | 7.57 | 12.99 |
| 8 | 87.39 | 3.66 | 91.05 |

160. The net result of the 1981–82 reapportionment war was this: the five white majority districts remained basically unchanged; *District 6* had its black population reduced to 74.91% from 82.61% (and its total minority population increased from 83.68% to 84.92%); *District 8* had only insignificant changes in its black and total minority population; and *District 2* had its total minority population reduced to 64.98% from 76.73% (but with little reduction in its Hispanic population, which dropped only to 33.20% from 33.34%). *As indicated above, these changes to District 2 were made with the approval of the incumbent, Ricardo Medrano.* (Findings of Fact 150, 152).

161. On March 27, 1982, the City submitted this new 8–3 plan for preclearance under § 5 of Voting Rights Act, stating that the "submitted changes maintain the opportunity for the election of not less than three minority representatives to the City Council." [113]

162. On June 25, 1982, the new 8–3 plan received preclearance from the Attorney General, by letter stating:

"The Attorney General does not interpose any objection to the change in question. However, we feel a responsibility to point out that § 5 of the Voting Rights Act expressly provides that the failure of the Attorney General to object does not bar any subsequent judicial action to enjoin the enforcement of such change." [114]

163. This timing in the approval of the new 8–3 plan was fortuitous, to say the least. Four days later, on June 29, 1982, the revised Voting Rights Act became effective; under its new § 2 standard, [115] proof of "discriminatory effects alone" of the 8–3 system—without regards to whether it was "intentionally adopted or maintained for a discriminatory purpose"— would establish that the 8–3 system violated § 2 of the Voting Rights Act. 42 U.S.C. §§ 1973(a) and (b).

*1983: elections & the Robinson–Rucker at-large race.* [116]

164. On April 2, 1983, City Council elections were held under the 1982 reapportionment. This time, two blacks, nine whites *and no Hispanics* were elected.

165. Ricardo Medrano, the Mexican-American who had won the *District 2* seat in 1980 and 1981 (Findings of Fact 137, 140), was defeated in a runoff by a white candidate (Paul Fielding), who received 52.07% of the vote to Medrano's 47.93%. With hindsight, Medrano's defeat was attributed to three "political blunders" he committed during the 1982 reapportionment: agreeing to the reduction of the total minority population of District 2; adding precincts to the district which Medrano thought were heavily Mexican–American, but which were not; and by alienating black voters by opposing their 1982 efforts to obtain a third black district. [117]

---

113. Pls.Exh. 24 (March 31, 1982 transmittal letter).

114. Pls.Exh. 27. Contrast this "preclearance letter" with the one which the City received from the Attorney General in November 1979. Finding of Fact 126.

115. Congress had amended § 2 of the Voting Rights Act in 1982, primarily in response to the Supreme Court decision in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47—which held that, in order to establish a violation of

§ 2, plaintiffs had to prove that "the challenged electoral scheme was intentionally adopted or maintained by state officials for a discriminatory purpose." *Westwego,* 872 F.2d at 1204, fn. 3.

116. Pls.Exh. 82, pp. 65–73.

117. TR. VI (126, 214–15, 238). In the general election, Fielding received 38.08% of the vote, Medrano received 35.76%, and a black candidate (Spears) received 26.07%. Pls.Exh. 82, pp. 65–66. *Analysis showed that Fielding got 89% of the white vote, that Medrano got 64% of the*

**1360**

166. The two black members were from the two predominately black districts—*District 6* (Heggins, facing another black candidate, won with 86.53% of the vote) and *District 8* (Blair defeated three black and one white opponent with 81.49%). In *District 1*, one of the three white candidates (Jim Hart) won without a runoff with 57.42% of the votes—defeating one Hispanic candidate (Serna—1.56%) and two black candidates (Giddings—13.76%; Lewis—1.56%).

167. In contrast to prior years, there were black candidates in each of the three at-large races. In *Place 11* (mayor), one of the seven white candidates (Starke Taylor) won without a runoff over former mayor Wes Wise with 53.65% of the vote; the two black candidates received 0.38% (Watts) and 0.32% (Wooten).[118]

168. With regard to the 1983 mayor's race, a Dallas Morning News story stated that candidate Wes Wise was "wooing" blacks and needed a large black turnout—and that aides to Mayor Taylor "say privately that they would be satisfied with 40 to 50 percent of the black vote." In addition, a Dallas Morning News column stated that "Wise has been accused of siding with City Council Member Elsie Faye Heggins on recent municipal issues to solidify his strength in the minority community."[119]

169. In the *Place 10* at-large race, there were four white candidates and one Afri-can–American (Al Lipscomb). Lipscomb received 11.39% of the vote; future-mayor Annette Strauss was elected without a runoff with 70.37%. In this race, there were newspaper articles which identified Strauss as a "civic leader"—but which referred to Lipscomb as a "longtime black activist" and as the "black activist ... plaintiff in the lawsuit that brought the City of Dallas single-member districts."[120]

170. In the *Place 9* at-large race, two black candidates ran against four white candidates. One of the African–Americans was the plaintiff Marvin Crenshaw; *the other was Marvin Robinson—and it was because of him that this 1983 at-large race was of great consequence to the black community in Dallas.*

171. A meeting of African–American leaders in Dallas had been held early in 1983 with the objective of finding "a consensus candidate to run at-large out of the black community because we had continuously been informed that a black could win an at-large race with the right credentials."[121] This group sought "one of the best candidates that we could put up, one who had been well-educated, who had [held] very high positions, who had participated in [respected] civic organizations around the City at every level."[122] At this meeting, Marvin Robinson was selected as the "test case" for the black community.

---

Hispanic vote, and that Spears got 76% of the black vote. TR. IV (34–35).

**118.** Ex-mayor Wise ran second in this Place 11 race with 43.43% of the votes—so the two leading white candidates received over 97% of the votes. During this campaign, Taylor made the statement that it would be all right with him if "Police Chief Billy Prince didn't want to hire minorities," and he later attempted to correct this by issuing "a statement supporting affirmative action." Pls.Exh. 88.

**119.** Pls.Exh. 88, pp. 22–24, 28. See Grofman, Migalski and Noviello, *"The 'Totality of Circumstances Test' in Section 2 of the 1982 Extension of the Voting Rights Act: A Social Science Perspective,"* 7 Law & Policy 199, 214 (April 1985), suggesting that *"racial appeals occur in a campaign if one candidate calls attention to the race of his opponent or his opponent's supporters"* (e.g., where a white candidate uses a picture of his black opponent is his own campaign material)—or *"if media covering a campaign dispro-*portionally call attention to the race of one candidate or that candidate's supporters" (e.g., "racial telegraphing" by contrasting a white "civic leader" against a "black activist" opponent).

**120.** Pls.Exh. 88, pp. 7, 15; TR. I (50–51) (Lipscomb testimony); Pls.Exh. 105. *Although Lipscomb raised only $770.00 for this campaign, he received some 40% of the black votes and over 11% of the total vote.* TR. I (52–53).

**121.** TR. I (154) Robinson testified that blacks were told this by the City Council, by the Executive Director of the Citizens Council and others; "you name it, and we were being informed." TR. I (154). See Findings of Fact 154, 156, (re statements to this effect by Mayor Jack Evans).

**122.** TR. I (113) (testimony of State Senator Eddie Bernice Johnson, one of the African–American leaders at this meeting); TR. I (154–56) (Robinson testimony). And see Finding of Fact 84 at fn. 48.

172. Marvin Robinson was an *excellent* choice as the "consensus black candidate." He was well-educated,[123] he was a veteran and a successful business executive,[124] and he had "paid his dues" by being *very active* in civic and communities affairs in Dallas—including service as President of the Black Chamber of Commerce, Co–Chairman of the Tri–Racial Committee in the school desegregation suit, President of the Committee of One Hundred (an organization of black business executives in Dallas), and a member of the Park Board of the City of Dallas. He was also active in the Dallas Assembly, the Dallas Alliance, the United Way and the Summer Musicals—and had served on the Executive Committee of two very important bond issues (the City Arts District and Parkland Hospital). TR. I (150, 152–54).

173. The group of African–American leaders that selected Marvin Robinson as the "consensus black candidate" in early 1983 was also realistic:

"We took a good look at our involvement in the black community and the lack of funds to run the race. *We knew that a black in this town would need $200–250,000 [for an at-large race]. We also knew that we lacked the capacity in the black community to raise those kind of funds.* And the only way we were going to raise those funds was to go back to those [white] individuals who

we worked with and [with whom] we had tried to develop a rapport or cadre of support ..." TR. I (155).

174. However, Robinson and his supporters found out that this assistance and financial backing—which they expected from Anglo business and community leaders, and other whites they had known and worked with in a myriad of civic and community efforts [125]—was not there. *Although they went back "continuously, time and time again," Robinson's campaign was able to raise only $15,739—and "the mass of that ... came out of poor black folks' pockets." This $15,739, plus another $15,000 borrowed from a bank, was the total amount that Robinson had for his city-wide, at-large campaign for Place 9.*[126]

175. Robinson's primary opponent in the 1983 Place 9 race was Jerry Rucker, a white candidate; Rucker was also a lawyer and he had served on the City Planning Commission and on the Zoning Ordinance Advisory Commission. He also had run a construction business in Dallas for "virtually his entire adult life."[127]

176. There were four white candidates and two black candidates in the general election for Place 9. Rucker received 45.45% of the total vote. Marvin Robinson was second with 21.23%, and the other black candidate—the plaintiff Marvin Cren-

---

**123.** Robinson graduated from Southern University in Baton Rouge, where he was President of his freshman and sophomore classes, Vice–President of his junior class, and President of the Student Body (senior year), and an All–American athlete in track and field (national champion in the mile relay). He was also active in the NAACP and, after he left Southern, was a founding member of the Student Non–Violent Coordinating Committee and the Southern Regional Director of the Congress of Racial Equality. In 1968, Robinson graduated from Howard University Law School with a J.D. Degree. TR. I (151–52).

**124.** Robinson had been Acting General Counsel of the Housing Development Corp. (low and moderate income housing in Washington, D.C.) and Vice–President of a construction corporation before he came to Dallas in 1970 as Executive Director of the Interracial Council for Business Opportunity. He then joined Xerox Corp. as Regional Director of Real Estate; took a leave of absence to serve as Director of one of

the DISD "magnet schools" (the Business & Management Center), then returned to Xerox (first as Director of Administration Services for the Office Products Division, later as Assistant to the President of that Division). TR I (149–50). At the time he testified, Robinson was President of Accommodations, Inc., a concessions management firm (with operations at DFW Airport, Love Field, the State Fair, etc.). TR. I (148).

**125.** TR. I (103) (Johnson testimony); TR. I (151–56) (Robinson testimony).

**126.** TR. I (155–58). A comparison of Robinson's 1983 Statement of Contributions (Pls.Exh. 106) with the statement filed in 1987 by Al Gonzalez (Pls.Exh. 110), shows that almost all of Gonzalez' financial support came from white, non-minority areas in North Dallas. TR. I (161–63).

**127.** TR. I (pp. 108, 167–68).

shaw—was third with 12.15%. *Robinson and Crenshaw together had received some 90% of the black vote, but only 20% of the white vote.*[128]

177. In the runoff on April 16, 1983, Marvin Robinson—the consensus at-large candidate of the black community—was soundly "drummed." *Although Robinson received almost 100% of the black votes, he got only 11% of the white vote;* this translated in 31.78% of the total vote, and Jerry Rucker won with 68.22%.

178. *Since this race by Marvin Robinson in 1983, no serious black candidate has ever run for an at-large seat in the Dallas City Council elections.* Testimony at trial established that blacks are convinced that "this town is not ready ... to elect an African–American in an at-large race"—and that no "African–American in this town is going to acquire the $250,000 that he or she needs to run that kind of race."[129]

### 1985: council elections [130]

179. On April 6, 1985, the Dallas City Council elections were held (under the 1982 reapportionment). Again, two blacks and nine whites were elected to the Council.

180. The blacks were from the two predominately black districts—*District 6* (Diane Ragsdale, who was unopposed), and *District 8* (Al Lipscomb won over two black opponents with 75.02% of the vote).

181. In the *District 2* race, there was one black candidate and one Hispanic. The black (Woods) received 1.60% of the vote, and the Hispanic (May) received 10.17%. There was a runoff between two of the three white candidates—Fielding (36.96%) and Palmer (35.98%)—Lori Palmer won the runoff with 58.13% of the votes.

182. There were no minority candidates in the *Place 9* or *Place 10* at-large races.

In *Place 11* (mayor), the only black candidate (Morehead) received 3.01% of the vote, and Mayor Taylor was re-elected with 50.61%. Former Council Member Max Goldblatt ran second with 45.56%—so the two leading white candidates received over 96% of the total vote.

### 1986: no reapportionment, but agreement on a Hispanic at-large seat

183. There had been no Mexican–American on the Dallas City Council since the lines to District 2 had been redrawn in 1982—and since Ricardo Medrano had been defeated in the 1983 Council elections. (Findings of Fact 165, 181).

184. This led Mexican–Americans to petition the City Council for reapportionment in 1986. An ad hoc organization called "COMAR"—the Committee for Mexican–American Representation—asked that the 8-3 lines be redrawn to create a possible Hispanic district.[131] As they had before, African–Americans asked for the creation of a third black district.

185. On Oct. 29, 1986, the City Attorney sent Council Members a memorandum describing "alternative district plans that would illustrate the options the City Council might consider in determining the feasibility of establishing new district boundaries" for the April 1987 election.[132]

186. Attached to this October 1986 memorandum were 7 plans which included three 65% or more black single-member districts;[133] another plan which included three 60% or more black districts; and a number of plans which would increase both the Hispanic and total minority population of District 2.[134]

187. *Therefore, just as in 1982 (Finding of Fact 150), in 1986 the Dallas City Council could have drawn three districts*

---

**128.** Pls.Exh. 82, pp. 66–67; Pls.Exh. 66, 67.

**129.** TR. I (158–59); TR. I (99–100, 103); TR. 2 (19–21). Both Senator Johnson and Marvin Robinson testified that "without a doubt," the defeat of Robinson in this April 1983 at-large race has deterred other black candidates from running at-large. TR. I (103, 158–59). See also Pls.Exh. 50 (Palmer Dep., pp. 32–33, 38–39).

**130.** Pls.Exh. 82, pp. 74–82.

**131.** TR. VI (11–12); TR. VI (109–110).

**132.** Pls.Exh. 28.

**133.** These are Plans C–1, D–2, D–3, E–1, E–2, E–3 and E–4 (Pls.Exh. 28).

**134.** See, e.g., Plan C–3 (Pls.Exh. 28).

*with a black majority of more than 60% and a fourth "swing district" with a total minority population in excess of 50%.*

188. However, by a 6–5 vote, the Council decided to take no action to reapportion the 8 single-member districts in 1986. Council Member Jerry Rucker gave this explanation of why nothing was done in 1986:

Q. It was the feeling of the Council, then, that two blacks was equitable, it was fair, that there was not a need to increase black representation?

A. *Well, no, but the difference between two and three is not anywhere near the difference between zero and one.* I mean, zero and one was one that was worth doing a redistricting. *The difference between two and three [blacks] wasn't worth the redistricting [in 1986].* There was adequate expression of the [black] viewpoint.... [135]

189. Credible testimony at trial [136] established that, after this Council vote, Mayor Starke Taylor called a meeting of some Mexican–American leaders; that he told them he would support and endorse a Mexican–American for one of the at-large seats in the 1987 elections; and that he would agree "to do everything he could" to see that the Hispanic candidate won, including helping the candidate get financial backing and votes from North Dallas.[137]

190. Credible testimony also established that this offer of support was made by Mayor Taylor because "he felt strongly that the Hispanic community was going to sue the City. He felt that they would have

a case," and that "one of the reasons why he was supportive of a Hispanic candidate was to try to delay or prevent a Hispanic challenge to the 8–3 system." [138]

191. In the 1986 general election, John Vance—the successful candidate for Dallas County District Attorney—ran a newspaper ad with his picture next to the picture of his black opponent. (Finding of Fact 168 at fn. 112).[139]

### 1987: council elections [140]

192. On April 4, 1987, the Dallas City Council elections were held. Two blacks, one Mexican–American and eight whites were elected.

193. Of course, the two blacks were from the predominately black districts— *District 6* (Ragsdale defeated one black and one white opponent with 78.91% of the vote), and *District 8* (Lipscomb, with 62.82%, defeated one black opponent).

194. There was no Hispanic candidate in *District 2.* Incumbent Lori Palmer was unopposed and was re-elected with 99.97% of the vote.

195. There were two black candidates in the race for *Place 11* (mayor). However, neither was a serious candidate; the plaintiff, Marvin Crenshaw, received only 0.87% of the vote, and the other black (Morehead) got only 0.09%. Annette Strauss was the leader in the general election (with 43.12%), and she defeated Fred Meyer in the runoff with 55.99% of the vote.

196. The plaintiff Roy Williams ran against two white candidates in the at-large race for *Place 9.* He received 10.21%

---

135. Pls.Exh. 49 (Rucker Dep., p. 46).

136. TR. VI (12–15); TR. VI (110–111) (*Adelfa Callejo testified that the Mayor was afraid that MALDEF was going to file suit against the City, and that she told the Mayor that a Mexican–American candidate could win an at-large race only if "that person had the votes from North Dallas, and [only] if North Dallas financed the campaign because we simply didn't have the financial resources."* See also Pls.Exh. 48 (Palmer Dep., p. 40).

137. Pls.Exh. 37A contains a League of Women's Voters study entitled "Substantial Equality (City Government—City Council Representation)," issued October 1987. On pages 50–51 of Pls.Exh.

37A, in discussing the 1986 reapportionment efforts, this study states: "Proponents of redistricting [in 1986] were anxious to move the Council to action last fall so that the Justice Department would have plenty of time to give approval prior to the Spring elections. *They were also concerned that opponents to the redrawing of lines would use the proximity of the 1990 census as a stalling tactic, and that it might be as late as Spring 1992 before more substantial representation might become a reality."*

138. Pls.Exh. 48 (*Palmer* Dep., pp. 39–40).

139. Pls.Exh. 87.

140. Pls.Exh. 82, pp. 83–90.

of the total vote, and the incumbent Jerry Rucker was elected without a runoff with 66.58%.

197.    Al Gonzalez was the sole Mexican–American candidate in the *Place 10* at-large race. (See Finding of Fact 189, 190). His opponents were four African–Americans and one 76–year old white male (Martin). Gonzalez testified that he had been very successful as co-chair of a 1985 City bond campaign; that there was "a lot of talk ... from the Hispanic community" about the need for a Mexican–American on the City Council; that he had been active in the Hispanic Chamber of Commerce; that he met with Mayor Taylor and businessman Norman Brinker about running for Place 9; that Brinker agreed "to be my chair" and "to try to raise money from the business community"; that businessman W.L. Bankston agreed to serve as his treasurer; *that he knew he couldn't raise the money for an at-large race from the black or Hispanic communities; but that he hoped to be able to raise some "$150,000 from the Dallas establishment."* [141]

198.    Gonzalez did, in fact, raise over $173,000—almost all from "the North Dallas establishment." [142]    With this support, and with no serious white opponent, Gonzalez won the 1987 Place 10 race without a runoff.    He received 57.59% of the vote; the white candidate (Martin) received 10.89%; and the four black candidates split the remaining votes. (Of these, Verna Thomas was the leader with 10.72% of the vote.)

199.    However, Gonzalez served only one term on the Dallas City Council.    Apparently because of health and economic reasons, he decided not to run for re-election in 1979—and he received criticism from the Hispanic community when he refused to endorse a Mexican–American ei-ther for Place 9 or for a single-member district. [143]

*1988:  racial tension, crisis & litigation*

200.    In early 1988, following a long-period of complaints by minorities over the "deadly force policy" of the Dallas Police Department and the powers of the Police Review Board, two Dallas police officers were shot and killed within a two-week period.    The Chief of Police, after the death of the two officers, accused the two black City Council Members (Lipscomb, Ragsdale) of creating an atmosphere of hate and hostility in the City which fostered violence. [144]    As this racial tension was described later:

"In early 1988, Dallas experienced a chain of events that devastated the city. The anguish which accompanied the loss of life—of both citizens and police—made it clear that racial tensions were high and that without some method to openly address those tensions, our City was in danger of continued crisis." (Pls. Exh. 29, p. 1). [145]

201.    Pettis Norman—a Dallas businessman, a community leader, and an African–American—gave this description of conditions in Dallas at this time: "severe problems, racial problems, police-community relations problems, [a] community in my estimate coming loose at the seams ... *that's when "the City really became very angry and hostile and it seemed to split along racial lines."* [146]

202.    This caused Norman to contact Mayor Annette Strauss and to suggest that a commission should "look at the issues that gave rise" to this crisis:

"...  It was my feeling at that time that the police shooting was just a symptom of a much deeper problem.    And I thought that as a City we must, once and

---

**141.**  None of this testimony by Al Gonzalez is inconsistent with the testimony credited by this Court in Findings of Fact 189 (fn. 137) and 190 about Mayor Taylor's promise to support a Hispanic candidate in a 1986 at-large race. Pls. Exh. 50 (Gonzalez Dep., p. 34–36, 49–55).

**142.**  Pls.Exh. 114; Pls.Exh. 50, pp. 162–64; Int. Exh. 24, 25; TR. III (15–16, 42–44, 167, 184–86); TR. IV (114); TR. VI (13–15, 203–06).

**143.**  TR. VI (16–17, 120).

**144.**  TR. VII (5–6); TR. VI (15–16, 18, 110); TR. III (41).

**145.**  Pls.Exh. 29 ("Final Report of *Dallas Together*," submitted Jan. 12, 1989) (*"Final Report"*).

**146.**  TR. VII (5–6).

for all, come to grips with what gave rise to those problems, look at the underlying issues: *the issue of minority representation,* the issue of economic participation, the issue of education, the issue of social participation."

203. Within days of this call from Pettis Norman, Mayor Strauss appointed the *"Dallas Together"* commission to "deal with the difficult task of finding ways to reduce the racial tensions in our community" and to "break down barriers of prejudice, racism and classes." *She charged this commission "with the task of bringing Dallas together* by identifying the root causes of the racial tensions being experienced in our City"—and "to develop action recommendations which would address the causes, not just the symptoms, of these tensions." By March of 1988, *"Dallas Together"* had been formed—with some 65 "African–Americans, Hispanics, American Indians, Asians and whites"—and it began intensive meetings which would last through the end of the year.[147]

204. On March 4, 1988, a Dallas Morning News article reported that a candidate for Criminal District Court No. 2, who was running against the African–American incumbent, mailed 77,000 fliers criticizing her opponent because he had changed his name to "Baraka" after converting to Islam and becoming "a follower of Malcom X, the slain Islamic leader and black nationalist."[148]

205. In April of 1988, the "Housing Mediation Team"—which had been appointed by Mayor Strauss to help resolve litigation involving racial discrimination in low-income public housing in the City of Dallas—recommended that "the City of Dallas should voluntarily agree to enter into the *Walker v. HUD* Consent Decree," stating:

" ... We believe that there is strong sentiment by all parties with whom we have talked that the City has had an active, historical involvement in the DHA's operations and, therefore, bears some responsibility for the condition of public housing in Dallas. As a result, we have concluded that the City will be brought into the lawsuit involuntarily and will likely face enormous legal expenses in its defense. If the City is found liable, it then faces the likelihood of considerable financial outlays. It is for these reasons that we believe the city should enter the Consent Decree voluntarily."[149]

206. Then, on May 18, 1988, this lawsuit was filed—charging that the City's 8–3 mixed system for electing Council members was unconstitutional and was in violation of § 2 of the Voting Rights Act because it discriminates against African–American voters. The Ledbetter Neighborhood Association intervened on August 25, 1988, claiming that the 8–3 plan also discriminates against Mexican–Americans.

207. It was with this background of racial tension, hostility, crisis and other litigation—and with *Dallas Together* studying, among other things, the issue of minority representation in City government—that the depositions of eight members of the City Council (including the mayor) were taken in this case in September of 1988.

*Sept. 1988: is the 8–3 system fair?*

208. *Of the eight Council Members deposed in September of 1988, there were six*—Mayor Strauss (Place 11), Jerry Rucker (Place 9), Max Wells (District 4), Jerry Bartos (District 3), Dr. Charles Tandy (District 1) and John Evans (District 7)—*who testified that the 8–3 system was "fair" or "equitable" and that it afforded equal access to minorities.* The testimony of Mayor Strauss is typical:

"Q. In the past public debates about the continued existence of the 8–3 plan, is it accurate that your position is basically in favor of retaining the 8–3 plan?
A. In favor of maintaining the at-large mostly. My main concern is that we have [adequate] representation.... I

---

**147.** Pls.Exh. 29; TR. VII (6–7); Pls.Exh. 29. *Pettis Norman* served as one of the three Co–Chairs of *Dallas Together.* TR. VII (7–8).

**148.** Pls.Exh. 90.

**149.** See the *Walker III* opinion (*Walker v. HUD* ), 734 F.Supp. 1289, 1290.

think right now the 8–3 serves the City well." [150]

209. These six members also testified that they believed a qualified black could be elected to one of the 3 at-large places— even though it would cost much more to run for an at-large seat than a single-member district—and that there was no racial bloc voting "to their knowledge" in Dallas City Council elections.[151]

210. In contrast, Lori Palmer (District 2) testified that the 8–3 system had serious deficiencies because:

(i) It was "impossible for a third black candidate" to be elected in South Dallas because the black community was split between Districts 1 and 7.

(ii) It was difficult "for a minority to run successfully for an at-large position in the City" because of the tremendous voting strength in North Dallas—and because of the inability of a minority candidate to raise the money needed for an at-large campaign (since blacks and Hispanics "cannot afford to put that kind of money in a political campaign").[152]

211. Al Gonzalez (Place 10) agreed with Lori Palmer that the expense of an at-large race—which he estimated at $150–200,000 —would prevent a lot of people from running because they "can't afford that kind of money and can't get that kind of support," and that this lack of resources would affect a "higher percentage of blacks and Hispanics than it does Anglos." [153]

212. *The testimony given by six of the Council members in September of 1988, in support of the 8–3 system (Findings of Fact 208–09), would also prove to be contrary to the Final Report of Dallas Together.*

*Jan. 1989: the Dallas Together report*

213. On Jan. 13, 1989, the Final Report of *Dallas Together* was submitted to the Mayor, to the "City of Dallas and to the citizens of Dallas." [154] After "weeks of intensive dialogue"—and some 47 meetings from March 1988 through Jan. 12, 1989— "the members of *Dallas Together* identified five areas that they felt were generating continued racial tension": economic opportunity & development, business development, education, needs of the underclass, and *political participation.* (Final Report, pp. 2–3).

214. *The Political Participation Committee "ultimately asked a basic question: Is Dallas together? The committee concluded: It is not. And it should be. And there is no rational reason for it not to be."* (Final Report, p. 20). The committee also concluded:

"That a basic, vital concomitant part of economic opportunity is political opportunity and access into a fairly conceived, properly designed, and representative governmental system. *By most standards* (numerical, demographic, population and racial distributions) *our City Council districts, as presently structured, do not provide sufficient opportunity for all of our citizens to be properly and fairly represented in a system that is designed to meet the needs of contemporary Dallas.*

"The committee noted, with some alarm, the sense of hopelessness and despair by many of our citizens of all races. *Much of their concern is founded in a sincere belief, rightly or wrongly, that they are systematically excluded from the political process.* The committee recognized that deeply felt emotions such as these provide a breeding ground for

---

**150.** Pls.Exh. 51 (Strauss Dep., p. 11); Pls.Exh. 49 (Rucker Dep., pp. 6–8, 11–12); Pls.Exh. 52 (Wells Dep., p. 13); Pls.Exh. 53 (Bartos Dep., p. 21); Pls.Exh. 54 (Tandy Dep., pp. 21–23); Pls. Exh. 55 (Evans Dep., p. 17).

**151.** Pls.Exh. 51, pp. 8, 12, 33 (Strauss); Pls.Exh. 49, pp. 6–9, 11–14 (Rucker); Pls.Exh. 52, pp. 14–15, 20 (Wells); Pls.Exh. 53, pp. 12, 28, 30–31 (Bartos); Pls.Exh. 54, pp. 19–23, 30–31 (Tandy); Pls.Exh. 55, pp. 17, 24, 28 (Evans).

**152.** Pls.Exh. 48 (Palmer Dep., pp. 10–13, 38–39).

**153.** Pls.Exh. 50 (Gonzalez Dep., pp. 34–36).

**154.** *The report was also dedicated to the children of Dallas:* "It is our hope that we can break down some of the barriers that have taken so many years to erect so that our children will not have to repeat the struggle against racism." Final Report, p. 1.

crisis ..." (Final Report, p. 21) (emphasis added).

215. Accordingly, the Political Participation Committee recommended—*"with a sense of urgency"*—that the Dallas City Council appoint a "Charter Review Committee" to:

"—Gather and evaluate research data related to the following issues, among others:

—the proper number, population size, and demographic make-up of our single-member City Council districts

—the number, population size, and method of selection of at-large districts in conjunction with an evaluation of the proper role of such districts in our municipal system

... [155]

—Direct the Charter Review Committee to conduct an extensive series of public hearings throughout the city in order to gather specific recommendations in each issue area, based upon citizen input, research, and sound public policy analysis

—Direct the Charter Review Committee to develop and present to the City Council in a timely manner recommendations for any changes in our City Charter that are necessary to make our governmental system not only the most representative, but also the best, system that can be employed by our citizens into the twenty-first century" (Final Report, pp. 21–22).

216. This committee report ended with a recognition that these issues—including the current mixed system of 8 single-member districts and 3 at-large places—"tend to activate a great diversity of legitimate opinions and, in some instances, passion.

To a degree, that very fact proves the committee's point. It is our belief that, as a free and fair society, based on sound constitutional principles, our City should never be afraid to 'look for fear of seeing.'"

217. On March 8, 1989, the Council established the Dallas Citizens Charter Review Committee ("CRC"), as recommended by *Dallas Together,* for the purpose of "exploring options and practices" and—*by June 1, 1989*—making recommendations concerning the single-member districts and the at-large places in the 8–3 system for electing the Dallas City Council.[156]

### May 1989: last elections under the 8–3 & racial problems

218. The next City Council elections were scheduled for May 6, 1989. However, on Feb. 2, 1989, the plaintiffs filed a motion for preliminary injunction to stay these elections.

219. By Order dated April 6, 1989, this Court made the assumption *arguendo* that the plaintiffs could establish that the 8–3 system was in violation of the Voting Rights Act.[157] Despite this, the elections were not stayed because of two reasons:

"*First,* in *Chisom v. Roemer,* 853 F.2d 1186 (5th Cir.1988), the Fifth Circuit made it clear that district courts should not enjoin state or municipal elections if there is 'other corrective relief [that] will be available at a later date, in the ordinary course of litigation.' Here, there is 'other corrective relief' available; *if the plaintiffs do prevail at trial, a new City Council election can be ordered under a revised plan.*

"*Second,* as repeated in *Chisom* and other Fifth Circuit cases, if the 8–3 plan

---

**155.** The "issues" omitted from this quotation involved the role and powers of the Mayor, the compensation and staffing for members of the City Council, and campaign financing. Final Report, pp. 21–22.

**156.** Pls.Exh. 30.

**157.** As stated in the April 6, 1989 Order, the assumption was that the plaintiffs could prove that the 8–3 system "does not adequately provide for minority representation and participation in the City political process and that the

continuation of this denial of participation is a substantial cause of the current racial tensions and problems that are harming all citizens of Dallas. The discriminatory result is achieved by the single member district lines which 'pack' African–American residents in two single member districts [6 and 8] which are 74.91% and 87.39% African–American, by the 'cracking' of a contiguous African–American section into districts [1 and 2] of 20.91% and 31.78% African–American population, and by the use of the at-large places."

is found to be unconstitutional, this Court 'must grant the appropriate state or local authorities an opportunity to correct the deficiencies.' Accordingly, the City of Dallas argues that the election should not be enjoined because Dallas should be given an opportunity to remedy the defects, if any in its present 8–3 system."

220. However, this Court took pains to emphasize that "the City of Dallas is, in fact, presently taking advantage of this opportunity" to correct any deficiencies in the 8–3 system:

"The Charter Review Committee has been appointed. This Court has been advised by the defendant that the Committee has been instructed to finish its work promptly, in order that a City Charter election can be held in August, 1989, to consider any necessary Charter Changes. Therefore, under *Chisom*, the judicial relief sought by the plaintiffs would not be appropriate until the City of Dallas has completed this 'opportunity to remedy the defects, if any, in its present 8–3 system.' (Defendant's Response, pp. 27–29.)

"For these reasons, the plaintiffs' Motion for Preliminary Injunction must be DENIED. *However, this case is set for trial on September 5, 1989—the earliest date possible after the conclusion of the requested 'opportunity' for review of the 8–3 plan.*"

221. Accordingly, the Council elections were held—as scheduled—on May 6, 1989. As expected, there were two blacks and nine whites elected to the Dallas City Council.[158] But, *there were no Mexican–American candidates, either for a single-member district or for an at-large place, in the May 1989 City Council elections.*

222. The black members were, of course, from the two predominately African–American districts—*District 6* (Ragsdale, who ran unopposed), and *District 8* (Lipscomb, who was also unopposed). In *District 2*, incumbent Lori Palmer ran unopposed and was elected. In *District 1*, another black candidate (Giddings) ran against two white opponents, and received

28.33% of the vote—but the incumbent (Tandy) was re-elected with 60.99%.

223. The plaintiffs Williams and Crenshaw ran for two of the at-large places. In *Place 9*, Williams received 7.60% of the vote in a race against three white candidates. In *Place 11* (mayor), Crenshaw received 3.18% of the vote, and Mayor Strauss was re-elected with 72.38% of the vote. Another black candidate (White, Jr.) ran for *Place 10* (at-large); he received less than 4% of the total vote, and Jim Buerger was elected with 59.75%.

224. On April 27, 1989, a Dallas Morning News column stated that a "protest vote" for lawyer and "civic gadfly," Peter Lesser—who was running against Annette Strauss in the Place 11 (mayor) race—could lead to racial violence and white flight. (Pls.Exh. 91).

225. Also in 1989, the Justice Department issued an objection to *Dallas County's* absentee polling places for the November 1988 general election. This objection stated:

"During the course of our review [of the 6 location changes and the 3 additional locations for absentee voting], our staff orally informed county officials that the proposed changes were legally unenforceable absent the requisite Section 5 preclearance and that *there was substantial concern that the proposed changes would discriminate against minority voters.* Thus, it appears that although the county was well aware of the Section 5 preclearance requirements, it took no steps to ensure that its decisions could be adequately reviewed prior to implementation. The county apparently intended to, and, in fact, did proceed with these changes without obtaining the requisite Section 5 preclearance.

"... We note, as well, that Anglo and minority (both black and Hispanic) residents of Dallas County are not similarly situated socio-economically, since blacks and Hispanics lag significantly behind Anglos in income, education, occupational status and electoral participation....

"Only after what appears to have been significant pressure from the black com-

---

**158.** Pls.Exh. 82, pp. 91–93; Pls.Exh. 82A.

munity did Dallas County agree to place an absentee voting site in a location convenient to some blacks. Even so ... *the county nevertheless delayed opening that absentee voting site until after the occurrence of an event [an appearance by the Rev. Jesse Jackson] which as the county was fully aware, would have provided many black voters with a convenient opportunity to vote absentee by personal appearance at the Martin Luther King Jr. Center site."* [159]

## D. History of the 10-4-1 Plan

226. As directed by this Court,[160] evidence was presented at trial by all parties concerning the 10-4-1 plan which resulted from the work of the Charter Review Commission ("CRC").

### the Charter Review Commission

227. CRC began its work on March 15, 1989 with 14 members and 11 alternates. Each member of the City Council appointed one CRC member and one alternate, and Mayor Strauss appointed three additional members.[161]

228. Ray Hutchison, the Chairman of CRC, had also chaired the Political Participation Committee of *Dallas Together*, and had written its report. (Findings of Fact 213-216). He explained that the 8-3 system was unfair to minorities:

> "... But you could look at the numbers and you see a ten-person City Council plus the Mayor, and you add it up. And at that time I believe we did have one Hispanic member [of the Council]. But then you have two African-Americans. And you can sense that something is wrong in the [8-3] system."

Hutchison also testified that the CRC concluded that 18% (i.e., 2 out of 11 members) "was not fair representation on the Dallas City Council for blacks"—particularly since *the Council could "achieve 27.3% African-American representation" (i.e., 3 out of 11 members) at any time by redrawing the 8-3 lines to create a third "safe seat for blacks."* [162]

229. Hutchison's conclusions were reinforced by the 1986 Census population estimate—used both by CRC and *Dallas Together*—which showed Dallas to be 30% black, 18% Mexican-American, 5% Native & Asian-American, and 47% Anglo.[163]

230. CRC had been directed to complete its review by June 1, 1989, in contemplation of a Charter election in August. (Findings of Fact 217, 220). According to Hutchinson, this short deadline for such "a watershed event"—the changing of the structure of City government in Dallas—caused a "significant outpouring" of adverse reaction, as well as criticism that the CRC was "just a deliberate delay [to] perpetuate [the 8-3] system that was opposed." [164]

231. Because of this "severe burden," at the first CRC meeting an "Order of Procedure" was adopted so the work could be completed. It called for "full participation by the community on an invited basis," with "public hearings later." [165]

232. On March 28, 1989, CRC distributed a questionnaire to present and former members of the Dallas City Council. In response, it received completed questionnaires from 16 people. Among other things, this group estimated:

(i) that the cost of an election campaign in a single-member district would range from $15-30,000;

(ii) that a campaign for an at-large seat (except the mayor, Place 11) would cost at least $100,000 and would probably range from $150-200,000.[166]

233. In late March, CRC also distributed a "Request for Opinions" to over 90

159. Pls.Exh. 93; TR. I (92-93).

160. See *Terrazas v. Clements,* 537 F.Supp. 514 (N.D.Tex.1982) (three-judge court), *stay denied,* 456 U.S. 902, 102 S.Ct. 1745, 72 L.Ed.2d 158 (1982); *Terrazas v. Clements,* 581 F.Supp. at 1332.

161. Pls.Exh. 37A, pp. 4-5; TR. IV (24-25).

162. TR. IV (60-66, 90, 98). *See fn. 12.*

163. Pls.Exh. 32; TR. IV (71-72).

164. TR. IV (66-67).

165. TR. IV (70-71); Pls.Exh. 37A, pp. 9-15.

166. Somewhat higher estimates were given for single-member district races involving a run-off or a seriously contested election. See Pls.Exh. 37E, pp. 5-9, 75-79; Pls.Exh. D, pp. 12-16, 27-31. The highest estimate for an at-large race

civic, business, religious, neighborhood, racial and ethnic organizations in Dallas. Among other information—including the estimate that Dallas had a 30% black and 18% Hispanic population in 1986—this Request for Opinion contained the following:

"The Dallas governmental structure of 8 single-member districts with 2 Council Members elected at large (additional to the Mayor) was initiated as a part of a court settlement in 1975. *The first election held under this system occurred that year, with seven elections having been held under the current system.* Two African–Americans have been elected to single-member districts in each of the seven elections. One Hispanic was elected to one single-member district in two of the elections, and Anglo Americans have been elected to the remaining single-member districts in each election. *One Hispanic was elected to one at-large Place in one election. Anglo–Americans have been elected to the remaining at-large seats in all elections. African–Americans have not been elected to any at-large seat under the current system.*" [167]

234. The CRC received *written* responses from approximately 40 of these organizations.[168] There was no formal tabulation of the results of this mailing, but from the trial exhibits it appears:

(i) that some 17 organizations were in favor of "pure single-member districts" or a system in which only the mayor was elected at-large;

(ii) that these 17 included the Catholic Diocese of Dallas, CAUSA, Greater Dallas Community Relations Commission, Dallas Homeowners League, the Dallas Black Chamber of Commerce, the Mexi-

can–American Bar Association, the J.L. Turner Legal Society, the Greater Dallas Community of Churches, the South Dallas Improvement League, the Progressive Voters League, and the NAACP (Dallas Chapter);

(iii) that about 19 organizations were in favor of some type of system that had "at large" seats on the Dallas City Council;

(iv) that these 19 included the League of Women Voters, the Greater East Dallas Chamber of Commerce, the Stemmons Corridor Business Assoc., the Southeast Dallas Chamber of Commerce, the Oak Cliff Chamber of Commerce, the Dallas Citizens Council, the Lakewood Chamber of Commerce, the Dallas Asian–American Chamber of Commerce, the North Dallas Chamber of Commerce, and the Greater Dallas Chamber of Commerce.[169]

235. CRC also held "26 separate public sessions, including 8 public hearings in the neighborhoods of Dallas." There was no formal tabulation of the positions taken by the speakers at these hearings, so the weight of the opinions expressed was not measured. Charges were made that this was done deliberately to conceal the fact that the speakers—at least those in minority areas—overwhelmingly supported a single-member district system and opposed any at-large seats (except, perhaps, for the mayor).[170] However, these public hearings were recorded on both audio and video cassettes.[171]

236. In addition, the record contains *written* statements presented to the CRC by some 17 *individuals* at these public hearings. Of these, 9 opposed any at-large seats (with the possible exception of the

---

was $200–240,000. Pls.Exh. 37D, pp. 2–61, 96–100; Pls.Exh. 37E; Pls.Exh. 37G.

**167.** Pls.Exh. 31, pp. 4–5.

**168.** The final report of the CRC (Pls.Exh. 34) indicates that another 10 organizations may have responded, but no evidence of these responses—whether written or oral—was presented at trial. See Pls.Exh. 31; Pls.Exh. 37B, pp. 75–81; Pls.Exh. 37D, E, F and G. See also Pls.Exh. 139 (which tabulates 32 written responses).

**169.** This figure does not include the Dallas Hispanic Chamber of Commerce because of a serious dispute—which cannot be resolved on the basis of the trial record—as to whether the "vote" taken by this organization was proper and reflected the views of its members. See Pls.Exh. 37G, pp. 32–33, 134–38, 150–51; Pls. Exh. 37F, pp. 37, 125.

**170.** See, e.g., TR. VI (69–70, 82–83, 112–13).

**171.** Some of the audio cassettes were admitted in evidence. Pls.Exhs. 38A–E.

mayor)—and 7 favored some type of mixed system with at-large seats.[172]

237. The statement presented to the CRC by former Council Member Richard Smith was typical of those who supported at-large positions:

> "In my view, the advantages of the at-large election of at least some members of the Council outweigh the disadvantages. Traditionally, at-large representatives have provided a perspective different from that of district representatives, one that should be maintained.... At-large positions provide an opportunity for a candidate who is not yet ready to be mayor to establish credentials and develop relationships, and develop stature, to prepare for promotion to the office of mayor.... At-large positions are particularly important for minority candidates. A minority candidate who would not be able to muster sufficient support to be elected mayor might well be able to gather the support necessary to be elected to an at-large City Council position." [173]

238. Similarly, the statement presented by Karen Roberts to the CRC was representative of those who wanted only single-member districts:

> "It is long past time to end the at-large system in Dallas. It wrongly excludes minorities because of the polarized voting patterns in elections for at-large seats.
>
> "Additionally, the cost of running at-large is prohibitive with lower income groups, the groups from which most minorities come.... An at-large candidate cannot walk the entire district, which would be the whole city. The candidate must depend upon expensive media, something out of reach for low income candidates. Thus there is a definite bias toward the election of persons from white, higher income areas.
>
> "The result is a less than democratic system. One which excludes a large group of our citizens, many of whom feel disenfranchised from the electoral process. A lack of representation in the system is unfair and this unfairness comes out in a multitude of ways. The final result is a divided, frustrated city with problems beyond control." [174]

239. Besides the conflicting opinions of organizations and individuals, the CRC members also received a myriad of suggested plans and maps and alternatives for redistricting.[175] However, CRC did not have any help from an expert or outside demographer, nor did it have any "analysis of elections or voting patterns." [176] Because of this, there was some confusion and uncertainty as to just what would happen—in terms of minority representation on the City Council—under the various plans and alternatives presented to the CRC members.[177]

240. Eventually, there was some focus on two alternatives: (i) a 12–1 single-member district plan, with only the mayor elected at-large; and (ii) the 10–4–1 plan, with 10 single-member districts, 4 quadrants or "super-districts," and the mayor elected at-large.[178] According to CRC Chairman

---

172. Pls.Exh. 37F, G.

173. Pls.Exh. 37D, pp. 104–06; Pls.Exh. 37A, p. 39.

174. Pls.Exh. 37E, pp. 8–9. See also Pls.Exh. 37E, pp. 39–40 (Greater Dallas Community Relations Commission); Pls.Exh. 37F, pp. 59–63 (Dallas Homeowners League); Pls.Exh. 37G, pp. 24–27 (Greater Dallas Community of Churches).

175. See, e.g., Pls.Exh. 33; Pls.Exh. 37E, pp. 26–38; Pls.Exh. G, pp. 40–85.

176. TR. IV (102–03, 144–45). The only "expert" assistance was from the City's expert witness in this case, Dr. Delbert Taebel, who provided some information on cumulative voting. TR. IV (103–06). *Apparently, the members of CRC did not know that Dr. Taebel had already been retained by the City as its expert in this case when he appeared at two CRC meetings.* TR. III (67–68, 157–58).

177. See, e.g., TR. I (175–76); TR. VII (48–50); Pls.Exh. 38E. Hutchison explained that it was not the responsibility of CRC to *redistrict* the City, but only to examine its *structure of government.* Pls.Exh. 38A; TR. IV (91–92). Despite this, there was constant concern about the number of minorities that could be elected to the City Council under the various plans considered by the CRC. Pls.Exh. 38A–E.

178. See Pls.Exh. 34, 39. Hutchison testified that he thought the idea of the 10–4–1 plan had been first proposed in 1989 by the East Dallas Chamber of Commerce. TR. IV (147); Pls.Exh. 38E. However, its origin appears to be much older.

**1372**

Hutchison, *the committee decided against any at-large seats like those that were present in the 8–3 system because "it was conceded by us that the [8–3] system is unfair."* [179]

241. On May 27, 1989, CRC was scheduled to "start the process of trying to come to decisions." However, Hutchison was asked by Pettis Norman to recognize him for "a motion to delay the process." Hutchison was taken "aback a little bit," but he did recognize Norman to make that motion. Then, someone—one of the minority members or alternates—told Hutchison that Norman had made "the wrong motion" and that "he should have moved for approval of the 12–1 plan." [180] Hutchison—being concerned that there would be a "racially polarized vote"—then made a substitute motion "to adjourn the committee subject to the call of the chair." This motion passed by a one or two vote margin. [181]

242. On June 13, 1989, MALDEF advised Hutchison that it believed the 10–4–1 plan would be in violation of the Voting Rights Act because "the effect of the 4 quadrant districts is to establish 4 virtual at-large positions." [182]

243. Hutchison called the CRC back in session on June 13, 1989—two weeks after the deadline that had been set by the City Council. *The meeting opened with some civility, but it degenerated into acrimony and bitterness that matched the animosity that had taken place seven years earlier, during the 1982 reapportionment battles.* [183] (Findings of Fact 142–163).

244. By its first vote at the June 13 meeting, the CRC unanimously condemned the 8–3 system. There were seven CRC members or alternates who had been elected to the City Council under this system, but all of them had now concluded that the 8–3 plan was unfair to minorities. One of them, Lee Simpson (Finding of Fact 157) stated, in substance:

> Of the 13 people elected at-large to the City Council since 1975, only 2 lived south of Northwest Highway. There have been no at-large members from South Dallas or from the inner-city. Nor have there been any from Oak Cliff or Pleasant Grove or East Dallas.

245. After this vote, the CRC considered the issue of whether Dallas should have an all single-member district system (like the 12–1). At this point, hostility increased as the members broke into two factions—with Al Lipscomb, Diane Ragsdale, Joyce Lockley (all African–Americans) and Joe May (Hispanic) aligned against everyone else. [184]

In January 1982, a League of Women's Voter's Report suggested the possibility of "an 8–2–1 system, with 8 single-member district seats, 2 members elected at large but having residency requirements (possibly a southern and northern district), and the mayor remaining totally at-large." Pls.Exh. 37A, pp. 7, 35. Then, *in February 1982, a newspaper story reported that Council Member Don Hicks (District 1) "may even raise the issue of increasing the size of the 11-member City Council to 13 to preserve his Oak Cliff seat as a predominately white district" by replacing two "at-large positions with four regional council districts."* Pls.Exh. 24 (Exh. M).

**179.** TR. IV (135–136, 144, 153); Pls.Exh. 38C, E.

**180.** This statement referred to a meeting which had been held at the Dallas Black Chamber of Commerce offices by some leaders of the minority communities, including the minority members of CRC. There was confusion about what took place at this meeting. Some thought that Norman had agreed to move for the adoption of the 12–1 plan; others were disturbed by the lack of adequate information, and they understood that Norman was going to move for a delay by

CRC "so they could hire their own demographer" to evaluate the various plans. TR. I (56–57, 91–92, 175–76); TR. VI (22, 47–50); TR. VII (47–50).

**181.** TR. IV (pp. 86–87). Hutchison explained that "rightly or wrongly, we were involved somewhat in trying [this] lawsuit in our deliberations. And I knew enough about the subject matter [of the litigation] to know it's not a good idea if you can avoid it to have Anglos vote one way, African–Americans vote another way, etc."

**182.** Pls.Exh. 37H, p. 2.

**183.** See, e.g., the exchange that followed the heated comments of Council Member Al Lipscomb concerning the existence of "an all-white Country Club" in Oak Cliff (District 1). Pls.Exh. 38E.

**184.** Except Lee Simpson and John Fullinwider, who continued to try to get the group to debate the issues and to negotiate a compromise. Pls. Exhs. 38C–D.

246. The majority group presented the 10-4-1 plan "as a compromise" between those in Dallas who wanted all single-member districts and those who still wanted an all at-large Council. They thought 10-4-1 would give Hispanics a better chance to win a "coalition seat," and they denied that the quadrants were merely an attempt to continue to deny minority representation by the use of "at-large" seats.[185]

247. *The minority group vehemently denied that the 10-4-1 was any "compromise" because the all at-large system had not existed since Judge Mahon's decision in 1975.* They were suspicious that the 10-4-1 plan "had been floated to people in power to get them to agree to support something less than an all at-large system" and to preserve "Anglo control of the Council." They argued that blacks and Hispanics could not raise the money necessary to campaign successfully in a quadrant any more than they could in an at-large seat, and that Hispanics could not win any district under the 10-4-1 plan. They asserted that the quadrants were merely "at-large" districts with another name, with Al Lipscomb angrily saying: *"If it looks like a duck, walks like and acts like and quacks like a duck, then it's a duck."* [186]

248. The minority group also tried—unsuccessfully—to get CRC to recommend more than one plan to the City Council. There were also threats of litigation and threats to oppose preclearance of the 10-4-1 plan. At one point, Al Lipscomb shouted *"Let's just expedite this thing, vote, and go to Court."* Some CRC members felt that this showed that "blacks and Hispanics were not willing to negotiate" because they believed they could get whatever they wanted in court.[187]

249. With this racially-charge atmosphere, the CRC—by a 10-4 vote—decided against any plan that was all single-member districts. Then, the committee decided on 4 quadrant districts (by a 10-4 vote) and on 10 single-member districts (by a 9-5 vote). Accordingly, the CRC recommended that the Dallas City Council be composed of the following:

"—10 persons elected from single-member local districts of approximately equal size, places 1-10.

—4 persons elected to single-member regional districts of approximately equal size, places 11-14.

—1 person elected by the entire city as mayor, as the official head of City government, and as a voting member of the Council and its presiding officer, place 15." [188]

250. *In addition, the CRC recommended that this 10-4-1 plan should be used for the May 1991 Council elections using the 1980 Census data—and that lines should be redrawn for the 1993 elections using the 1990 Census.*[189]

251. When the work of CRC was concluded, this was its comparison of the proposed 10-4-1 plan to the existing 8-3 system: [190]

### 8-3 system

*Blacks*—"Currently districted to permit 2 'safe' seats for blacks. Would permit 1 additional 'safe' seat for blacks"

*Hispanics:* "When districted for 3 blacks, permits 1 'possible' hispanic district with 43% concentration, along with blacks, to create a 53% 'majority minority' district. One Hispanic has been elected to a similar district. When additional 3rd seat is drawn for blacks, reduces opportunity for Hispanics substantially"

### 10-4-1 Plan

*Blacks:* "Permits 4 'safe' seats for blacks, 3 local districts and 1 regional

**185.** Pls.Exh. 38D–E (statements by Ray Hutchison, Jack Evans, Pettis Norman, Dr. Hope Garcia and others).

**186.** Pls.Exh. 38D–E (statements by Al Lipscomb, Diane Ragsdale, Joyce Lockley, Joe May, and John Fullinwider).

**187.** TR. IV (86) (Hutchison); Pls.Exh. 38D–E.

**188.** Pls.Exh. 34, p. 3–4. The term of office was to be two years—and "a person may not serve as a member of the Council in any one or more of places 1–14 for more than 4 consecutive 2–year terms."

**189.** TR. IV (140–41).

**190.** Pls.Exh. 36.

district, with each having 75 + % concentration"

*Hispanics:* "Permits 'possible' local district of 44% concentration for hispanics in a 65% 'majority minority' local district, plus 1 'possible' hispanic seat in a 'majority minority' regional district having ⅓rd hispanic, ⅓rd black, and ⅓rd anglo population"

Under this projection, there would be no "safe seat" for Hispanics—all Hispanic districts under the 10–4–1 were characterized as "possible"—and, by their "safe seats," African–Americans were expected to achieve 26.67% representation of the expanded City Council (i.e., 4 out of 15 seats).[191]

252. Although there was some contrary testimony and some criticism of the Mayor's choice of a chairman,[192] the CRC process was fair and it was open to all Dallas citizens.[193] However, there is some doubt that the process was "representative" of the community as a whole. *This was not the fault of CRC or its chairman;* but with the "severe burden" of the short deadline set by the Council (Finding of Fact 230), and with the difficulty of getting people and organizations to participate,[194] only a small number of individuals and groups really participated in the process.[195] And, with the bitterness and distrust and racial tension that developed in the CRC process, the losing minority group (Findings of Fact 245–247), felt like the CRC and "the powers

that be … just discounted us as though we didn't exist and ran rampant."[196]

253. In any event, *this was the net result of the efforts of CRC: it proposed a plan for the structure of City government—the 10–4–1 plan—that actually projected a lower percentage of African–American representation (26.67%) than the City Council could have achieved simply by redrawing lines under the existing 8–3 plan to create a third black district (27.3%) and a fourth "swing district" with a total minority concentration in excess of 50%.* (Findings of Fact 147, 150, 187, 228, 251).

### the city council

254. On June 20, 1989, the CRC submitted its report to the Dallas City Council. The report noted that "four members of the Committee strongly believe in and support … a 12–1 council structure" that is different from the 10–4–1 plan "recommended by a substantial majority of the Committee."[197]

255. Among other things, the Minority Report advised the City Council that:

"This [10–4–1] recommendation was supported by the Anglo members of the CRC, along with the minority members appointed by the mayor. CRC members representing Districts 6, 8, and 2 (which are the predominantly minority districts under the current system) opposed the 10–4–1 plan. The CRC member appoint-

**191.** TR. VII (17–18, 37). In contrast, blacks could achieve 27.3% representation if the Council simply redrew the 8–3 lines to create a third "safe seat for blacks." Finding of Fact 228. *See fn. 12.*

**192.** TR. IV (67–70); Pls.Exh. 38C. But see Tr. VII (10–12) (Pettis Norman testified that he thought Hutchison had been "fair and even handed" and that any CRC recommendations to change the 8–3 system "could be sold best by someone from [the North Dallas] community").

**193.** TR. IV (130).

**194.** Hutchison explained that it was difficult to get people or groups "really even interested" at the start, that public participation was encouraged but this "worked in some cases and it didn't in others," that only half (or less) of the

organizations contacted had the interest to respond to the CRC questionnaire. TR. IV (131–32). Pettis Norman testified that "we were encouraging and *begging* … people that we previously invited to come and testify." TR. VII (12).

**195.** CRC estimated that it heard from organizations "having memberships that likely number in excess of 3000 Dallasites." This would be only .006% of the number of registered voters for the May 1989 City Council elections and only .033% of the persons who actually voted in the mayor's race (Place 11) in those elections. Pls.Exh. 82A, p. 91.

**196.** TR. I (58) (Lipscomb).

**197.** Pls.Exh. 34 (CRC Report); Pls.Exh. 39 (Minority Report); Pls.Exh. 36 (Comparison of 10–4–1 plan to 8–3 system and to the Minority Report's 12–1 plan).

ed by a Hispanic Council Member (former Councilman Al Gonzalez) also opposed the 10–4–1 plan.

"...

"The 10–4–1 plan preserves significant vestiges of the at-large system. The regional districts, containing 220,000 + population, would be more expensive to campaign in than single-member districts. These larger districts would necessarily entail media advertising, which is beyond the reach of most minority candidates, unless they can gain 'Establishment' support from outside the district. The regional districts would be at least 50% Anglo (2 out of 4 districts) and would in all likelihood be 75% Anglo (3 out of 4 districts), thus preserving disproportionate Anglo power on the council."

256. The CRC recommendations were set on the agenda for the City Council meeting on June 28, 1989—the last day on which an August referendum could be set on the Charter amendments required by these recommendations. However, at the briefing session for this meeting a new Council Member, Jim Buerger (Place 10), proposed a delay because he felt "we did not have adequate time to evaluate [the CRC] proposal." Buerger had other concerns:

"... And it is my feeling .. that [the 10–4–1] proposal did not achieve that goal [of *Dallas Together*], did not achieve a consensus, it could not conceivably bring our City together, but in effect polarized it and that I felt that there was opportunity to find an option that was an alternative that could still be something that would be acceptable to all communities and something that would be workable ..."

Buerger explained that "the two positions were polarized under 10–4–1 and 12–1" and that "common ground that all communities could stand on" might be a 12–2–1 system (with the 2 at-large seats having residency requirements). He wanted to get off the

"fast track" because he had "very strong feelings"—after talking to Council Member Ragsdale—that "there could be a compromise of some sort." He also felt that Council Members had not even had time to read, much less understand, the *final* CRC proposals—which were actually delivered during this Council meeting.[198] However, Buerger's request for a delay was defeated by a 7–4 vote.[199]

257. At the June 28 Council meeting, about 25–30 persons had registered to speak. Of these, all but one expressed strong opposition to the 10–4–1 plan. When Bernice Washington (African–American) spoke, she began to sing and this started a spontaneous demonstration; minorities and others who were present joined Ms. Washington, and their demonstration disrupted the Council meeting.[200]

258. Despite the demonstration—and over its noise—the Council voted 7–4 to adopt the CRC recommendation concerning the 10–4–1 plan, and to set it (and other matters) for a referendum election on August 12, 1989. Al Lipscomb proposed the 12–1 single-member district plan, but this was defeated by an 8–3 vote.[201]

259. The City Council rejected one recommendation of the CRC. Instead of using the 10–4–1 plan for the regular 1991 elections (based on 1980 census data), *the Council voted to delay the elections until at least November 1991 or later depending on when the City was able to obtain preclearance from the Attorney General under § 5 of the Voting Rights Act.*[202]

260. Subsequently, the City Council rejected a request by the two African–American members—Ragsdale (District 6) and Lipscomb (District 8)—to offer the voters the 12–1 plan as an alternative in the August 12, 1989 referendum. However, this was done because the Texas Secretary of State and the Dallas City Attorney had advised the Council that, under state law,

**198.** TR. V (62–67) (Buerger); TR. V (171) (Ragsdale); TR. VI (91) (Orozco); TR. I (56–58) (Lipscomb).

**199.** TR. VI (67–69).

**200.** TR. VI (24, 67–69).

**201.** Buerger, Lipscomb, Ragsdale and Palmer voted for the delay and against the 10–4–1 plan. Buerger also voted against the 12–1 plan. TR. V (63, 66–67).

**202.** Pls.Exh. 32, 35, 40.

two incompatible measures could not be placed on the same ballot.[203]

261. From June 28 until the August 1989 referendum, there were planned demonstrations by minority groups to disrupt almost every meeting of the Dallas City Council, as well as protest marches in downtown Dallas against the 10–4–1. These activities received extensive media coverage.[204]

### the election

262. On the same night as the Council vote (June 28), a "tri-ethnic organization"—Dallas Citizens for Democracy—was formed to attempt to defeat the 10–4–1 plan in the August 1989 referendum. Diane Orozco (Hispanic), Kathryn Gilliam (African–American) and Larry Duncan (white) were the co-chairs of this organization.[205]

263. Dallas Citizens for Democracy was able to raise only $6,000. It used this to pay for one "city-wide mailout targeting certain voters," for one smaller mailing that targeted East Dallas, and for phone banks, postage and printing.[206]

264. Another organization, called "Vote Yes For Dallas," was formed to promote the 10–4–1 plan. It raised some $150–200,000. Among its other efforts, "vote Yes For Dallas" targeted the Mexican–American community with the mailing of a 10–page brochure in color and with ads on Hispanic radio stations and in Hispanic newspapers.[207]

265. The City's explanations of the proposed Charter amendments stated:

"Based on plans drawn using 1980 census data, *it is the City's position that the 10–4–1 plan would result in three places from the 10 single-member districts and one place from the four quadrants being safe seats for African–Americans.* By safe seats, it is assumed that at least 65% of the population of the district would be African–American.

"In addition, one of the places from the 10 single-member districts would have a population consisting of between 45% and 52% Hispanic, and one of the four quadrants would be at least 33% Hispanic. *This would give Hispanics the possibility of strongly influencing the elections in the two districts." (emphasis added).*[208]

266. In the August 12, 1989 election, the 10–4–1 plan passed with 65% of the total vote.[209] However, *95% of the African–Americans who voted, and over 70% of the Hispanics who voted, were opposed to the 10–4–1 plan—which passed because it received 85% of the white vote.*

267. Conflicting evidence was presented concerning the Hispanic vote in this referendum. Immediately after the election, "Vote Yes For Dallas" announced that the Mexican–American vote had been "split"—and that LULAC 100, the Hispanic Women's Network of Texas, the Dallas Hispanic Chamber of Commerce and a cross-section of Mexican–Americans had supported the 10–4–1 plan.[210] However, credible testimony and exhibits established:

(i) that "LULAC 100" only had some 8–20 members, and that several other LULAC groups had opposed the 10–4–1 plan.

(ii) that there was a vehement dispute among members of the Dallas Hispanic Chamber of Commerce as to whether this Chamber had taken a proper vote of its members or whether its "support" for 10–4–1 was only the reflection of the views of a handful of individuals who attended one meeting;

---

**203.** Def.Exh. 43; TR. IV (44).

**204.** TR. VI (88–89).

**205.** TR. VI (65–67). Diane Orozco was the first recipient of *the Sarah T. Hughes Minority Fellowship at SMU Law School,* which is funded by the Dallas Bar Association and the Dallas Bar Foundation, primarily with money raised from the annual *Bar None* "gridiron" show of the Dallas Bar. TR. IV (64).

**206.** TR. VI (25, 71–72).

**207.** TR. VI (72–73).

**208.** Pls.Exh. 42.

**209.** Int.Exh. 5, 36; Pls.Exh. 80; TR. II (16–17); TR. IV (55–56); TR. V (182–83). Every precinct in which African–Americans constituted a majority rejected the 10–4–1.

**210.** See, e.g., TR. VI (195–96).

(iii) that all other *major* Hispanic organizations had opposed the 10–4–1; and

(iv) that other information distributed by "Vote Yes For Dallas" about the Hispanic vote was misleading and inaccurate.[211]

Therefore, although there was some split in the Hispanic community (or among some of its leaders), this Court finds that Hispanics voted overwhelmingly against the 10–4–1 plan.

268. In view of this bloc voting—in which an 85% white vote defeated the 95% black vote and the 70% Hispanic vote—*the 10–4–1 referendum in August 1989 was probably the most racially divisive election in the history of the City of Dallas.* State Senator Eddie Bernice Johnson (23rd District) described the atmosphere in her district in the month following this referendum:

"... We have taken a lot without too much striking back in Dallas. But the time is running out. The clock is ticking. Young people are not nearly as patient as what we have seen in our days.

"While we might think the City Council is in chaos now, unless we bring forth some fairness we haven't seen nothing yet. And I have never been one to threaten. I've never been one to speak out before I do my homework.... But I live in a community where I represent 500,000 people. It's very diverse. It is not majority black. And I feel *the tension.* I feel *the discomfort.* I feel *the anxiety* and I see *the despair.* I see *the discouragement* and I've heard it from my own son ...

"...

"I think that if you would interview blacks on a one-to-one basis throughout this City, the attitudes, even when you start to register voters now, *they say there's no point in it, nothing's going to change, those white people are going to do what they want to do. That's a dangerous environment to be in for*

*that kind of helplessness to prevail,* and that is the case right now." [212]

269. The well-intentioned *Dallas Together* commission—and the tortured efforts of the Charter Review Commission—had ended after the August 1989 referendum with severe racial tension, a divided community, and a racially charged atmosphere—that was no better, and was probably even worse, than when *Dallas Together* had been conceived in early 1988. (Findings of Fact 200–203, 214).

#### other litigation

270. On August 4, 1989, just a week before the 10–4–1 referendum, this Court issued its *Walker III* opinion—which held that, for over 50 years, the City of Dallas had caused, had supported, and had perpetuated racial segregation and discrimination in low-income public housing programs in this City.[213] In recording this history of "deliberate segregation in public housing in Dallas by DHA and by the City itself," *Walker III* summarized these examples:

"... the City Manager selected the site for DHA's first 'Negro' housing project;

"... the Mayor (and City Council) requested DHA to construct the 3500–unit West Dallas Housing project, as a solution to the 'Negro Housing Problem' of the 1950's, in order to keep blacks from moving into 'white areas' of the city;

"... because of the City Council's opposition, the additional 3,000 units of public housing available in 1962 were denied to those in need of low-income housing;

"... because of the City support for (and the active participation of the City Attorney in) DHA's illegal tenant assignment and selection plans, DHA was permitted to forfeit over $31 million in federal funds from 1969 to 1974—and this loss resulted in the rapid and irreversible deterioration of every DHA housing project, including West Dallas;

---

211. TR. IV (75–78, 95–100); Int.Exh. 43; TR. VI (39, 70–71, 198, 207–08); Pls.Exh. 37G, pp. 32–33, 134–38, 150–51); Pls.Exh. 37F, pp. 37, 125; TR. VI (75–77, 95–100). There was no evidence concerning the number of members in the Hispanic Women's Network of Texas.

212. TR. I (95–96).

213. *Walker III* (*Walker v. HUD*), 734 F.Supp. 1289 (N.D.Tex.1989) (Memorandum Opinion, pp. 1289–1290, 1293–1308, 1308–1309).

"... the City, despite DHA's policies of blatant discrimination, has made (or promised) grants of CDBG [Community Development Block Grant] funds to DHA when the particular project furthers segregation (e.g., *Robin Square*), but has refused CDBG grants to DHA for efforts to correct its past policies of discrimination (e.g., funding for the mobility and relocation benefits under the Consent Decree in this case); and

"... the City simply continues to refuse to recognize that it has *any* responsibility to help solve the monumental problems that are the legacy of the City's mistake in having the West Dallas project built to keep at least 3,500 blacks out of the white areas of Dallas."

271. On August 22, 1989, just ten days after the 10–4–1 referendum, Judge Sanders refused to declare that the DISD had achieved "unitary status." His order recited that "the three African–American members of the [DISD] Board" opposed the "Motion to Declare Unitary Status"—and that the Board was "unable to agree upon a reply" to the Court's Order that the Board file a response addressing several matters that were "fundamental" to any request for a "unitary status" declaration.[214]

### the aftermath of 10–4–1

272. CRC had also recommended that the salary paid to City Council members be increased—from $50.00 a meeting to "$1,650 per month plus verified expenses of office," with the mayor to receive "$2,500 per month plus verified expenses of office." This was defeated in the August 1989 referendum due, in large part, to the bloc voting of blacks and many Hispanics against *everything* on the ballot.[215]

273. The City submitted the 10–4–1 plan to the Attorney General for preclearance under § 5 of the Voting Rights Act. In doing so, it represented that there would be 4 "safe seats" for blacks ("3 local districts and 1 regional district") and a "possible local district of 44% concentration for Hispanics in a 65% 'majority minority' local district."[216]

274. On Oct. 16, 1989, the Attorney General refused to preclear the 10–4–1 plan because no lines had been drawn for the 10 local districts or the 4 quadrants, stating:

"... You have advised us, however, that the City has not yet adopted a specific districting plan for the new election system and will not adopt such a plan until after the 1990 Census data are available. Moreover, you have explained that when 1990 data are available, the City may well not select any of the several alternative districting plans for the proposed new election system that have been developed to this point using 1980 Census data. Thus, you are unable to provide information at this time regarding how the proposed method of election will impact upon minority voting strength in the City.

"Under these circumstances, the Attorney General is unable to make a determination as required under Section 5 regarding the purpose and effect of the proposed changes in the method of election for the city council and the related changes."[217]

275. Finally, *Dallas Together* and CRC did have a definite impact upon the attitude of the members of the City Council about the fairness of the 8–3 system. Unlike the depositions taken in September 1988—when 6 of the 8 Council Members testified that the 8–3 system was "fair and equitable and afforded equal access to minorities" (Findings of Fact 208–210)—9 members of the present Council either agreed with the unanimous conclusion of CRC (i) that the 8–3 system was racially unfair and

---

**214.** See Memorandum Opinion and Order (August 22, 1989) in *Tasby v. Edwards*, CA 3–4211–H (N.D.Tex.).

**215.** Pls.Exh. 34, 82A; Findings of Fact 266–68; Int.Exh. 37.

**216.** Pls.Exh. 36; TR. III (7, 51, 174); Finding of Fact 265. However, the City Council did not review this preclearance request, and it has not taken any official position on how many minorities could be elected under the 10–4–1 plan. TR. III (7, 48–49, 174–75, 199, 213); TR. V (27–28, 72–75).

**217.** Attorney General letter of Oct. 16, 1989 to City Attorney Analeslie Muncy (filed as *Court's Exh. A–6*).

should be condemned or (iii) that the 8–3 system should be abandoned. (Findings of Fact 214–15, 228, 240, 244). Specifically:

(i) *Mayor Annette Strauss* first testified that, "according to my own experience," she did think the 8–3 system "had served the City well"—but immediately conceded that she had changed her mind since her deposition, and that she now agrees with *Dallas Together* and CRC that the 8–3 system has not been fair to minorities.[218]

(ii) *Al Lipscomb* (District 8), *Diane Ragsdale* (District 6), and *Lori Palmer* (District 2) all testified that the 8–3 system was unfair and denied minorities access to the political process because a black or Hispanic candidate could not win any of the three at-large places—and because the black community was "packed" into Districts 6 and 8, and "cracked" between Districts 1 and 7, to deny them a third "safe" seat on the City Council.[219]

(iii) As to the three new Council Members, *Glenn Box* (District 3) testified that one of the reasons he supported the 10–4–1 was because no blacks had been able to win an at-large election and because he thought "time had passed" for the 8–3 system;[220] *Harriet Miers* (Place 9, at-large) testified that the 8–3 system was unfair because the number of single-member districts needed to be increased

so there would be additional black and Hispanic representation on the Council;[221] and *Jim Buerger* (Place 10, at-large) testified that the 8–3 system failed "to provide adequate representation on a geographic basis" and "that historically [the 8–3 system] has not been to the advantage [of African–Americans] other than the fact that it was better than the at-large system."[222]

(iv) two Council Members had changed positions since their depositions had been taken in September 1988 (Findings of Fact 208–211); *Jerry Bartos* (District 3) first testified that "the 8–3 system is a system that represents fairness and equity *for the numbers available*"—but then conceded that blacks should have had three Council seats based on the 1980 census (City approximately 30% black) and that having only two black seats under the 8–3 was not fair;[223] and *Max Wells* (District 4) first testified that "I supported the 8–3. I think its fair"—but admitted that blacks did not have fair representation because they only had two districts from which African–Americans could be elected to the Council unless the district lines were redrawn.[224]

(v) two other members of the Council, *Charles Tandy* (District 1) and *John Evans* (District 7) maintained their deposition positions that the 8–3 system was fair and that minorities could win a race for one of the at-large places.[225]

---

**218.** TR. IV (4–6). The City's interpretation of Mayor Strauss' testimony is disingenious, to say the *very* least. See Defendant's Response to Plaintiff's Proposed Findings of Fact and Conclusions of Law (*"Defendant's Response"*), p. 24.

**219.** Lipscomb, TR. I (47–49, 54–56, 64); Ragsdale, TR. V (157–58, 164–66, 171); Palmer, Pls. Exh. 48 (Palmer Dep., pp. 10–13, 38–39).

**220.** TR. III (166–168) (Box). The City distorts the testimony of Box by relying upon a statement he made—that he thought the "opportunity has been there" for blacks under the 8–3—*before* he made the admissions quoted above.

**221.** Miers, TR. V (4–6). Again, the City's position that—in these statements by Miers, she did not actually use the words "the 8–3 system was unfair"—is disingenuous, to say the least.

**222.** Buerger, TR. V (60–61). Buerger also testified that the 8–3 system "would be a distinct advantage to the minority community" in the future because he felt the minority population

in Dallas would continue to grow. Tr. V (60–62).

**223.** Bartos, TR. III (210–11). The City distorts the testimony of Bartos by citing the first part of his testimony, and then ignoring everything else.

**224.** Wells, TR. III (195–199). Again, the City distorts the testimony of Wells by conveniently ignoring everything but the first sentence quoted above.

**225.** Tandy, TR. III (3–6); Wells Tr. III (46–48). However, even Tandy conceded that the at-large members elected to the Council in the past had not taken "the time or effort" to represent minorities "in the southern half of the City." TR. III (4). And, even Evans admitted that he thought quadrants under the 10–4–1 were better than two of the at-large seats under the 8–3 because this "would give a better opportunity for the citizens to have people closer to them than were representing them." TR. III (47–48).

276. In addition, the only two minority witnesses used by the City at trial to support the 10–4–1 plan both testified that the 8–3 system was unfair and did not afford equal access to minorities. *Rene Martinez* (Mexican–American), Vice–Chairman of both *Dallas Together* and *"Vote Yes For Dallas"* (Findings of Fact 213, 264), testified that he did not "presently" support the 8–3 system because of the difficulty of a minority candidate winning an at-large race.[226] *Pettis Norman* (African–American), Vice–Chairman of *Dallas Together* and a member of CRC, testified that he "absolutely" agreed that blacks were "packed" in Districts 6 and 8 "to reduce the voting strength of the African–American population"—and he stated:

"I think there is no question that the current [8–3] system should have been redone a long time ago, and we [blacks] could have had a greater impact politically. It's very unfortunate that we have not, so *the current system, there's no discussion about that, discriminates period, because of the way the lines are drawn.*"[227]

### E. *Specific Findings On Critical Issues*

277. Many of the findings made above are based upon undisputed evidence. However, the testimony concerning certain critical facts was so conflicting that some specific findings and credibility determinations should be made before *the Gingles threshold* (p. 1319) and *the Zimmer factors* (pp. 1319–1320) are addressed.

*safe districts and packing*

278. Since the beginning of the 8–3 system in 1975, there have been two—*and only two*—African–American single-member districts in Dallas. These districts have contained far in excess of 60–65% black population. For example, *District 6* is 74.91% black (84.92% total minority) and *District 8* is 87.39% black (91.05% total minority), using 1980 census figures. (Findings of Fact 159–60).

279. Yet, all of the fact witnesses for the plaintiffs testified that a 65% minority concentration—total minority population (not voting age population)—would constitute a "safe district" for African–Americans in Dallas. For example, State Senator Eddie Bernice Johnson, State Representative Fred Blair, and County Commissioner John Wiley Price all testified that a 60–65% black concentration would prevent a white bloc vote from diluting the minority vote.[228] Several witnesses for the City agreed that a 60–65% minority concentration would be a safe seat for blacks or Hispanics in Dallas. Indeed, in April 1989, City Attorney Analeslie Muncy explained to the CRC that "I think everybody is going in the direction of 65%" as being a safe minority seat.[229] *The Court credits this testimony by these and other fact witnesses.*

280. In addition, testimony by the same witnesses established that a 75% total minority concentration (or more) would constitute "packing" to dilute the black and Hispanic vote.[230] *The Court credits this and similar evidence*[231]—*and specifically rejects all contrary testimony by any other fact or expert witness.*[232]

**226.** Tr. VI (236–37); Tr. VII (8); TR. VI (pp. 71–72); Pls.Exh. 34.

**227.** Tr. VII (5, 36); Pls.Exh. 34.

**228.** Tr. I (90, 101) (Johnson); Tr. I (134) (Blair); Tr. I (184, 187–90) (Price). In fact, Johnson and Price had been elected to their present positions *in partisan races* in districts that were 53–55% African–American. In partisan races—unlike the traditionally non-partisan Dallas City Council elections—a minority candidate may receive financial support from the political party, may pick up a "coattail effect" from other party races on the ballot, and may realize a greater turnout of black or Hispanic vote because of party affiliation. TR. I (188–89) (Price); TR. II (148–49).

**229.** Pls.Exh. 38A; Tr. III (213–14) (Bartos); Tr. VII (20–21) (Norman); Pls.Exh. 50 (Gonzalez Dep., p. 27); Pls.Exh. 49 (Rucker Dep., p. 27); Pls.Exh. 51 (Strauss Dep., p. 20).

**230.** TR. I (101) (Johnson); TR. I (134) (Blair); TR. I (187–88) (Price). See also TR. II (21–25) (Dr. Charles Cotrell, plaintiffs' expert).

**231.** See, e.g., Findings of Fact 137, 140 (Ricardo Medrano's election in 1980 and 1981 to District 2, which then had a Hispanic population of 33.34% and a total majority population of 76.73%).

**232.** E.g., Rene Martinez testified it "it would probably take anywhere from 75% to 80% Hispanic population in order to have a *potentially* safe district." TR. V (192–94, 204–10). Similarly, CRC Chairman Ray Hutchison testified at one point that a 65–75% minority concentration

281. Credible testimony also established that single-member district plans in which 3 of the 8 districts were 60%–65% African–American were drawn and proposed to the City Council in the 1970's, in 1979, in 1981 and 1982, and in 1986. (Findings of Fact 39, 50, 71, 88 at fn. 59, 147, 150, 187).[233] Despite this, the City Council refused to create a third black district under the 8–3 system; in each instance, the refusal was primarily motivated by the desire of the majority of Council Members "to preserve [a white Council representative] for the white parts of Oak Cliff." (Findings of Fact 121, 151 at fn. 101, 140–58).[234]

282. It is clear, therefore, that the concentration of the African–American population into two black districts of over 75% concentration (Districts 6 and 8)—and the distribution of the remaining African–American population into Districts 1 and 2—constitutes dilution of the black vote through packing and cracking in the drawing of district lines in violation of § 2 of the Voting Rights Act.[235] (Findings of Fact 125, 133, 159).

*at-large seats*

283. No African–American has ever been elected to one of the at-large seats under the 8–3 system. (Finding of Fact 233). Only one Hispanic (Al Gonzalez) has been elected at-large under the 8–3 system, but that was due to very atypical circumstances which will not reoccur. (Findings of Fact 197–99).

284. Therefore, it was not surprising that all of the fact witnesses for the plaintiffs and the intervenor testified that it was not possible for a black or Hispanic candidate to win one of the three at-large seats under the 8–3 system.[236] *This testimony is credited because it is true and it is supported by other credible evidence.*

285. Several fact witnesses for the City testified that a "qualified" minority candidate could win an at-large race.[237] *The Court totally discounts this testimony because, for the reasons next discussed, it is not believable and because it is contrary to the credible evidence presented at trial.*

286. An effective campaign for a single-member district under the 8–3 system costs approximately $15–30,000. (Finding of Fact 232). Minority candidates have been able to raise enough money to run successful campaigns in Districts 6 and 8. For example:

(1) Diane Ragsdale won a special election (with a runoff) in *District 6* in 1984 by raising and spending about $16,000, and won re-election in 1985 with a campaign costing about $12,000.[238]

(2) Al Lipscomb won election to *District 8* in the 1984 special election by raising and spending about $3,075.[239]

---

would be required for a safe district. TR. IV (78–81, 91–92, 139).

**233.** Pls.Exhs. 13–14 (*1970's*); Pls.Exh. 19 (*1979*); Pls.Exhs. 21–23 (*1981–82*); Pls.Exh. 28 (1986).

**234.** TR. I (48) (Lipscomb); TR. I (127–28, 135–36) (Blair); TR. I (96–97, 186, 190–91) (Price); TR. VII (36) (Norman); Pls.Exh. 22, 23, 26 (pp. 12, 15, 18, 19–23, 27, 31, 41–42).

**235.** The 8–3 system, held constitutional by Judge Mahon in 1975, became subject to the lesser, "effects" standards of § 2 of the Voting Rights Act in June 1982. But for the undisputed fact that Council Member Ricardo Medrano (District 2) opposed the drawing of a third black district in the 1982 reapportionment battles—and approved of the redrawn lines for his district—this Court would hold that the City intentionally maintained the packed single-member districts for a discriminatory purpose, and that this was unconstitutional—as well as a § 2 violation. See fn. 5.

**236.** TR. I (99, 102) (State Senator Eddie Bernice Johnson); TR. I (129–30, 133) (State Rep. Fred Blair); TR. I (155–56) (Marvin Robinson); TR. I (171–72) (School Board Member Yvonne Ewell); TR. I (188–94) (County Commisioner John Wiley Price); TR. V (167–69, 180) (Council Member Diana Ragsdale); TR. V (102–109) (Plaintiff Marvin Crenshaw); Pls.Exh. 48 (Palmer Dep., pp. 10–13, 38–40).

**237.** Pls.Exh. 49 (Rucker Dep., pp. 11–12); Pls.Exh. 51 (Strauss Dep., p. 12); Pls.Exh. 52 (Wells Dep., p. 20); Pls.Exh. 53 (Bartos Dep., pp. 30–31); Pls.Exh. 54 (Tandy Dep., pp. 21–23); Pls.Exh. 55 (Evans Dep., p. 24).

**238.** TR. V (213); Pls.Exhs. 110.

**239.** Pls.Exh. 102, 111; TR. I (42). In contrast, Jerry Bartos spent $17–18,000 on his winning race in *District 3* in 1987, and about the same amount in 1989. TR. III (221). However, *Glenn Box* spent $90–100,000 on his *District 5* race (and runoff) in 1989. TR. III (189–90). Obviously, the amount required for either a

287. In contrast, *a campaign for an at-large place would cost at least $100,-000; would probably range from $150–200,000; and may well require from $200–250,000 for a viable minority candidate to succeed in an at-large race.* (Findings of Fact 173, 211, 232).[240] In fact, these are the amounts raised and spent by the winning candidates in most of the at-large races in City Council elections from 1983 through 1989:[241]

|  | Contributions | Expenditures |
| --- | --- | --- |
| **1983** | | |
| Place 9 (at large)—Jerry Rucker | $ 167,424.11 | $ 163,831.28 |
| Place 10 (at large)—Annette Strauss | 153,300.14 | 148,619.93 |
| Place 11 (mayor)—Starke Taylor | 661,575.98 | 952,359.26 |
| **1985** | | |
| Place 9 (at large)—Jerry Rucker | $ 216,505.00 | $ 182,710.84 |
| Place 11 (mayor)—Starke Taylor | 1,078,181.80 | 898,897.58 |
| **1987** | | |
| Place 9 (at large)—Jerry Rucker | $ 100,672.83 | $ 89,747.46 |
| Place 10 (at large)—Al Gonzalez | 171,998.50 | 170,867.34 |
| Place 11 (mayor)—Annette Strauss | 1,286,907.00 | 1,708,582.10 |
| **1989** | | |
| Place 9 (at large)—Harriet Miers | $ 132,177.00 | $ 137,823.34 |
| Place 10 (at large)—Jim Buerger | 91,045.00 | 134,306.75 |

---

288. Most of the money raised for these at-large races comes from the non-minority areas of Dallas.[242] *There is an obvious reason for this: the substantial economic disparities between white and minority residents of Dallas.* Of persons living at the poverty level, 57.7% are blacks; indeed, blacks, Hispanics and other racial or ethnic minorities constitute 81% of the families living in poverty in Dallas.[243] (Findings of Fact 397–401).

289. Because of this, it is simply not possible for black or Hispanic candidates to raise—*from their communities*—the large amounts of money needed for an at-large City Council race. For example:

(i) Al Lipscomb could only raise $770.00 for his 1983 *Place 10* race against Annette Strauss—and, although he got 11.39% of the total vote, Strauss raised over $150,000 was elected with 70.37%;

(ii) For their at-large races in 1989, the two plaintiffs were only able to raise $435.00 (Williams) and $540.00 (Crenshaw) against opponents who each spent over $134,000;

(iii) Even Marvin Robinson—who was the "consensus" black candidate—was able to raise only $15,739 for his 1983 *Place 9* race against Jerry Rucker (who spent over $160,000 in winning the run-off with 68.22% of the total vote).[244]

single-district or an at-large race may be considerably less for an incumbent running for re-election or for a candidate who has established "name identification" with the voters by prior campaigns.

240. TR. I (155–56); TR. VI (27–29); Pls.Exh. 114.

241. *1983 races:* Pls.Exh. 104, 107, 108. *1985 races:* Pls.Exh. 120, 122. *1987 races:* Pls.Exh. 114, 113, 124. *1989 races:* Pls.Exh. 129, 131. *The amounts shown are this Court's calculations based upon the exhibits listing campaign contributions. However, they may be low; Jim Buerger testified he spent $165–170,000 in 1989, and Harriet Miers testified she spent about $200,000 in 1989. TR. V (51, 83).*

242. For example, Harriet Miers testified that she would not be surprised to find that most of her contributions in the 1989 Place 9 race came "from either North Dallas or interests that are located or reside in North Dallas." TR. V (52). See also Pls.Exh. 98, 99, 100, 101 (showing campaign contributions for at-large races by zip code location).

243. Pls.Exh. 3–5. See *Lipscomb v. Jonsson,* 459 F.2d at 339 ("It may also be that [blacks] ... are effectively fenced out of the City Council election process by the high cost of city-wide campaigning").

244. Pls.Exh. 105 (Lipscomb); Pls.Exh. 106 (Robinson); Pls.Exh. 127, 133 (Williams, Crenshaw).

290. With these small amounts of money, *a black or Hispanic at-large candidate is not able to purchase radio or television advertising—an essential for any citywide campaign in Dallas.* Indeed, most cannot even find the $20,000 that would be required for one city-wide mailing of political material. And, the "door-to-door" campaigning that can be effective for single-member districts is not a viable alternative, because it is simply impossible for a candidate to "walk" the entire City of Dallas in an at-large campaign.[245]

291. Therefore, the only way that a minority candidate could win an at-large race in Dallas under the 8–3 system was to obtain substantial support from the white community. Marvin Robinson tried this in 1983, but was unsuccessful—despite the repeated statements by white community leaders that a "qualified black" could win an at-large race. In 1987, Al Gonzalez knew that he could not raise the $150–200,-000 needed for his *Place 10* race from the black and Hispanic communities, so he hoped to raise most of this money from the white "business community."[246] Not only did he receive this financial support, *Al Gonzalez also benefited from the rather amazing circumstance of having the only at-large race in the history of the 8–3 system in which there was no serious white candidate*—something that had not happened since the time that the CCA was selecting the minorities who would be permitted to serve on the City Council. (Findings of Fact 31–34, 37, 46, 83, 101, 197–99).[247]

292. It is obvious from the testimony credited by this Court (Findings of Fact 279–81), that a minority candidate elected with overwhelming white support—like Al Gonzalez—does not have the confidence of the black or Hispanic communities; this is because, as Senator Eddie Bernice Johnson testified, *"we didn't choose [the at-large] people. They were chosen [for us] by the same group of people that chose everyone else."*[248] As Judge Mahon stated years ago in *Lipscomb,* "meaningful participation in the political process must not be a function of grace, but rather is a matter of right." 399 F.Supp. at 790.

293. Finally, although it was clearly established that Al Gonzalez was an excellent at-large representative of all minorities,[249] it was also obvious that minorities still objected because *4 of the 11 members of the City Council*—Mayor Strauss (Place 11), Al Gonzalez (Place 10), Jerry Rucker (Place 9), and Jerry Bartos (District 3)—*all lived in a single City Council District in North Dallas (District 3).*[250]

*the supposed "city-wide" view*

294. Under the 8–3 system, minorities are denied equal access to the three at-large seats. (Findings of Fact 283–93). This severe, adverse impact upon blacks

---

**245.** TR. I (52–54) (Lipscomb did not have enough money in his *1983 Place 10* race to distribute cards showing his co-endorsement by the Progressive Voters League); TR. I (158–59); Pls.Exh. 106 (Robinson was able to spend only $754.80 for radio ads in his *1983 Place 9 race*); TR. V (153–55) (Williams mailed about 50 cards in his campaign, shared money with Crenshaw "for car fare to the next speaking engagement," and tried to get "media coverage" just by "showing up wherever the media was" that might give him a free chance to get on radio or television). See also Finding of Fact 86.

**246.** Pls.Exh. 50 (Gonzalez Dep., pp. 34–35, 46–50). However, Gonzalez did testify that he could have paid for this campaign with his own funds.

**247.** In contrast to Marvin Robinson's campaign, *Al Gonzalez spent over $27,600 for radio, television and newspaper ads and over $17,000 for political consultants.* Pls.Exh. 114.

**248.** See, e.g., TR. I (99–102, 111–12) (Johnson); TR. I (133) (Blair); TR. VI (14–17, 31) (Garcia); TR. IV (110–11, 120) (Callejo); Pls.Exh. 37G, pp. 125–31; Pls.Exh. 37F, pp. 59–61 (Statement to CRC by Dallas Homeowners League: *"How can we believe that an at-large Council Member is 'doing what is best for all the citizens of Dallas' when his or her campaign war chest comes from only a small fraction of those citizens"*).

**249.** See, e.g., the testimony of Jerry Bartos. TR. III (223–25, 229).

**250.** Pls.Exh. 51 (Strauss Dep., pp. 31–32); TR. III (171) (Glenn Box testimony that historically all at-large Council Members have come from one geographic area of the City, North Dallas); Finding of Fact 244 (of 13 at-large Council Members since 1975, all but two have been from North Dallas and "there have been no at-large members from South Dallas or from the inner-city").

and Hispanics *is not* justified by the argument that at-large seats are necessary so there will be some members with a "city-wide view" on the Dallas City Council. See *McMillan v. Escambia County*, 748 F.2d 1037, 1045 (5th Cir.1984) (affirming district court's rejection of County's claim that "the at-large system [for electing county commissioners] is preferable because it makes the commission responsive to the needs of the whole community").

295. The Charter Review Commission unanimously rejected this supposed justification when it voted against any system with at-large seats. (Findings of Fact 240, 244). During the CRC proceedings, Chairman Ray Hutchison stated that "It is possible for every member of the City Council ... to represent the entire City" and that "parochial views don't come with single-member districts; they come with the individual." Former Council Member Lee Simpson put it more directly; he stated: *"It is baloney that single-district members do not vote on a city-wide basis."* [251]

296. Indeed, *every present or former member of the City Council from one of the eight districts testified that he or she voted on the basis of what was best for the entire City—not on the basis of something which might favor their district, but which was contrary to the "city-wide view."* [252] For example, Jerry Bartos (District 3) testified that he always tried diligently to make "decisions based on the entirety of this City"—not the selfish interest of his district—and that "the day I can't do that, I would really not want to serve

any longer." [253] Some Council Members conceded that there could be legitimate disagreement as to just what the "city-wide view" was on particular issues. [254] And, despite repeated questions by the Court, not a single member of the present City Council was able to give any specific, convincing example of a matter that would have been decided differently by the Council but for the presence of some at-large member with a "city-wide view." [255]

297. Moreover, credible testimony established that many of the at-large members of the Council—almost all of whom were from North Dallas (Findings of Fact 233, 244, 293)—*had not* provided any "city-wide view"; instead, they simply ignored the minority areas of the city and represented the interests of North Dallas that contributed the money for the at-large races. [256] For example, City Manager George Schrader had testified before Judge Mahon in the 1975 *Lipscomb* trial that there were "city-wide issues" in *garbage and waste disposal* that required some at-large members on the Council. (Finding of Fact 86). Yet, 14 years later when CRC Chairman Ray Hutchison "drove" one of the minority areas just before a CRC public hearing, he *"was amazed at the garbage in the streets"*—and the people there told him "they want to know who's going to pick up my garbage and give [me] a system that [will] make sure [it] happens." [257]

298. In addition, the "city-wide view" argument totally ignores the fact that Dallas has had a council-manager form of government since 1931. The City Manager

---

251. Pls.Exhs. 38A–E; TR. IV (36–37).

252. In contrast, Jerry Rucker (Place 9, at-large) testified that "there is not one of those who come from single-member districts" who have a "city-wide view." Pls.Exh. 49 (Rucker Dep., p. 47). See also TR. V (68–69, 92) (Buerger, Place 10, at-large). *This testimony was not credible.*

253. TR. III (216–17) (*Bartos*). See also TR. I (66) (*Lipscomb*); TR. I (131–32) (*Blair*); TR. III (10–11, 32–33) (*Tandy*); TR. III (50) (*Evans*); TR. III (175–77) (*Box*); TR. III (200–202) (*Wells*); TR. IV (14–16) (Strauss); TR. V (10–12) (*Miers*); TR. V (162–63) (*Ragsdale*).

254. See, e.g., TR. III (177); Pls.Exh. 37F, pp. 59–61; Pls.Exh. 37G, pp. 24–27 (Statement to CRC by Greater Dallas Community of Churches:

*"On any given issue, there can be many perspectives of what is best for Dallas, but there is no one 'city-wide perspective' which is inherently more valid than the others"*).

255. See, e.g., TR. III (37) (Tandy); TR. III (191–93) (Box); TR V (11–12) (Miers); TR. V (212) (Ragsdale).

256. TR. I (102, 131–33, 94); TR. III (4, 29–30, 171, 206); TR. IV (38); TR. V (13–14, 50, 99); TR. VI 161–62, 168, 209–10); TR. VII (54). *In contrast, the current at-large members—Miers (Place 9), Buerger (Place 10)—are attending town-hall meetings in every one of the single-member districts.* TR. III (29–30); TR. V (13–14, 46–42); TR. V (91–92).

257. TR. IV (150–51).

is the "chief administrative and executive office of the City." (Finding of Fact 13). Obviously, it is the responsibility of the City Manager and his staff to provide a "city-wide" view on policy issues being determined by the Council. Indeed, the City of Dallas has an entire department—the Department of Planning and Development—to present "city-wide" information to those "people who have a role in setting City policy." [258]

299. Pettis Norman, one of the minority witnesses presented by the City, testified:

"... I think [a city-wide view is] more of a function of an individual as opposed to a system. You can have, in my estimation, the most narrow-minded person running at-large and be elected and [he] would not see the City at-large.

"By the same token you can have a visionary person running in a single-member district and they will look at the City at-large. So I think that's more a function of a person as opposed to position...." [259]

The Court credits this testimony,[260] it discounts all contrary testimony, and it specifically finds that *the supposed "city-wide view" argument does not justify the dilution of black and Hispanic votes caused by the at-large seats in the 8-3 system.*

#### the "two people to call" argument

300. The City also argues that the at-large seats in the 8-3 system are justified because they give a person with a complaint about City services "two people to call instead of one"—an at-large member in addition to the single-district representative. *This is not an argument to be*

tossed aside lightly; it should be thrown away with great force.[261]

301. Dallas citizens do not have only "one person" (their district representative) to call about a complaint. The City Manager and his staff run the day-to-day business of the City. As City Manager Richard Knight told the CRC:

"As the City's chief administrator, my job is to make sure that the City organization responds to all citizens, delivering Council-authorized services in an efficient, cost-effective manner. Anytime you set out to serve the needs of a City of 1 million people with 14,000 employees, you will likely encounter some differences of opinion on responsiveness of your services. There is always room for improvement. It's a continual challenge to make our organization more 'user friendly,' that is, open and helpful to Dallas citizens.

"*Citizens can contact their Council Members, the [City] Manager's Office or City Departments to get information or to express their needs.* They can speak at Council meetings, public hearings, town hall meetings and board and commission meetings. *They can call in service requests to Action Center or directly to City departments.*" [262]

302. Although constituent calls are certainly part of the job of Council Members, persons with complaints about City services can call the City Manager, the City department involved, "Action Center," someone who represents another single-member district, or even ex-council members—just as well as an at-large representative.[263]

**258.** TR. VI (144) (Greer); and see the presentation by City Manager Richard Knight to the Charter Review Commission. Pls.Exh. 37E, pp. 79–94. See also Cts.Exh. A–5 (*George Schrader* testimony from 1975 *Lipscomb* trial, pp. 143–44).

**259.** TR. VII (53–54). See also TR. III (228–29) (Bartos testimony that "There will be good at-large people and bad at-large people" just like there will be "good and bad" single-district representatives).

**260.** And the similar evidence discussed in Findings of Fact 294–99.

**261.** And with apologies to Dorothy Parker. Frewin, *"The Late Mrs. Dorothy Parker,"* p. 149 (Macmillan 1986).

**262.** Pls.Exh. 37E, pp. 80–81. First Assistant City Manager Jan Hart estimated that the City Manager's office received some 800–1000 complaints or requests for information each month directly from citizens; and, she could not remember a single instance in which an at-large Council Member contacted the City Manager's office on behalf of someone who was dissatisfied with their representative. TR. VII (138).

**263.** Don Hicks told the CRC he was still receiving constituent calls even though he had been

303. Indeed, under the credible evidence, it would be very unlikely for a black or Hispanic in South Dallas or another minority area to ask for assistance from one of the at-large Council Members in North Dallas. (Finding of Fact 297, at fn. 256.[264]

304. Therefore, *the "two people to call instead of one" argument can in no way justify the fact that blacks and Hispanics do not have equal access to the at-large seats in the 8–3 system.*

### the mayor's at-large place

305. The cost of running for mayor—which has almost become prohibitive in recent years[265]—excludes many people (whites, blacks, Hispanics, and other minorities) from a viable campaign for *Place 11* (mayor). However, even if this expense operates to exclude a disproportionate number of blacks and Hispanics,[266] the weight of credible evidence did justify the at-large seat for the mayor of Dallas.

306. For example, Lori Palmer (District 2) testified that the mayor should be elected at-large—despite the difficulty of a minority being elected—for these reasons: all of the people of the City "should have a say about who gets elected as their mayor"; there are serious concerns about accountability—i.e., a mayor elected by other Council Members is accountable to colleagues on the Council, while a mayor elected by all voters in the City is accountable to the citizens; and having the mayor elected by the Council would not enhance the chances of blacks or Hispanics being elected mayor, but it would lessen the influence and prestige of the office.[267] *The Court credits this testimony.*

307. The Court also credits testimony that the mayor does have a symbolic position as the head of City government, does act as the spokesperson for Dallas, does have the power to preside over City Council meetings and appoint Council committees, and that each citizen should have "a direct say" in who represents them as mayor.[268]

308. Indeed, this Court recognized the special position of the mayor in *Walker III* by reasoning:

"The City of Dallas, of course, was not a party to the Consent Decree. However, the Mayor of Dallas (then, Starke Taylor) was instrumental in the settlement. He, lawyers from the City Attorney's office, and other City employees participated in the negotiations in 1986. The Mayor promised that the City would support the settlement and would assist DHA in meeting its obligations under the Decree—and DHA viewed the support and endorsement of the City to be essential to the success of the Consent Decree.

"...

"The City argues that Mayor Starke Taylor did not have authority to speak for the entire City Council. This is true. However, it is also true that *Starke Taylor was not acting as a private individual in the settlement negotiations—he was participating in his official capacity as the Mayor of Dallas.* It is also obvious that Mayor Taylor consulted with other members of the City Council, since a majority of the Council initially supported the Consent Decree." [269]

off the Council for six years. Pls.Exh. 37A–E. Both Evans (District 7) and Ragsdale (District 6) testified that they get complaint calls from people who live in other districts. Pls.Exh. 55 (Evans Dep., p. 18); TR. V (169) (Ragsdale).

**264.** TR. I (102, 132).

**265.** For example, in the 1987 race and runoff, Mayor Annette Strauss spent over $1.7 million and her opponent, Fred Meyer, spent over $1.49 million. Pls.Exh. 124 (Strauss); Pls.Exh. 125–26 (Meyer).

**266.** Some witnesses testified that a black or Hispanic could be elected mayor with substantial support from the white community; others testified that a minority could not be elected mayor. TR. III (170, 218); TR. IV (28–29); TR. VII (32).

**267.** Pls.Exh. 48 (Palmer Dep., pp. 23–26).

**268.** TR. III (170) (Box); TR. III (218–19) (Bartos); TR. IV (28–29) (Strauss); TR. V (77–78) (Buerger); Pls.Exh. 48 (Palmer Dep., p. 26). See also Pls.Exh. 13 (George Allen Dep. from *Lipscomb* case, p. 61). *Under the Charter amendments approved in August 1989, the mayor will be the only member of the Council elected to a four-year term.*

**269.** See *Walker III* (*Walker v. HUD*), 734 F.Supp. at 1347–48. See also Finding of Fact 23.

309. In addition, unlike the 10–4–1 plan or the at-large seats under the 8–3 system, there were a number of individual blacks and Hispanics, as well as minority organizations, that appeared before CRC to support a single-member district plan with the mayor elected at-large (Findings of Fact 234–36)[270]—and that the losing group before CRC was advocating a 12–1 plan, with the at-large election of the mayor. (Findings of Fact 241, 245, 254).

310. However, the Court specifically notes that CRC—after considering a myriad of possibilities—determined "that 15 was the maximum operating size" of the Dallas City Council (including the at-large election of the mayor).[271] The City Council agreed, and this 15–person Council was approved in the August 1989 referendum. This means, of course, that there would be more single-member district seats available for minorities under a 14–1 plan—even if the substantial expense of campaigning for mayor should have a disproportionate impact upon African–Americans and Hispanics.

311. Finally, these conclusions are supported by the Fifth Circuit's decision in *Lipscomb;* there, in reviewing the 8–3 system as a "court-ordered plan" instead of a "legislative plan," the Fifth Circuit specifically permitted Dallas to "provide for the election of the mayor by general city-wide election *or* by election by the City Council." 551 F.2d at 1048–49.[272]

### F.  *The Gingles Threshold*

312. The three-part *Gingles* threshold was met both by the African–American plaintiffs and by the Hispanic intervenor. *Thornburg v. Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766; *Westwego,* 872 F.2d at 1205–06.

#### (1) *Blacks:  size & compactness*

313. African–Americans in Dallas are, without question, sufficiently large and geographically compact to constitute a majority in several single-member districts. For example, with a 65% African–American concentration, there can be 3 black districts out of 8, 4 out of 10 or 11, and 5 out of 15—with a majority African–American *voting age population* (using 1980 census figures).[273]

314. Moreover, a district with 65% total black population is sufficiently concentrated to insure the election of the choice of the African–American community. (Findings of Fact 278–282). This conclusion is supported by statistical proof, as well as credible lay testimony—particularly that of experienced black politicians who have been elected from similar districts. (Findings of Fact 279–80). *Monroe v. City of Woodville,* 881 F.2d 1327, 1331 (5th Cir.1989); *Brewer v. Ham,* 876 F.2d 448, 453 (5th Cir.1989).[274]

#### (2) *Blacks:  politically cohesive*

315. The focus of the "political cohesiveness" inquiry is whether or not the voting behavior of the minority group in question is marked by racially polarized or bloc voting.[275] The basis for the inquiry should first—*and primarily*—be those elections in which a *serious* black candidate[276] was opposed by a white candidate.

---

**270.** See, e.g., Pls.Exh. 37E, pp. 39–40 (Greater Dallas Community Relations Commission).

**271.** TR. IV (155).

**272.** See Findings of Fact 104–106. See also *East Jefferson Coalition v. Parish of Jefferson,* 703 F.Supp. 28, 30–31 (E.D.La.1989) (district court approval of 6–1 plan instead of all single-member district system).

**273.** Pls.Exh. 43–47, 140–42; Findings of Facts 78, 88 (at fn. 59), 147, 187, 228.

**274.** In *Brewer v. Ham,* 876 F.2d at 452, the Fifth Circuit held: "our court has refrained from endorsing any uniform method for deriving voting age figures from general population data. *The appropriate method and its results in a given*

*case are matters of fact which the plaintiffs must prove.* Of course, where the minority population in a proposed single-member district is sufficiently large, district courts may rely on such figures as evidence that the minority's voting age population exceeds 50%. For example, in two previous cases before the court where the newly-created single-member districts contained a minority population *well in excess of 60%,* the district court could reasonably conclude that the voting age population exceeded 50% as well."

**275.** As the Supreme Court noted, these terms are used interchangeably. *Gingles,* 478 U.S. at 52 (fn. 47), 106 S.Ct. at 2766 (fn. 47).

**276.** This Court credits the testimony of Dr. Cotrell that whether a minority candidate is "seri-

*Citizens for a Better Gretna v. City of Gretna,* 834 F.2d 496, 503 (5th Cir.1987); *Campos v. Baytown,* 840 F.2d 1240, 1245 (5th Cir.1988).

316. There are several reasons for this focus on white versus African–American candidates. First, these races provide the most direct test of the hypothesis that race is a factor in the election system under scrutiny.[277] Second, although the results in white versus white races should be considered, *to emphasize them without careful and practical scrutiny* ignores the discriminatory effect of an at-large system which discourages potential, viable African–American candidates from running for election, given a long history of elections lost because of a white bloc vote. *LULAC v. Midland ISD,* 648 F.Supp. 596, 607 (W.D.Tex.1986). The credible evidence in this case established that the at-large seats in the 8–3 system had just such a chilling effect on African–Americans who would have been viable candidates in City Council election.[278] Finally, "when there are only white candidates to chose from, it is "virtually unavoidable that certain white candidates would be supported by a large percentage of ... black voters"; however, "evidence of black support for white candidates in an all-white field" would tell us nothing about the political cohesiveness of blacks or about "the tendency of white bloc voting to defeat black candidates." *Westwego,* 872 F.2d at 1208, fn. 7; *Campos,* 840 F.2d at 124–25; *Gretna,* 834 F.2d at 502–03.

317. In *Lipscomb,* Judge Mahon found that African–Americans were politically cohesive in Dallas: "Black voters, that is, those residing in the inner-city area, vote for black candidates, giving them at least a plurality, and usually a majority of their votes, and the white community, the non-minority voter tends not to vote for the black candidate." (Findings of Fact 78, 79). The record shows that the racial segregation, discrimination and racial tension that were present when *Lipscomb* was tried in 1975 are still substantial factors in the political life of Dallas today.[279]

318. In addition, in the 1979 action seeking "preclearance" of the 8–3 system under § 5 of the Voting Rights Act, *the City stipulated that African–Americans in Dallas were politically cohesive:* "In Dallas City Council elections in which black candidates participated, racial bloc voting was a significant factor contributing to their defeat"—and "black City Council candidates who carried the inner-city area by large majorities were defeated by white opponents who obtained majorities in the more populous white residential areas of the city." (Findings of Fact 79, 114–15).

319. In this case, however, the City argues that this 1979 stipulation should be ignored because "it was not made by the City as part of the record in this action"— and because that stipulation "relates solely to the pre–1975 evidence presented to the Court in *Lipscomb."* This argument is not only ridiculous, *it is demeaning to this Court and to the City of Dallas.*[280] The

---

ous" or "viable" depends upon the candidate's "degree of visibility," what kind of resources "can the candidate marshal" for the campaign, the "portion of vote which [the] candidate received," and the candidate's degree of support in the minority community. TR. II (10–12) (Cotrell).

277. TR. II (19–21) (Cotrell).

278. Findings of Fact 283–92; TR. I (50–51) (Lipscomb); TR. I (112–14) (Johnson); TR. I (130) (Blair); TR. I (160) (Robinson); TR. III (167) (Box); Pls.Exh. 48 (Palmer Dep., pp. 13–14, 33).

279. TR. I (95) (Johnson); TR. IV (62, 65) (Hutchison); TR. VII (5) (Norman); Pls.Exh. 29.

280. Anyone who thinks this statement is too harsh should take time to compare the City's 1979 stipulations before the D.C. Court (Pls.Exh. 16, 17) to the City's response *in this case* to the Plaintiffs' Post–Trial Proposed Findings of Fact. Of the first 35 findings proposed by the plaintiffs on Jan. 16, 1990, *all but 6 were taken verbatim from the 1979 stipulation by the City.* Despite this, the City admitted only 13 of these proposed findings—and, as to other 23, responded that these findings (*taken from the City's identical stipulations in 1979*) were "incorrect," were not "supported by the cited evidence," or were not full or accurate statements. See *Defendant's Response,* pp. 1–6. The City's attorneys played the same game in responding to the plaintiff's First Request for Admissions in this case. Compare Pls.Exh. 8 to the City's 1979 stipulations (Pls.Exh. 16, 17).

post–1975 evidence analyzed at great length in these Findings of Fact supports the City's 1979 stipulation—*of racial polarization and bloc voting*—and the City's attorneys have not been kind enough to explain what miraculous things happened after July 1979 that rid this City of racial polarization, white bloc voting, and racial tension in less than a decade.[281]

320. The African–American plaintiffs also met the second step of the *Gingles* threshold with statistical evidence. As the following tables show, in a large number of both at-large and single-member district elections since 1977, the African–American vote was substantially polarized.[282]

321. At-large elections involving serious black candidates: [283]

| | black vote for black candidate | | | | |
|---|---|---|---|---|---|
| election & place | black candidate | r | r$^2$ | slope | % |
| 1977–11 | Emory | .98 | .97 | .52 | 62 |
| 1977–10 | Wilkerson | .96 | .92 | .35 | 38* |
| 1983–9 | Robinson & Crenshaw | .91 | .84 | .65 | 90 |
| 1983–9 runoff | Robinson | .93 | .86 | .85 | 100 |
| 1983–10 | Lipscomb | .89 | .79 | .42 | 48 |
| 1987–10 | four | .95 | .9 | .67 | 88** |

* *Wilkerson's 38% of the black vote was a plurality of that vote. An Hispanic candidate, Medrano, recived the second highest percentage of the black vote, 27%.*

** *There were four black candidates in this race. The scores for each of these are:*

| candidate | r | r$^2$ | slope | % black vote |
|---|---|---|---|---|
| *Thomas* | *.91* | *.83* | *.45* | *47* |
| *Jackson* | *.71* | *.51* | *.2* | *26* |
| *Young* | *.2* | *.04* | *.03* | *12* |
| *Gibson* | *−.22* | *.05* | *−.014* | *3* |

322. At-large elections involving other black candidates:

| | black vote for black candidate | | | | |
|---|---|---|---|---|---|
| election & place | black candidate | r | r$^2$ | slope | % |
| 1975–11 | Emory* | | | | |
| 1987–9 | Williams | .8 | .65 | .26 | 33 |

**281.** Contrary, of course, to the racial tensions and hostilities that lead to the mayor's *Dallas Together* commission in early 1988 (Findings of Fact 200–203)—and to its "urgent" recommendations to the City Council, resulting in the creation of the Charter Review Commission in early 1989 (Findings of Fact 213–17).

**282.** The statistical significance for the regression analysis of the elections relied upon by plaintiffs meets or exceeds the standards set by other experts and by the Fifth Circuit. TR. II (59, 155–156) (Cotrell); Pls.Exh. 57–80. Grofman, "The Totality of Circumstances Test," 7

Law & Policy 199, 206 (1985); *Overton*, 871 F.2d at 544 (Jones, concurring). Dr. Cotrell explained that he did take into consideration the fact that the results of elections before 1983 were less accurate due to the small number of observation points (these elections were studied by Council district rather than precinct).

**283.** The scores for this and the following tables are from Pls.Exh. 57–80. These and the other correlation scores presented below are corroborated by the homogeneous precinct analysis calculations presented by plaintiffs.

| election & place | black candidate | r | r² | slope | % |
|---|---|---|---|---|---|
| 1989–9 | Williams | .79 | .62 | .2 | 26 |
| | Tobian (white) | .73 | .53 | .29 | 49 |
| 1989–10 | White | .81 | .66 | .16 | 19 |
| 1989–11 | Crenshaw | .48 | .23 | .03 | 6 |
| | Lesser (white) | .72 | .52 | .22 | 40 |

\* *Emory received less than 5% of the total vote (Pls. Exh. 82, p. 3).*

323. At-large elections without black candidates:

| black vote for black candidate | | | | | |
|---|---|---|---|---|---|
| election & place | black candidate | r | r² | slope | % |
| 1976–11 | Weber (made runoff) | .94 | .88 | .5 | 89 |
| 1976–11 runoff | Weber (lost) | .93 | .86 | .58 | 99 |
| 1983–11 | Wise\* | | | . | |
| 1985–11 | Taylor (winner) | .53 | .28 | .3 | 78 |
| 1987–11 | Strauss (made runoff) | .76 | .58 | .54 | 95 |
| 1987–11 runoff | Strauss (winner) | .85 | .72 | .42 | 97 |

\* *Plaintiffs did not run a regression analysis for this race. Defendant's figures showed that 69% voted against the white winning candidate, Starke Taylor (Pls. Exh. 81, p. 4). Wise did carry the predominantly African–American Council districts by substantial margins (Pls. Exh. 82, p. 68).*

324. Single-member district races with white v. black:[284]

| black vote for black candidate | | | | | |
|---|---|---|---|---|---|
| election & place | black candidate | r | r² | slope | % |
| 1983–1 | Giddings | .7 | .48 | .5 | 57 |
| 1983–2 | Spears | .82 | .68 | .73 | 78 |
| 1983–8 | Blair | .7 | .5 | .5 | 91 |
| 1987–6 | Ragsdale | .89 | .79 | .6 | 93 |
| 1989–1 | Giddings | .64 | .41 | .64 | 84 |

**284.** This table does not include the 1977 District 1 race. Neither plaintiffs nor defendant were able to provide accurate precinct racial composition figures upon which estimates could be based.

325. Other single-member district races:

| | black vote for black candidate | | | | |
|---|---|---|---|---|---|
| election & place | black candidate | r | r² | slope | % |
| 1983–2 runoff | results not statistically significant | | | | |
| 1985–2 | Fielding (white) | .78 | .61 | .52 | 74 |
| 1985–2 runoff | Fielding (loser) | .71 | .51 | .52 | 76 |

326. Charter amendment elections:[285]

| | black vote for Charter proposition | | | | |
|---|---|---|---|---|---|
| election & place | black candidate | r | r² | slope | % |
| May 1989 prop. 1 | vote "for" | .94 | .89 | .79 | 96 |
| Aug. 1989 prop. 1 | vote "against" | .9 | .81 | .71 | 95 |

---

327. This statistical evidence of the political cohesiveness of African–Americans in Dallas was supported by the testimony of fact witnesses which this Court has credited. (Findings of Fact 278–82, 316–17). For example, African–American elected officials and civic leaders testified that the black community was politically cohesive;[286] and there was similar credible testimony by former Council Member Al Gonzalez, Mayor Annette Strauss, and CRC Chairman Ray Hutchison.[287] Indeed, the CRC based its planning and recommendations on the assumption that there was bloc voting by whites and African–Americans.[288]

328. Finally, the plaintiffs' expert, Dr. Charles Cotrell, testified that in his opinion the African–American community in Dallas was politically cohesive:

"In my opinion, the African–American vote in Dallas is cohesive in ... many of the circumstances and electoral contests which I've examined. There are varying degrees of that cohesiveness, but we find that cohesion especially in those instances where African–Americans whose candidacies are deemed viable run in head-to-head contests with white candidates. But we also find evidences of cohesion when two white candidates square off and there is either no African–American candidate in the race, or [no black candidate] as viable as others who had run."[289]

329. In contrast, the City's expert, Professor Delbert Taebel, testified that—while there was "some" evidence of cohesion—

**285.** Pls.Exh. 57–80, 81. These non-candidate elections are of probative value because the subject matter of the elections—the powers of the Police Review Board in the May 1989 election and the 10–4–1 council plan in the August 1989 referendum—were seen in the community as racial issues. The Fifth Circuit has indicated that a district court trying a § 2 case should examine any elections, endogenous or exogenous, which can aid the inquiry into the existence of polarized voting. *Westwego*, 872 F.2d at 1209. Here, experts for both the plaintiffs and the City testified that these Charter elections would be relevant to the racially polarized voting inquiry. TR. II (16) (Cotrell); TR. III (94–96) (Taebel).

**286.** TR. I (99, 108) (Johnson); TR. I (159) (Robinson); TR. VII (33–34) (Norman).

**287.** Pls.Exh. 50 (Gonzalez Dep., p. 30); Pls.Exh. 51 (Strauss Dep., pp. 18–20); TR. IV (112) (Hutchison). Even former Council Member Jerry Rucker testified that blacks were politically cohesive in Dallas. Pls.Exh. 49 (Rucker Dep., pp. 7, 29–30).

**288.** Pls.Exh. 33, p. 2.

**289.** TR. II (9) (Cotrell).

there were "indicators of non-cohesion," including: multiple African–American candidacies in the same race; the estimated results in the African–American community for the 1983 Lipscomb–Strauss Place 10 at-large race; the regression analysis for various white versus white races; and the voter dropoff from the number voting in the mayor's race to the number voting in the at-large races.[290]   However, upon analysis, none of these factors support Prof. Taebel's opinions.

330. The presence of more than one black candidate in a race *may* indicate a lack of cohesion, but it does not always do so.   Contrary to Prof. Taebel's analysis, common sense tells us this did not happen in the 1983 general election for Place 9, where Marvin Robinson and Marvin Crenshaw (both African–Americans) ran against a white candidate Jerry Rucker.   (Findings of Fact 170–78).   Together, the two black candidates received 90% of the black vote in the general election and only 20% of the white vote.   And, *Prof. Taebel simply ignores the runoff in this race because it is inconsistent with his theory;* yet, in this 1983 Place 9 runoff between Robinson and Rucker, there was 100% cohesion of the African–American vote behind Robinson, the preferred black candidate, who still lost to Rucker with his 89% of the white vote. (Findings of Fact 170–78).

331. Similarly, Prof. Taebel's second example—the 1987 Place 10 race—was obviously atypical because of the promise of white support to Al Gonzalez in order to avoid a Hispanic lawsuit against the 8–3 system.   (Findings of Fact 189, 197–98). With this white North Dallas support, Gonzalez did not have a serious white opponent, and it is clear that none of the four blacks were viable candidates either. (Findings of Fact 198, 321 at fn. 283).   Be-

cause of these obvious "practical considerations," Prof. Taebel's forced opinions of the lack of cohesion he purports to find in these two races is worthless.

332. Prof. Taebel's inclusion of the results of the Lipscomb–Strauss 1983 race as evidence of non-cohesion was based on the fact that the African–American vote was split between a white and an African–American candidate.   Yet, there was credible testimony by Al Lipscomb (the black candidate) of a perception of futility which he encountered from voters, and even members of his own family, due to the fact that he, an African–American, could never defeat a well-financed white candidate such as Annette Strauss.   (Findings of Fact 283–92, 316 at fn. 278).   Lipscomb also testified to the great disparity in financial resources—over $150,000 for Strauss and only $770.00 for Lipscomb—which accounted for his inability to have his name placed on the slating card of the Progressive Voters League, an African–American slating group whose endorsement he shared with Ms. Strauss.   (Findings of Fact 287–89). Moreover, when Lipscomb ran for the City Council from an 80% African–American single-member district the following year, he was overwhelmingly elected by that same African–American constituency.[291]   Prof. Taebel ignores all of these practical considerations.   Therefore, his "lack of cohesion" opinion based on the 1983 Lipscomb–Strauss race is not credible.

333. Similarly, the evidence of a voter drop-off from the mayor's race to the at-large places does not negate a finding of African–American cohesion.   That dropoff was more than out-weighed by the marked increase in African–American voter participation in at-large races with a viable African–American candidate from the participation in white versus white at large races.[292]

---

**290.** TR. II (185, 172, 173–74, 87) (Taebel).   Prof. Taebel did testify that the African–American community was "very cohesive" in partisan elections.   TR. II (184).

**291.** TR. I (42, 50–51) (Lipscomb); Pls.Exh. 82. Not to be outdones by Prof. Taebel, the City argues that the 1987 Place 9 race and the three at-large races in 1989 show lack of cohesion because the black candidates only received from 6% to 33% of the black vote.   *This ignores the obvious fact that no serious black candidate has*

*run at-large in Dallas since the defeat of Marvin Robinson in 1983.*   (Finding of Fact 178).   For example, the plaintiffs were only able to raise $435.00 (Williams) and $540.00 (Crenshaw) for their 1989 races against opponents who spent over $437,000 (Place 9—Miers) and over $1 million (Place 11, mayor—Mayor Strauss).

**292.** Pls.Exh. 7 (increased participation in at-large races by District 6 and 8 voters in 1983 and 1987).

334. Moreover, the high African–American cohesion on the August 1989 City Charter referendum, and the ability of the African–American vote to coalesce around candidates associating themselves with the political agenda of the Democratic party, is also convincing evidence of the ability of the ability of African–Americans in Dallas to unite behind a single political platform and common means by which to achieve them.[293]

335. The "politically cohesive" opinions stated by Dr. Cotrell, the plaintiffs' expert, are supported by credible lay testimony, by Judge Mahon's specific findings in his 1975 *Lipscomb* opinion, by the City's 1979 stipulations before the D.C. Court, and by the CRC assumption of bloc voting by blacks and by whites, and high 4 and 4 squared values from statistically significant calculations. Prof. Taebel's testimony is supported only by lay testimony discredited by this Court, and it is seriously weakened by his over-emphasis of white versus white elections (in which there was no viable black candidate). Therefore, *this Court credits this testimony of Dr. Cotrell and finds that the testimony by Prof. Taebel was not credible or convincing.*

### (3) *Blacks: white bloc voting*

336. The final *Gingles* issue involves a two-fold inquiry. First, the candidate choice of a substantial part of the African–American community must be determined. Then, it must be decided whether or not white bloc voting defeated that choice. *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). An absolute majority vote of African–Americans is not required in order for a candidate to be the choice of a "substantial part" of the black minority group under the *Gingles* threshold. And, the primary focus must be elections in which a serious African–American candidate is opposed by a non-black candidate. (Finding of Fact 315). *Westwego*, 872 F.2d at 1208, fn. 7; *Gretna*, 834 F.2d at 502–3. Indeed, *Gingles* itself "looked only to elections where black candidates were running." *Campos*, 840 F.2d at 1245.

337. Of course, it is proper to consider—but not to *overemphasize*—the results of all-white races or elections in which

there is no viable black candidate. The Fifth Circuit made this clear in *Westwego*, 872 F.2d at 1208, fn. 7:

"As we noted in the *Gretna* case, when there are only white candidates to choose from it is 'virtually unavoidable that certain white candidates would be supported by a large percentage of ... black voters." 834 F.2d at 502. *Evidence of black support for white candidates in an all-white field, however, tells us nothing about the tendency of white bloc voting to defeat black candidates. Id.* This is precisely why we have held that evidence from other elections may be used to support a vote dilution claim where evidence from the specific electoral system at issue is sparse, *see* discussion in text *supra,* and why the district court must consider carefully the relative probative value of each type of evidence.

338. Under these principles, it is clear that there is white bloc voting in Dallas which usually defeats the preferred choice of African–Americans. This is precisely what Judge Mahon found in his 1975 opinion in *Lipscomb*, 399 F.Supp. 782, 785–786 (N.D.Tex.1975). The racial factors influencing Dallas political life have not changed significantly since then. (Findings of Fact 78–79, 317).

339. *In its 1979 "preclearance" action, the City of Dallas stipulated before the D.C. Court that there was racially polarized voting in Dallas:* "In Dallas City Council elections in which black candidates participated, racial bloc voting resulted in their defeat. Black City Council candidates who carried the inner-city area by large majorities were defeated by white opponents who obtained majorities in the more populous white residential areas of the City." (Findings of Fact 114, 318–19). And, the City has not shown any justification for its blatant disregard in this case of the 1979 stipulation. (Findings of Fact 318, 319, at fn. 280, 281).

340. Moreover, the fact that no combination of African–American candidates in the same race has ever received more than 20% of white vote—and that no individual

---

**293.** Pls.Exh. 79–80; TR. II (184).

black candidate has ever received more than 15% of the white vote—is probative of the extent and strength of the white bloc vote in Dallas. For example, in the 1983 Place 9 general election, the African–American candidates Robinson and Crenshaw received a combined total of 20% of the white vote with 6% of the white vote going to Robinson and 14% to Crenshaw). Then, in the 1983 runoff for Place 9, Robinson received only 11% of the white vote.[294]

341. In addition, analysis of at-large elections since 1975 involving a serious African–American candidate shows that the choice of the African–American community has always been defeated by substantial white polarized bloc voting. This same result has occurred in single-member district elections in Council Districts 1 and 2. Only

in Districts 6 and 8, the two predominantly black districts, has white bloc voting been unable to defeat the choice of the African–American minority group.[295]

342. Dr. Charles Cotrell, the plaintiffs' expert, testified that the white bloc vote is usually able to defeat the preferred candidate of the African–American community. As in his cohesion testimony, the races in which a viable African–American candidate opposed a white candidate were given more weight in Dr. Cotrell's considerations. The calculations upon which he based his opinions—and which are summarized in the following tables—met the standard criteria for statistical significance and magnitude of r's and r squared values.[296]

343. At large elections involving serious black candidates:

| election & place | black candidate | $r$ | $r^2$ | slope | % |
|---|---|---|---|---|---|
| | | white vote for black candidate | | | |
| 1977–11 | Emory | —.96 | .91 | —.51 | 6 |
| 1977–10 | Wilkerson | —.92 | .84 | —.33 | 1 |
| 1983–9 | Robinson & Crenshaw | —.88 | .77 | —.62 | 20 |
| 1983–9 runoff | Robinson | —.91 | .83 | —.84 | 12 |
| 1983–10 | Lipscomb | —.87 | .75 | —.41 | 2 |
| 1987–10 | four | —.9 | .82 | —.64 | 16 * |

* There were four black candidates in this race. The scores for the white vote for each black candidate are:

| candidate | $r$ | $r^2$ | slope | % of white vote |
|---|---|---|---|---|
| Thomas | —.85 | .72 | —.41 | 0 |
| Jackson | not statistically significant | | | |
| Young | not statistically significant | | | |
| Gibson | not statistically significant | | | |

344. The same result occurred in the single-member district elections in Districts 1 and 2 in which African–Americans exceed 10% but are less than a majority of the population:

| election & place | black candidate | $r$ | $r^2$ | slope | % |
|---|---|---|---|---|---|
| | | white vote for black candidate | | | |
| 1983–1 | Giddings | —.45 | .2 | —.37 | 3 |
| 1983–2 | Spears | —.75 | .57 | —.8 | 0 |
| 1989–1 | Giddings | —.45 | .2 | —.5 | 15 |

**294.** Pls.Exh. 57–58, 66; Findings of Fact 176–77.

**295.** Pls.Exh. 57–78, 82.

**296.** TR. II (10, 13, 59, 155–56) (Cotrell).

345. Even in elections without a serious African–American candidate, substantial white polarized voting has often been able to defeat the candidate receiving the highest percentage of the African–American vote:

| | | white vote for that candidate | | | |
|---|---|---|---|---|---|
| election & place | black candidate | $r$ | $r^2$ | slope | % |
| 1976–11 | Weber | −.91 | .83 | −.49 | 36 |
| 1976–11 runoff | Weber (loser) | −.91 | .83 | −.57 | 37 |
| 1977–10 runoff | Baldwin | −.89 | .78 | −.34 | 34 |
| 1983–11 | Wise * | | | | |
| 1989–9 | Tobian | −.73 | .53 | −.29 | 17 |

\* *Plaintiffs did not run a regression analysis for this race. Defendant's figures showed that 69% voted against the white winning candidate, Starke Taylor (Pls. Exh. 81, p. 4). Wise did carry the predominantly African–American Council districts by substantial margins (Pls. Exh. 82, p. 68).*

346. White polarized or bloc voting defeated the African–American bloc vote in the May 1989 and August 1989 City Charter elections.[297]

| | | white vote | | | |
|---|---|---|---|---|---|
| | | $r$ | $r^2$ | slope | % |
| May 1989 prop. 1 | vote "for" | −.96 | .92 | −.8 | 10 |
| Aug. 1989 prop. 1 | vote "against" | −.93 | .86 | −.72 | 18 |

347. Convincing lay testimony also established that there is a substantial white bloc vote in races involving black versus white candidates which causes the defeat of the black candidate. Former at-large Council Member Al Gonzalez testified "in a white versus black race, the white is more likely to win the majority of the white vote." State Senator Eddie Bernice Johnson testified that: "In Dallas, it's impossible to speak of elections in the City without speaking of race because it is clear beyond a shadow of a doubt that it makes a difference."[298] Other elected officials and leaders of the black community testified unanimously, and very credibly, to the existence of a white bloc vote against African–American candidates which can—*and does*—defeat the preferred choice of the African–American community.[299] *The Court credits this testimony by these and other witnesses.*[300]

297. See fn. 285.

298. TR. I (100, 102–13, 107–110) (Johnson); Pls. Exh. 50 (Gonzalez Dep., pp. 30–31). Senator Johnson also testified that Marvin Robinson lost the 1983 Place 9 at-large to Jerry Rucker because "one face was black and the other was white."

299. TR. I (55) (Lipscomb); TR. I (129–30) (Blair); TR. I (157–59) (Robinson); TR. I (194) (Price); TR. I (172) (Ewell); TR. V (20, 33–34) (Ragsdale); TR. VI (9, 48–49) (Garcia); TR. VII (33–34) (Norman).

300. City witnesses Rene Martinez and Ray Hutchison also testified about the existence of a significant white bloc vote that usually defeats the choice of the African–American community. TR. V (228) (Martinez); TR. IV (113) (Hutchison).

348. African–American political choice is not only defeated at the polls, it is also effectively defeated by the demonstrated power of the white bloc vote which discourages persons who would be the preferred choice of the African–American community from even running for election. Contrary to the City's argument, the plaintiffs have no burden to identify specific persons who failed to run at-large in fear of the white bloc vote; but in any event, Marvin Robinson testified that he had talked to potential black candidates who did not run at-large after they realized that a black candidate could not raise "the $250,000 that he or she needs to run that kind of race." [301]

349. In contrast, the City's expert, Prof. Taebel, finds some evidence which supports, and some evidence which denies, the existence of white bloc voting defeating the preferred black candidate. He sees whites as demonstrating a "disparate" voting pattern based on his inclusion—*and emphasis*—of white versus white races, and races without a viable black candidate, in his analysis. However, he admits that the pattern shows no more than 20% of white voters *ever* voting for any African–American candidate or combination of candidates—which suggests that, however "disparate" their voting behavior might otherwise be, the one predictable thing that most whites will not do is to vote for a black candidate.[302]

350. Under his analysis,[303] Prof. Taebel concludes that the choice of the African–American community was the winning candidate in nine of the twelve elections he studied—and, on this basis, the City argues that a white bloc vote does not usually defeat the preferred candidate of the black community in Dallas. *This argument is specious; it's improper emphasis upon the results in recent white versus white*

*races is unsupported and unconvincing, and makes the Taebel/City analysis worthless.* (Finding of Fact 337). *Westwego*, 872 F.2d at 1208, fn. 7.

351. This testimony by State Senator Eddie Bernice Johnson demonstrates why it is a mistake to put too much emphasis on white versus white races:

"Who were the preferred candidates [of African–Americans in at-large races]? There were probably a great number of preferred candidates who were not in the race because they didn't think it was possible to win. And rather than take the chance of putting that person out there not being well-financed, knowing full well that the system was not going to allow the person to be victorious, they didn't get out there. So they then—*see, we've never really had our real choice. We've always had to settle for what was slightly possible, of what might be better than the other one, or whether it must be better to go with this one than that one, lesser of the two evils. . . ."* [304]

352. Moreover, the Taebel/City analysis has other serious flaws:

(i) It simply omits two races (1983 Place 9 general, 1989 Place 9 general) in which the preferred candidate of either a majority or plurality of the African–American voters *did not* win.

(ii) It counts the 1983 Place 10 race as a win for an African–American preferred candidate when it is clearly impossible to determine which candidate received the majority or plurality of the African–American vote.[305]

(iii) It lacks any "functional view of the political process," since the *only* support for its conclusion that a white candidate was the preferred black choice is the fact that this candidate got a higher

---

**301.** TR. V (138) (Williams); TR. I (50–51) (Lipscomb); TR. I (112–14) (Johnson); TR. I (130) (Blair); TR. I (160) (Robinson); TR. III (167) (Box); TR. II (19–21) (Cotrell); Pls.Exh. 48, pp. 13–14, 33. Although Robinson said "every individual who *has run*," it is obvious from the context of his statements that he really meant he had talked to *potential* candidates—because there has not been a single viable black who has run at-large since Robinson's 1983 defeat in the Place 9 race. Finding of Fact 178.

**302.** TR. II (186); Finding of Fact 335.

**303.** Def.Exh. 3; TR. VIII (53, 55) (Closing Argument).

**304.** TR. I (112–13) (Johnson).

**305.** TR. II (15) (Cotrell); TR. II (170) (Taebel).

percentage of the African–American vote than did his white opponent.[306]

(iv) It treats some winning whites as the "black preferred candidates" even though their views were obviously not representative of the African–American community on issues such as the South Africa Boycott, retaining the at-large system, affirmative action, and the police review board.[307]

353. In addition, the only race in the Taebel/City analysis in which the winning candidate received a higher percentage of the African–American vote than the white vote was the 1987 runoff for Place 11. Mayor Strauss, the winner, attributed that vote to a negative vote against her opponent, who was a Republican County Chair, rather than a preference for her:

"... I would like to think it [my support from the African–American candidate] was all because of me, but realistically I was running against a Republican county party chairman. And wherever I went in the minority community they said they—it was not—they did not want a Republican party chairman to be their Mayor. I don't think any party chairman should be mayor. The election got partisan. We should not have that but that's what happened.[308]

354. Moreover, in this 1987 victory, Mayor Strauss also received 42% of the white vote. Had she received only the maximum white vote ever received by any black candidate or candidates—i.e., 20%—she would have been defeated. (Finding of Fact 340).

355. Finally, two other objective factors support the conclusion that these white at-large winners in the Taebel/City analysis

should not be considered "representatives of the choice of the black community" for purposes of determining the effect of the white bloc vote on the preferred candidate of the African–American community. First, the financial support of these candidates came overwhelmingly from white areas in the City.[309] Second, the low percentage of appointments of African–Americans to City boards and commissions contradicts the view that these white winners were African–American representatives; indeed, Council Members Ragsdale and Rucker both testified that only the African–American Council Members were consistently looked to as the primary sources of African–Americans to be appointed to City boards and commissions. (Finding of Fact 429).

356. The "white bloc vote" opinions stated by Dr. Cotrell, the plaintiffs' expert, are supported by credible lay testimony, by Judge Mahon's specific findings in his 1975 *Lipscomb* opinion, by the City's 1979 stipulations before the D.C. Court, and by the CRC assumptions of white bloc voting, and by high correlation scores in statistically significant analysis. Prof. Taebel's testimony is supported only by lay testimony discredited by this Court, and it is seriously weakened by his over-emphasis of white versus white elections. *Therefore, this Court credits the expert testimony of Dr. Cotrell and specifically finds that the supposed expert testimony by Prof. Taebel was not credible or convincing.*

1) *Hispanics: size and compactness*

357. Since Judge Mahon's 1975 decision in *Lipscomb*, the Mexican–American population has increased faster than any other

---

**306.** For example, there was no testimony by the white candidates who had received over 50% of the black vote to suggest that they saw themselves as the representatives of the African–American community, that they were perceived as such by either the white or minority community, or that they had campaigned as representatives of the African–American community.

**307.** For example, Jerry Rucker (Place 9) clearly did not view himself as a representative of the black community, and he opposed the African–American community on each of these issues. Rucker also testified that a candidate speaking out on issues of particular concern to the Afri-

can–American community could not get elected at-large, characterizing such candidates as *"johnny one-noters."* Jim Buerger (Place 10), another white winner in the Taebel/City analysis, also testified that an at-large candidate could not get elected representing an African–American perspective or concerns. Pls.Exh. 49 (Rucker Dep., pp. 27–28, 62–63). See also TR. I (46–48) (Strauss).

**308.** TR. IV (45–46) (Strauss).

**309.** Findings of Fact 287–89, 291–92; Pls.Exh. 99–101, 108, 120–24.

minority group in Dallas—growing from 8–10% in 1975 (1970 census) to 12.29% in 1980 and to 18% in 1986. (Findings of Fact 6–8).

358. Hispanics are still not as concentrated as African–Americans in Dallas—the Hispanic concentration rate is 44.8% (1986 census estimate)—but *in view of the substantial increase since 1975, Mexican–Americans are no longer so dispersed that this would prevent the drawing of a majority Hispanic district.* Under the credible evidence presented at trial, the Mexican–American intervenor has established the first step of the *Gingles* threshold: that Hispanics are sufficiently large and compact enough to constitute a *voting age* majority in a single-member district plan. For example, it is possible to create one district out of 15 that is 60.15% Hispanic (total population) and 52.49% Hispanic (voting age population)—as well as a majority *voting age* population Hispanic district in a 13 or 14 district plan.[310]

359. This is supported by other credible evidence. In 1982, the City Council was presented with plans that would create a Hispanic district of 34.8–38.3%, with total minority population of from 65.3–69.9%. (Findings of Fact 147–48, 150). In 1986, the Council considered plans that would increase both the Hispanic and total minority population of District 2. (Finding of Fact 186). The City has admitted in this case that it is possible to draw a district that is between 53.91%–54.72% Hispanic total population. And, the CRC comparison estimated that there would be a "district of 54% Hispanic concentration in a majority-minority district" under a 12–1 plan.[311]

360. In addition, practical evidence shows that a Hispanic can be elected to a district which has a total minority population of 76.73% (with a Hispanic population of 33.34%). This, in fact, was the configuration of District 2, where Ricardo Medra-

no was elected in 1980 and 1981. (Findings of Fact 133, 137, 140; and see Findings of Fact 159, 164).

361. With the support of this history of District 2, the Court credits testimony that a 65% or more Hispanic district *is not* required for the election of a Mexican–American in Dallas City Council races. (Finding of Fact 314, fn. 274). *Brewer v. Ham*, 876 F.2d at 453. For example, Mayor Strauss testified that with a 50% Hispanic district, there would be "a very good chance" for the election of a Mexican–American; Commissioner John Wiley Price testified that a Hispanic could win in a 62% Mexican–American district; and Domingo Garcia testified that a Mexican–American could win in a 60% Hispanic district under a 15–0 plan (with a 75% total minority district).[312]

362. In response, the City criticizes the intervenor's "sample districts" on the grounds that they are not "compact" and are "extremely fragmented." While it is true that these districts are not as aesthetically attractive as would be required in a final plan, the purpose of the *Gingles* inquiry is not to create an actual election district—but to make a functional inquiry as to whether the political processes can be opened up to minorities who, historically, have been denied this access. *Dillard v. Baldwin County Bd. of Ed.*, 686 F.Supp. 1459, 1466 (M.D.Ala.1988). Since there is no proposal for the creation of an actual Hispanic election district, it is not necessary for this Court to engage in an inquiry regarding the application of § 2 standards to *sample* districts used for illustrative purposes. *East Jefferson Coalition v. Jefferson Parish*, 691 F.Supp. 991, 1007 (E.D. La.1988).[313]

363. Similarly, this Court rejects the City's argument that the Intervenor has the burden to prove that a majority Hispan-

---

**310.** See Int.Exh. 1–3; TR. VI (pp. 212–13) (Martinez); Pls.Exh. 33. See Finding of Fact 314, fn. 274.

**311.** See Def.Exh. X–2, X–3; Pls.Exh. 36. See also Finding of Fact 251.

**312.** TR. IV (32–33) (Strauss); TR. I (196–97) (Price); TR. VI (26–27) (Garcia). This Court

specifically discounts testimony that a 75–80% Hispanic district would be required in order for a Mexican–American to be elected to the City Council. TR. VI (192–94) (Martinez).

**313.** See Int.Exh. 1–3.

ic district could be drawn *under the 8-3 system.* This assertion is directly contrary to the position repeatedly taken by the City that the 8-3 system is "dead" because "there will be no more elections under it." [314] Moreover, since the CRC and the Council determined "that 15 was the maximum operating size" of the Dallas City Council (Finding of Fact 310), it was appropriate for the Intervenor to use up to 15 seats in presenting its sample Hispanic districts. (See Findings of Fact 310, 313).

364. Finally, since the African-American plaintiffs have clearly met the *Gingles* threshold, it is obvious that—even if the conclusion that a Hispanic district can be drawn with a voting age majority should be wrong—the Mexican-American community would have to be considered in any remedy if the plaintiffs establish a § 2 violation. See *Lipscomb,* 399 F.Supp. at 782. Therefore, any failures of the intervenor to meet the first *Gingles* test would "simply affect the remedy to which [intervenor] would be entitled if a violation of § 2 is found." *Westwego,* 872 F.2d at 1205, fn. 4; *East Jefferson Coalition,* 691 F.Supp. at 1005-08.

2) *Hispanics: politically cohesive and*

3) *Hispanics: white bloc voting*

365. For convenience, the second and third steps of the *Gingles* threshold will be discussed together because, with respect to the Hispanic intervenor, they involve common statistical evidence of cohesion and racial bloc voting—i.e., proof that there is "a consistent relationship between the race of the voter and the way in which the voter votes." *Gingles,* 478 U.S. at 50-51, 106 S.Ct. at 2766.

366. It is clear from Dr. Brischetto's polarization studies that in Dallas Hispanics vote for the Hispanic candidate and whites vote for the white candidate. These polarization studies also demonstrate the reality that whites do not *usually* support the Hispanic candidate.[315]

367. Dr. Brischetto considered City elections for the period 1980-1989, limiting these studies to those elections in which there was an Hispanic candidate. This limitation is proper. *Westwego,* 872 F.2d at 1208, fn. 7 (5th Cir.1989); *Campos,* 840 F.2d at 1245. Dr. Brischetto also utilized both homogeneous precinct analysis and multivariate regression analysis for his polarized voting studies.

368. In the City elections from 1983-1987, a clear pattern emerged. In three City Council elections in 1983 and 1985, whites and Hispanics voted differently; that is, the result of the election would have been different had the election been held only among whites or Hispanics. In the 1987 Place 10 race, both whites and Hispanics supported Al Gonzalez—but this was a very atypical election: because of the promise of white support to avoid a Hispanic lawsuit against the 8-3 system, almost all of Gonzalez's financial support came from the white areas of town. (Findings of Fact 189-90, 197-99). Moreover, *some* minority success at the polls does not establish free political access for Hispanics; instead, as here, it indicates manipulation of the process by whites selecting a "safe" minority candidate. *Zimmer v. McKeithen,* 485 F.2d 1297, 1307 (5th Cir.1973).

369. Dr. Brischetto also analyzed the August 1989 City Charter referendum concerning the 10-4-1 plan for Council elections. The same pattern was detected: whites voted 85% in favor of the 10-4-1 plan, while Hispanics voted greater than 70% against it. (See Findings of Fact 262-68). A visual representation of the voting patterns in this referendum shows that white North Dallas voted overwhelmingly in favor of the 10-4-1 plan, but minority South Dallas and West Dallas voted against it.[316]

370. In addition, Dr. Brischetto presented all "hypothetical district" analysis—i.e., a hypothetical district using existing voting precincts, but drawn so as not to dilute minority voting strength. His hypothetical Hispanic district was about 49% Hispanic (total population). After giving careful

---

314. TR. VIII (50, 56) (Closing Arguments).

315. Int.Exh. 4, 5; TR. II (64-80) (Brischetto).

316. Int.Exh. 36, 38. Similar polarized results were also found in exogenous elections for district judge in Dallas County. Int.Exh. 5.

consideration to this analysis and to some problems which it has, this Court does credit Dr. Brischetto's conclusion that, *had such a district existed, then the Hispanic choice would have been successful 100% of the time—in contrast to the actual 40% success rate in City elections.*[317]

371. The testimony of Dr. Brischetto was credible and convincing. *This Court credits his testimony that there was racially polarized voting in Dallas and that the white bloc vote usually defeated the Hispanic preferred candidate.*[318]

372. In contrast, the City's expert, Prof. Delbert Taebel, testified that there was no pattern of polarized voting in Dallas City Council elections—because "in at least 10 of the 14 contested races for at-large Dallas City Council positions during the period 1983–1989, the preferred candidate of Mexican–American voters was elected." *This Court discounts all of the testimony of Prof. Taebel for the following reasons:*

373. *Methodological flaws:* Prof. Taebel utilized a bivariate method in his regression analysis; that is, in studying Hispanic voting patterns, he regressed the Hispanic vote against the non-Hispanic vote. The non-Hispanic vote, of course, included the votes of African–Americans. As a result, Prof. Taebel's estimate of Hispanic vote vis a vis whites was low.[319] The fallacy of his approach is illustrated by comparing the estimate of Hispanic voting in the elections analyzed by Prof. Taebel with Hispanic voting patterns in Precinct 4411, the only homogeneous Hispanic precinct in Dallas—and by examining the one common election analyzed by both experts, the 1987 Place 10 race for City Council in which Al Gonzalez was elected.[320] In testing Hispanic political cohesiveness, Prof. Taebel's *bivariate* estimate of the percentage of Hispanic vote for Gonzalez is 54%—but Dr. Brischetto's *multivariate* estimate is 77%, while the homogeneous Hispanic precinct

(Pct. 4411) voted 95% in favor of Gonzalez.[321]

374. *Substantive flaws:* Prof. Taebel analyzed elections without regard to the ethnicity of the candidates to make a determination of Hispanic voting patterns. The preferred elections are those in which there is a minority candidate of the same race or ethnicity of the protected group. *Campos,* 840 F.2d at 1245.

375. *Improper cohesiveness standard:* Prof. Taebel also suggested a standard of 75% of the vote to gauge whether a minority group is "politically cohesive." This standard is improper. The purpose of looking into the question of political cohesiveness is to determine whether the protected minority group has the potential to elect candidates of its choice. Since candidates can be elected by a vote of 50% + 1, and since the question to be determined is whether they have that potential, a 75% standard is obviously unrealistic.[322]

376. *Impeachment:* Prof. Taebel first represented to the Court that his bivariate methodology had been approved in *Thornburg v. Gingles.* However, on cross examination, he admitted that *Thornburg* did not involve a tri-ethnic electorate.[323]

377. *White v. white races:* Finally, just as he did in his analysis of political cohesion and bloc voting concerning the African–American plaintiffs (Findings of Fact 329–33, 349–53), Prof. Taebel's analysis of Hispanic cohesion is flawed because of the over-emphasis given to all white versus white races. "*Gingles* is properly interpreted to hold that the race of the candidate is in general of less significance than the race of the voter—but only within the context of an election that offers voters the choice of supporting a viable minority candidate." *Gretna,* 834 F.2d at 503.

---

317. Int.Exh. 7–10, 15, 17, 19, 22, 35 and 38 (the summary exhibit). Tr. II (115–18) (Brischetto).

318. TR. II (64–66, 69–70, 71–84, 85–86) (Brischetto). See also *Terrazas,* 581 F.Supp. at 1353, where this Court held in 1984 that "there is evidence in the record of some [Anglo–Hispanic] polarization in Dallas County, although not without occasional breaks in the pattern).

319. TR. II (65–69) (Brischetto); Def.Exh. 1.

320. Int.Exh. 41; TR. III (129–460) (Taebel).

321. Def.Exh. 1; Int.Exh. 5, 41; TR. III (124–25).

322. TR. III (146).

323. TR. III (107–08).

378. Therefore, based upon the polarized voting studies presented by the Intervenor, and the lack of any credible contrary evidence, *this Court finds that the Hispanic community in Dallas is politically cohesive, and that the white majority votes sufficiently as a bloc to usually defeat the preferred candidate of the Hispanic voters.*

### G. *The Zimmer Factors*

379. If the *Gingles* threshold is crossed—as it has been by the African-American plaintiffs and the Hispanic intervenor in this case—then the district court in a § 2 vote dilution case, in its "searching practical evaluation," much address each of the 7 *Zimmer* factors, plus the 2 additional factors that may have "probative value as part of the plaintiff's evidence" in some cases. *Zimmer v. McKeithen,* 485 F.2d 1297; see also Senate Report to the 1982 amendments to § 2 of the Voting Rights Act.

#### *history of official discrimination*

380. Black residents of Dallas have been subjected to a long history of state and local discrimination. *Lipscomb,* 399 F.Supp. at 785–87, 790 (Judge Mahon 1975).[324] So have Mexican-Americans in Dallas. *Terrazas v. Clements,* 581 F.Supp. at 1348–51 (three-judge court). Credible testimony at trial confirmed that Dallas did discriminate against its black and Hispanic residents. (Findings of Fact 12, 17–18, 21–22, 57, 82–84, 214, 228, 283–91).[325]

381. Indeed, shameful as it now seems, *until 1968*—despite repeated opportunities to correct it—the Dallas City Charter contained a *"Segregation of the Races"* section which authorized the City Council to segregate the City into separate areas for the whites and "the Negro" race. (Findings of Fact 11, 13, 16, 19, 20, 36).[326]

382. African-Americans in Dallas were *intentionally* discriminated against by the various city-wide, at-large systems for electing members of the City Council until Judge Mahon's decision in *Lipscomb* in 1975. (Findings of Fact 77–84). The City's argument that the 8–3 system "remedied the defects of the at-large system" is absolutely wrong—because, after 1975, both blacks and Hispanics were discriminated against by the 8–3 system in violation of § 2 of the Voting Rights Act. (Findings of Fact 114, 228, 233, 240–44, 283–92).

383. The Dallas Independent School District has been engaged in desegregation proceedings since the 1950's. It has yet to be declared unitary. (Findings of Fact 25, 94, 141, 271).

384. On Jan. 20, 1987, the Dallas Housing Authority entered into a Consent Decree in a public housing desegregation case (*Walker v. HUD*), admitting "that there is considerable evidence that the racially identifiable character of the housing offered under its programs could have been caused at least in part by official DHA action . . ."[327]

385. In a pleading filed in the *Walker* housing desegregation case, the City of Dallas made this statement about racially segregated housing in Dallas: "Further, the City of Dallas agrees and admits that certain housing patterns were established by said [City, state and federal] laws, and that said racially segregated housing patterns have not yet been fully eradicated . . . [but] denies any current policy to provide housing on a racially discrimination basis."[328]

---

**324.** See *Graves v. Barnes,* 343 F.Supp. at 725, fn. 15–16 and *LULAC v. Midland ISD,* 648 F.Supp. 596, 613–621 (W.D.Tex.1986) for a catalog of statewide discrimination against blacks and Hispanics. See also *Lipscomb,* 399 F.Supp. at 793 (Judge Mahon 1975) (Mexican-Americans have endorsed some amount of official race discrimination, which has in the past existed in the State of Texas and the City of Dallas).

**325.** See, e.g., TR. I (54, 60) (Lipscomb); TR. I (95) (Johnson); TR. VI (103–08) (Callejo).

**326.** This section was also used to justify separate housing areas for "the Mexicans." See Finding of Fact 17.

**327.** See Appendix A to the *Walker I* opinion (*Walker v. HUD*), 734 F.Supp. 1231 (Memorandum Opinion, Appendix A) (N.D.Tex.1989).

**328.** City of Dallas Response to Plaintiffs' Motion to Modify Decree and Enjoin the City of Dallas. *Walker v. HUD,* CA 3–85–1210–R.

386. In the *Walker III* opinion, this Court found that for the past 50 years the City of Dallas has supported, maintained and perpetuated racial segregation in DHA's housing programs. (Findings of Fact 21–22, 27, 40–42, 205, 270, 406–07).

387. The *Dallas Together* commission—appointed by the mayor in early 1988 to address the racial tensions in the City—found increasing racial tensions, deteriorated or deteriorating minority neighborhoods, and major minority needs in education and economic development. The Political Participation Committee of *Dallas Together* concluded that:

> *"By most standards* (numerical, demographic, population and racial distributions) *our City Council districts, as presently structured, do not provide sufficient opportunity for all of our citizens to be properly and fairly represented in a system that is designed to meet the needs of contemporary Dallas.*
>
> "The committee noted, with some alarm, the sense of hopelessness and despair by many of our citizens of all races. *Much of their concern is founded in a sincere belief, rightly or wrongly, that they are systematically excluded from the political process.* The committee recognized that deeply felt emotions such as these provide a breeding ground for crisis ..." (Finding of Fact 214).

388. The CRC Chairman, Ray Hutchison, noted that the Dallas "history or experience" of lack of appointments of minority citizens to City boards and commissions had limited minority access to elective City positions by denying them the experience necessary to be considered "qualified" to run.[329] While he testified that more minorities are being appointed "now," the evidence is clear that the number of African–American and Hispanic appointments is directly related to the number of minorities on the Council.[330] Thus, a discriminatory electoral system which results in under-representation of African–Americans on the governing body, likewise limits minority access to an important "stepping stone" required for effective participation in the political process.

### *racially polarized voting*

389. As discussed above under the *Gingles* threshold, both the African–American plaintiffs (Findings of Fact 313–57) and the Hispanic intervenor (Findings of Fact 357–78) have established that there is racially polarized voting in Dallas City Council elections—and that the white bloc vote usually defeats the preferred choice of the minority communities.

### *extent to which City's practices enhance opportunity for discrimination*

390. The majority vote, place system used for the three at-large Council positions under the 8–3 system prohibit the use of single-shot voting for these at-large positions. *Westwego,* 872 F.2d at 1212.

391. As discussed above, the use of at-large positions greatly increases the expense of effective campaigning when compared to the costs of a single-member district campaign. Whites have been able to raise the funds necessary to effectively campaign at large—but African–Americans have not, and neither have Hispanics. Obviously, this has the effect of disproportionately limiting black and Mexican–American access to the political process. (Finding of Fact 283).

392. Under the City Charter, members of the Council serve, in effect, without compensation since they receive only $50.00 per meeting. A proposal to increase the pay for Council Members was defeated at the same time that the 10–4–1 plan was passed. (Finding of Fact 272). This is another barrier to equal access to full participation by the black and Mexican–American communities.[331]

---

**329.** TR. IV (100); Pls.Exh. 49 (Rucker Dep., pp. 34–35).

**330.** Pls.Exh. 137, 138, 95–97; Pls.Exh. 49 (Rucker Dep., p. 15); Pls.Exh. 48 (Palmer Dep., pp.

22–23, 26); TR. IV (17) (Strauss); TR. V (199) (Ragsdale).

**331.** TR. IV (101) (Hutchison); TR. V (30) (Miers).

*candidate-slating process*

393. From the early 1930's until the April 1977 elections, the CCA—a "white-dominated slating group"—controlled City Council elections in Dallas. (Findings of Fact 32, 83, 101). For almost 40 years, *the CCA never endorsed a minority candidate for the City Council.* From 1969 to 1973, it chose one black and one Hispanic to be on the Council; then, in the April 1973 elections, the CCA chose two blacks and one Hispanic for the Council. (Findings of Fact 31–33, 37, 55–56, 65).

394. By April 1977, the CCA was no longer in control of City Council elections. It has never been replaced by any other candidate-slating group, so this *Zimmer* factor does not *presently* hinder the ability of minorities to participate in the political process. (Finding of Fact 101). For this reason, the CCA is no longer available as a rationalization for the use of the 8–3 system. (See Findings of Fact 83–84, 89, 101).

*the effects of discrimination*

395. The next *Zimmer* factor is the extent to which members of the minority group in the City bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process.

396. The 1980 U.S. Census information shows significant economic and educational disparities between white and black residents of Dallas and between whites and Hispanics in this City.[332]

397. Poverty in Dallas exists primarily in the racial minority communities. Black persons in poverty make up 57.7% of the persons in poverty. Blacks, persons of Spanish origin and other racial or ethnic minorities make up 81% of families in poverty. Only 8.1% of the white population is below the poverty level—compared to 24.5% of the black population and 21% of the Hispanic population.

398. White median income was $23,322, but black median income was $13,917. White mean income was $31,036, black was $15,870. Only 10–11% of whites have income of less than $10,000, while 28% of Hispanics do; 32% of whites have income over $35,000, but only 7% of Hispanics do have incomes above that level.

399. 27.8% of the white population had four or more years of college, in contrast to 8.9% of the black population and 6% of the Hispanic population. 88% of the population with four or more years of college education was white, 10% was black. 50% of the Hispanic population had only an elementary school education, while less than 10% of the white population fell in this category.

400. The Center for Applied Research at the University of Texas at Dallas was commissioned by the Dallas Alliance to investigate and report on a wide range of socio-economic indicators. The report issued in 1987 found significant racial disparities in housing, economic development, minority participation in middle and upper management, criminal victimization, health and human welfare, and education. *Mayor Strauss testified that the report "pointed out the inequities that I know are here that we need to work to address."*[333]

401. The *Dallas Together* commission found significant disparities in the education, employment, housing, and political opportunities available to minorities in Dallas. (Findings of Fact 213–14).[334]

402. Credible testimony established that these socio-economic disparities adversely affect political participation by blacks and Hispanics, and that they are "a reflection of prior discrimination in the community."[335]

403. These disparities provide a distinct advantage to white at-large candidates in terms of financial and other support. (Findings of Fact 286–90).[336] The ridiculous pay for Council Members—$50.00 for

---

332. Pls.Exh. 3, 4, 5; Int.Exh. 39; TR. II (91–94) (Brischetto).

333. Pls.Exh. 29; TR. IV (66) (Hutchison).

334. Pls.Exh. 29; TR. IV (66) (Hutchison).

335. TR. II (25) (Cotrell); TR. II (94) (Brischetto).

336. TR. I (52, 106–07, 160); TR. III (167); TR. V (14–15).

each meeting—further exacerbates the discriminatory effect of these disparities by limiting the pool of African–Americans and Hispanics who can financially afford to serve on the Council where they would, in effect, volunteer their full time service.[337]

404. Finally, there was testimony at trial that gave a more vivid picture of "the effects of past discrimination" in Dallas than these statistics and reports. For example, when asked to explain what he meant by the statements that "all you have to do is drive" the City to see that "living conditions just weren't as good in South Dallas as in North Dallas," CRC Chairman Hutchison testified:

"I went out where I was raised on Hatcher Street and Second Avenue, and *it looks like a war zone*, quite frankly, and went into Oak Cliff ... went very much into East Dallas, went into North Dallas. And it was clear to me ... for whatever reason a person wants to assign, the fact of the matter was to me that the people in the older half of the City needed attention.

" ...

" ... I'm not prepared to say that, based on what we heard, that other sectors or segments of Dallas have received an unfair share of the wealth. But the problem is ... you've [got] geography that receives occasionally an unfair share of the burden. Even though they may get the same amount of street money relatively speaking, they may also get the friendly neighborhood criminal detention center ... "[338]

405. Similarly, State Senator Eddie Bernice Johnson testified:

"It is ... puzzling to me how South Dallas, as I know South Dallas, can look the way it looks and portions of Oak Cliff can look the way they look, and then go to North Dallas, just a few miles away, and see the difference. All of that does

not have to do with just the geographical location. There's a difference in the services, there's a difference in attitudes about those sections of the City, and until we do have people who can look at this City as a whole, I see us headed toward a Gary, Indiana and I'd much rather be headed like an Atlanta, Georgia."[339]

406. Finally, this Court dealt with a similar issue—i.e., the present effects of past discrimination in public housing—in the *Walker III* opinion. In contrast to the living conditions in North Dallas, this was the condition of the massive West Dallas project in 1975 at the time of Judge Mahon's decision in *Lipscomb:*

"There were numerous vacancies in the West Dallas project, and many of these vacant units had been boarded up because they were unfit for human occupancy. And, this was not surprising because:

(i) persons who lived at West Dallas were almost 5 times as likely to be *murdered* as other Dallas residents;

(ii) *rapes* were over 6 times more frequent in West Dallas than in other parts of the City;

(iii) according to Dallas police officers, *drug dealing* was rampant at West Dallas, and hundreds of *transients* were hiding or living in the vacant units; and

(iv) there were *substantial health risks* because a large portion of the project had been subjected to serious lead contamination by a nearby lead smelter.[340]

407. About 10 years later—and again in contrast to "North Dallas just a few miles away"—the *Walker III* opinion finds:

"The conditions at West Dallas in late 1986, just before approval of the Consent

---

337. TR. III (8); TR. IV (101); TR. V (30, 81–82).

338. TR. V (63–64, 150–53). See also TR. V (49–50, 54–56) (Harriet Miers testified that "in touring around during the campaign it was my impression that *there were circumstances in the southern sector [of Dallas] that didn't appear to exist in the northern sector and it was troublesome to me*").

339. TR. I (97–98). See also TR. VI (104–08) (Callejo); Pls.Exh. 53 (Bartos Dep., pp. 24–25, 40).

340. *Walker III* opinion (*Walker v. HUD*), 734 F.Supp. at 1307.

Decree in this case, were summarized by the testimony of [former] DHA Executive Director Jack Herrington at a Congressional Subcommittee hearing:

"In the three West Dallas housing projects—*George Loving Place, Edgar Ward Place and Elmer Scott Place*—there is an urgent need to reverse 30 years of wear, deterioration, vandalism, poor maintenance and inadequate funding. The overall housing conditions and 1,200 vacant, uninhabitable units have a negative impact on surrounding neighborhoods, business, industry and the city as a whole. *More than 8,000 adults and children live in a square mile area which has become, in many respects, a publicly owned slum.*"

"Because of the appalling conditions at West Dallas—housing that was barely fit to live in; almost 1300 vacant units that were boarded up; severe problems with drug dealers, with other crimes, with transients, and with vandalism; health risks due to lead contamination; a bitter life with roaches and rats and rubbish; and little or no hope that these things would change—people in need were refusing to accept housing in the West Dallas project. In 1986, the rejection rates for *George Loving, Edgar Ward and Elmer Scott* ranged from 58% to 60%; and, this was true even though the DHA staff had been instructed to deny any housing assistance to a family that refused to take a unit in West Dallas.... And, because of the same horrible conditions, a substantial number of the West Dallas tenants [as many as 85%] wanted to get out of the project....

"At the time of the entry of the Consent Decree (Jan. 20, 1987), there were 1,917 black families subjected to these conditions at West Dallas. The remaining 1,583 units at West Dallas were vacant, and almost 1,300 of these had been boarded-up for at least ten years because they were not fit for humans.[341]

The West Dallas housing project—the solution to "the Negro housing problem" in the early 1950's—is, therefore, a prime example in Dallas of how minorities bear the effects of past racial discrimination, and how this hinders their ability to participate effectively in the City's political process. (Findings of Fact 21–23, 40–42, 270, 405–07).

### overt or subtle racial appeals

408. Elections in the City of Dallas and in Dallas County have been marked by racial appeals concerning black candidates. These are consistent with the existence of racial bloc voting.

409. These racial appeals—both overt and subtle—have been described above for the period from 1972–1986. (Findings of Fact 51–53, 96, 98, 102, 168–69, 191, 204, 224). In addition, the Dallas newspapers routinely identify African–American candidates as "black." Only if there is an African–American in the race, is there such racial identification of candidates.[342] However, there was no evidence of any racial appeals in elections involving Mexican–American candidates in the Dallas area.

### extent to which minorities have been elected

410. Prior to 1975, no black was elected to an at-large place except for those endorsed by the CCA. None of the African–Americans selected by the CCA for the Council ever had a viable white opponent.

411. Since 1975, no black has been elected to an at-large City Council Place—and no black has been elected to a single-member district except in the two predominantly black districts (6 and 8). In contrast, there are other black elected officials in Dallas County, including a County Commissioner, school board members, judges, and justices of peace.[343]

412. Prior to 1975, no Hispanic was elected to an at-large place except the "one

---

**341.** *Walker III* opinion (*Walker v. HUD*), 734 F.Supp. 1307–1308.

**342.** Pls.Exh. 84–91. See Finding of Fact 168 at fn. 119.

**343.** Pls.Exh. 82. See Findings of Fact 12, 18, 24, 26–31, 36, 46, 56 90, 100, 135–36, 139–40, 166, 170–77, 180, 182, 193, 222.

Hispanic per term" endorsed by the CCA. Since 1975, the only Hispanic elected to an at-large place—Al Gonzalez—was elected under atypical conditions, with the overwhelming support of the "North Dallas" establishment. Finally, there have been no Hispanics elected to a single-member district since Ricardo Medrano won District 2 in 1980 and 1981 (but was defeated in the 1983 elections).[344]

### tenuous policies

413. Both justifications asserted by the City for the at-large seats in the 8–3 system are tenuous within the meaning of this "additional" *Zimmer* factor.

414. As discussed above (Findings of Fact 294–99), the supposed need for some members of the Council to have a "city-wide view" can in no way justify the dilution of black and Hispanic votes caused by the at-large seats. This is also true with respect to the supposed need for there to be "two representatives to call" about City services instead of one. (Findings of Fact 300–303).

415. However, although the question is a close one, there is justification for the election of the mayor at-large because of the factors discussed above. (Findings of Fact 305–11).[345]

### responsiveness

416. In *Lipscomb*, the City attempted—unsuccessfully—to persuade Judge Mahon that it had been "so responsive" to all minorities that the all at-large system was not unconstitutional. Judge Mahon recognized that the evidence showed that Dallas (in 1975) was acting in a responsive manner to all its citizens in trying to meet their needs—including "parks, street services, police and fire protection, transportation, equal employment opportunity, fair housing and community relations." Nevertheless, he held that the all at-large system was an *intentional* discrimination that di-

luted the vote of the black community in Dallas. *Lipscomb*, 399 F.Supp. at 791.

417. Despite this—and despite the fact that § 2 of the Voting Rights Act *does not* require a finding of intentional violation (see fn. 5)—the City in this case again asserts the very same "responsiveness" arguments in this case that were rejected 15 years ago by Judge Mahon.

418. Specifically, the City attempted to show that it was so overwhelmingly responsive to the needs of blacks and Hispanics—with respect to overall City employment of minorities, minority contracting, street and sanitation services, location of police and fire facilities, police and fire response times, location of park facilities, and library location and expenditures—that the system which elected this responsive council simply cannot violate the Constitution or § 2 of the Voting Rights Act.[346] In support, the City argues that former City Manager (Richard Knight) is an African-American; that, of the five Assistant City Managers, one is black and one is Hispanic; and that 10 of the 32 directors of City Departments are minorities.

419. Again, the City failed to show such a degree of responsiveness that would excuse a violation of § 2 of the Voting Rights Act, or that would even weigh in its favor in the "totality of circumstances" balancing. (See Findings of Fact 430–41).

420. There was strong and credible testimony, including that by City Council members and other City witnesses, that the 8–3 system had not been responsive to the southern sector of Dallas, the areas where most of the African-American community is concentrated. (Findings of Fact 297, 396, 404–407). Ray Hutchison described the conditions in some southern sector neighborhoods as "war zones." (Finding of Fact 404). In addition, the report of the Mayor's *Dallas Together* commission found "increasing racial tensions, deteriorated or deteriorating neighborhoods,

---

**344.** See Findings of Fact 33, 37, 46, 55–56, 83, 89–91, 100–01, 135–37, 140, 166, 180–81, 197–99, 225.

**345.** Contrary to the plaintiffs' contentions (see Proposed Finding 167), the Dallas mayor has

been elected at-large, by vote of the entire City, except for a period of 18 years (from 1931–1949). See Findings of Fact 9 at fn. 6, 10, 13–14, 19.

**346.** Def.Exh. 51–130.

particularly those of minorities, major needs in education, particularly those of minorities, and economic opportunity, particularly those of minorities."[347]

421. The City did not even claim to show that its actions had created equal conditions between predominantly white and minority neighborhoods. Instead, the City's evidence was directed primarily to show that the City was, at least in recent years, spending equal resources in each area of Dallas. While this may be enough to defeat a claim of current racial discrimination in the allocation of resources, it certainly does not show responsiveness to the particularized needs of the minority community—which would often require unequal and higher expenditures of City resources in minority areas to remedy the effects of past discrimination.[348]

422. Nor did the City attempt to show what portion of the resources spent in the minority community was money from the federal Community Development Block Grant program. These funds are required, by statute and regulation, to be spent for the benefit of low and moderate income residents and neighborhoods, with particular attention to areas suffering from the effects of past discrimination. Spending federal dollars in compliance with federal guidelines is not persuasive evidence of responsiveness.[349] *Jones v. City of Lubbock*, 727 F.2d 364, 381 (5th Cir.1984).

423. The City continues to maintain an street improvement petition and assessment policy which it admits is a significant barrier to improvement of streets, curbs, gutters, and sidewalks in low-income areas.

The City program for using federal CDBG funds to pay these citizens' share of the costs has been suspended.

424. The City did prove that its hiring of African–Americans increased from a low of 12.9% in 1981 to a high of 33.5% in 1987, and that its hiring of Mexican–Americans increased from a low of 4.0% in 1982 to a high of 11.6% in 1988.[350] However, the City's overall employment data was less than impressive. As the City Planner admitted, minority city employment has basically been static at around 30% since 1984, *while minority hiring has actually decreased.* African–American representation in executive and management positions was consistently below the 32.4% African–American total employee figure. Three categories of executives—public works, water utilities and City auditor—had no African–Americans. African–Americans are disproportionately over-represented in the lower ranking and lower paid jobs; they are 65.5 of the City's meter readers, 64% of the typists, 64% of the truck drivers, 59.4% of the laborers, and 72.9% of the janitors.[351]

425. The City's evidence on equal or lower emergency response times to minority areas was not correct because it included the central business district in downtown Dallas and the highway system in the minority area.[352]

426. The City's evidence concerning the location of City facilities was inexact and failed to negate the inference that the facilities were originally provided to white neighborhoods which are now minority because of population shifts. Nor did the evidence on location of facilities provide information on the quality of those facilities.[353]

347. Pls.Exh. 29, p. 20. The City had taken no steps to implement any new or additional programs to address these minority concerns between the issuance of the *Dallas Together* report and the September 1989 trial in this case.

348. TR. V (146) (Greer); Tr. VII (98) (Rollins). Although the City did present some testimony about specific programs targeted at minority areas—"Clean South Dallas," "Operation Clean," the "Reach Program," and the community-based "Crime Prevention Program"—there was no proof of the amounts spent by the City on these programs. TR. VII 114-20 (Hart).

349. TR. VIII (71) (Miller).

350. Def.Exh. 104, 105. The percentage of minorities *employed* by the City increased from 26.8% in 1981 to 30.5% in 1988 (for African–Americans), and from 8.7% in 1981 to 10.9% in 1989 (for Hispanics). Def.Exh. 104.

351. TR. VI (174–76) (Greer); Def.Exh. 59, pp. 26–36.

352. TR. VI (172–74) (Greer); TR. VII (71–72) (Miller); TR. VII (78) (Rollins).

353. TR. VII (73) (Miller); TR. VII (150) (Wise). See the testimony of CRC Chairman Ray Hutchison about the disparity in living conditions in the older South Dallas area in contrast with North Dallas. Finding of Fact 404.

**1408**

427. The City did establish that over 50% of the services of the Dallas Police Department are provided to predominately minority areas, and that police and fire stations are located and staffed so that they provide comparable services to minority areas. It also proved that the percentage of City contracts awarded to minorities increased from 6% in 1985–86 to 15% in 1987–88.[354]

428. Five months after the trial, the City moved to supplement the record with a Council Briefing by the Public Works Department (dated Feb. 9, 1990),[355] purportedly to show "that non-standard residential streets are not concentrated" in black or Hispanic areas of Dallas. However, the report did not really prove this—*because it "did not show whether the streets were well or poorly maintained"*; instead, since the Public Works Department is responsible only for street construction (not street maintenance), the report covered just "asphalt or gravel composition streets with no curbs and gutter." Moreover, even on this basis, the report shows that the two predominately black districts, Districts 6 and 8, have 21.8% of the miles of streets in the City, but they have 39.3% of the "asphalt a gravel streets" without curbs and gutters.

429. Finally, the City claimed responsiveness by individual Council Members in their appointments of African–Americans and Hispanics to City boards and commissions. However, this claim is contrary to Finding of Fact 388, and to an analysis of appointments during the past four years. Only 11.88% of the appointments made by the at-large Council Members during the 1985–1987 term were African–Americans, compared to 19% Hispanic and 69% white—and only 15% of the at-large appointments were African–Americans during the 1987–89 term, in contrast to 30% Hispanic and 54% white. In addition, of those appointed by all Council Members during the 1987–89 term, 20.9% of those appointed were residents of Council District 3 and 20.7% were residents of District 4—but only 4.7% of those appointed were residents of District 6 and only 8.0% were residents of District 8. The disparities were similar for the 1985–1987 term.[356]

### H. *The Totality of the Circumstances Test*

This Court's "searching practical evaluation," done with a "functional view of the political process"—over the *Gingles* threshold and through the *Zimmer* factors—ends with this evaluation of the "totality of the circumstances":

430. African–Americans in Dallas are sufficiently geographically compact to compose a majority of the *voting age* population in 3 of 8, 4 of 10 or 11, and 5 of 15 single-member districts. Although Hispanics are more dispersed than blacks in Dallas, they are sufficiently large and compact to constitute a *voting age* majority in a single district out of 14 or 15. (And see Finding of Fact 364).

431. African–Americans are politically cohesive in Dallas. So are Hispanics. There is a substantial white bloc vote in Dallas that is *usually* able to defeat the preferred candidate of a significant number of African–American voters, as well as the preferred candidate of a significant number of Hispanic voters.

432. Elections in the City of Dallas and in Dallas County have been marked by overt and subtle racial appeals in races involving blacks, but there is no evidence of this occurring with respect to Hispanic candidates.

433. Both the African–American and the Hispanic minority groups have been subjected to official discrimination which has adversely affected their right to vote and which has hindered their participation in the political process; the effects of this past discrimination are still present.

**354.** Def.Exh. 121–27; TR. VII (42).

**355.** *This report was filed as Court's Exh. A–7.*

**356.** Pls.Exh. 95, 137, 138. With the addition of Al Gonzalez (at-large) in 1977, and with the election of two responsive Council Members in 1989 (see Findings of Fact 293, 297 at fn. 256, 299), the number of appointments at-large members increased to 45% in the 1987–89 period.

434. There are substantial socio-economic disparities between the African-Americans and whites in Dallas, and between Hispanics and whites in Dallas. The lack of resources evidenced by these disparities continue to disadvantage African-American and Hispanic political participation as compared to whites. The token pay for Council Members—whose official duties are full time—disproportionately affects African-Americans and Hispanics, and reduces the pool of qualified candidates who might otherwise offer themselves as the candidates of the African-American or Hispanic communities.

435. The City's use of a majority vote/place system for the at large places effectively prohibits the use of single shot voting as an exercise of African-American or Hispanic political influence.

436. The at-large places require candidates to run city-wide, thus increasing the costs of campaigning to the substantial disadvantage of African-Americans and Hispanics.

437. The present configuration of single-member districts intentionally packs and cracks the African-American population with the effect of diluting their vote for the purpose of maintaining the political power of whites.

438. The City's evidence on responsiveness does not rise to the level that would justify giving any weight to this factor in the City's favor, either as to the African-American plaintiffs or as to the Hispanic intervenor.

439. The City's supposed interests in maintaining two of the at-large places are tenuous. Neither the "city-wide view" justification, nor the "2 representatives instead of 1 to call" argument, excuses the denial of viable at-large races to blacks and Hispanics because of the enormous cost of conducting an effective city-wide campaign.

440. Although it is a close question, because of several factors—e.g., the serious split in credible testimony; a sincere concern about accountability of a mayor elected by colleagues on the Council, instead of all voters; the recognition of the special position of the mayor by this Court in *Walker III*—there is justification for the election of the mayor at-large (despite the prohibitive expense of recent mayoral elections which excludes whites, blacks, Hispanics and other minorities from this position).

441. Balancing all of these *Zimmer* factors, and carefully weighing the evidence introduced as to each factor, this Court finds that the 8–3 system impermissibly denies African-Americans and Hispanics the equal opportunity to participate in the political process, and to elect candidates of their choice in the City of Dallas, in violation of § 2 of the Voting Rights Act.[357]

I. *Observations About The 10-4-1 Plan*

442. This Court is precluded from ruling on the validity of the 10–4–1 plan until it has received "preclearance" under § 5 of the Voting Rights Act. (Findings of Fact 273–74). In addition, since there are no lines drawn for the 10 single-member districts or the 4 quadrants, there cannot be a full evaluation of the effects of the 10–4–1 plan upon African-American and Hispanic voters in Dallas. However, the evidence presented at trial does permit this Court to make a few preliminary observations concerning the 10–4–1 plan.

443. Supporters of the 10–4–1 testified to their belief that the four quadrants will retain these "desirable" features of the at-large positions in the 8–3 system: (i) that the quadrant representatives can maintain "more of a city-wide view" on issues before the Council, and (ii) that persons who need to complain about City services will have

---

**357.** Because of this decision, it is not necessary for this Court to address the claims that the 8–3 system is unconstitutional because it *intentionally* discriminates against blacks and Hispanics, or the intervenor's "influence case"—i.e., that the 8–3 system violates § 2 of the Voting Rights Act because Hispanics "have less opportunity than whites to influence elections" under the 8–3. See (Plaintiff–Intervenor's Proposed Find-ings of Fact and Conclusions of Law, pp. 18–21). And see *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797 at 2810, 92 L.Ed.2d 85 (1986); *Armour v. State of Ohio*, 895 F.2d 1078 (6th Cir. 1990); *McNeil v. Springfield Park Dist.*, 851 F.2d 937 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989); *East Jefferson Coalition*, 691 F.2d 991.

"two representatives instead of one to call" (the single-district Council Member and the quadrant representative).

444. From the findings made above (Findings of Fact 283–93), it seems obvious that a minority candidate will not be able to raise the money needed for an effective quadrant campaign from the black and Hispanic communities.[358] The 10–4–1 plan will not change the substantial economic disparities that exist in Dallas between whites and African–Americans and between whites and Hispanics. (Findings of Fact 268–69, 288–89). This means either: (i) that a black or Mexican–American quadrant candidate would not be able to purchase radio, television, or newspaper ads; could only do limited political mailings; and would not be able to run a "door-to-door" campaign in a quadrant (Finding of Fact 290)—which will necessarily have over 250,000 people, a greater population than all but the seven largest cities in Texas;[359] or, that (ii) just as in the 8–3 system, a minority candidate could only win, in at least 3 of the quadrants, by obtaining substantial support from the white community. (Findings of Fact 291–92).

445. Any such adverse impact upon blacks and Hispanics (i.e., denial of access to at least 3 of the 4 quadrant seats) *would not* be justified by the claim that some members with a quadrant or "quasi-city-wide view" are needed on the Council—any more than this same "city-wide view" argument justified the at-large seats in the 8–3 system. (Findings of Fact 294–99).

446. Similarly, any such adverse impact upon minorities could not be justified by the assertion that people need "2 representatives instead of 1" to call about City services—any more than this same tenuous argument justified denying African–Americans and Hispanics access to the three at-large seats in the 8–3 system. (Findings of Fact 300–03).

447. Finally, as noted above, *if the City's explanation of the 10–4–1 plan is correct*—that there would be 4 black Council Members (3 local districts and 1 quadrant) and one *possible* 44% Hispanic single district—*this would actually provide a lower percentage of minority City Council representation (26.67%) than the Council could have achieved simply by redrawing lines under the 8–3 system to create a third black district (27.2%) and a fourth swing district with over 50% total minority population (and 43% Hispanic concentration).*[360] (Findings of Fact 228, 251, 253).

448. Without question, there are people and organizations who support the 10–4–1 plan in good faith, and for non-discriminatory, well-intentioned reasons; also, some well-respected people support it for reasons that are based upon incorrect assumptions.[361] But it is also without question that most African–American and Hispanic individuals and major organizations vehemently oppose the 10–4–1 plan—and feel, also in good faith and not without reason, that the adoption of 10–4–1 reflected "a callous disregard" of their views on the critical issue of what would remedy the past discriminations of the 8–3 system. This is, of course, what prevented the bringing of *"Dallas together"*—and what lead to the most racially divisive election in the history of Dallas, the 10–4–1 referendum in August 1989. (Findings of Fact 266–69).

358. With the exception, probably, of a quadrant that had a 60–65% African–American concentration and a higher total minority population—coupled with a race which had no viable white candidate. See, e.g., Findings of Fact 285–91.

359. Pls.Exh. 32 (estimated City population of 1,003,511 in 1986); TR. VIII (42) (Closing Argument).

360. See fn. 12.

361. For example, Pettis Norman—upon whose testimony the City heavily relies because he was their sole African–American witness on this point—supported the 10–5–1 plan because he understood (i) that black political representation is maximized at 10 single-member districts, but that it decreases if the number of districts is increased over 10; and (ii) that no more than three safe African–American districts could be drawn under a 15–0 plan. TR. VII (18–19, 23–26). *Both of his assumptions are incorrect.* The credible evidence established that there could, in fact, be 5 African–American districts under a 15 district plan (with 65% black concentration), and there could be as many as 4 such districts under a 10 or 11 district plan. Findings of Fact 313–14.

449. Finally, in view of these "preliminary observations," there would be nothing to prevent the Dallas City Council from addressing this problem again—before this Court is forced to do so following the preclearance battle over the 10–4–1 plan. (Findings of Fact 242, 247, 252, 256–58).

## J. *The Delay & The Remedy*

450. Because the City Council rejected the contrary recommendation of the CRC (Finding of Fact 259), there will be no Council elections in May 1991 under the 10–4–1 plan. Instead, these elections have been delayed *until November 1991* "to allow 1990 census data to be used in redistricting" *or until January 1992* "if the new districts do not get approval from the United States Department of Justice by August 1, 1991." (Finding of Fact 259).

451. The City's estimate of an 6–9 month delay *is not* correct. In fact, the delay may be—*and probably will be*—for an unknown, but much longer period of time. The City's request for preclearance of the 10–4–1 plan, after lines are drawn with the 1990 census, will be contested at every point by representatives of the African–American and Hispanic communities—both before the Attorney General and in any declaratory judgment suit filed in the District of Columbia. (Findings of Fact 113–29). Indeed, the very same thing happened when the 8–3 system was submitted for preclearance in 1978—and *it took almost 16 months for that controversy to be resolved.*[362] *If this course is repeated with the 10–4–1 plan, the elections could be delayed until August or September of 1992.*

452. In addition, once the preclearance issue has been resolved, the parties will no doubt return to this Court for a determination of the validity of the 10–4–1 plan.[363] Before this Court could act, it would be required to conduct another trial, primarily to determine the effect of the 10–4–1 district and quadrant lines upon blacks and Mexican–Americans. See *Jones v. City of Lubbock*, 727 F.2d at 386–87.[364] Should this occur, there would be additional delay—and, although the period is uncertain, *it is easy to see that the May 1991 elections could very well be delayed for two years or longer (until sometime in 1993).*

453. In the meantime, during this 1½–2 year delay, the 8–3 system—which has been condemned as "unfair" by the CRC and the City Council, and which has been found by this Court to be in violation of § 2 of the Voting Rights Act—will continue; and, the present Council will continue to serve during the entire period of the delay—despite the fact that the members were elected under ⸜ system which denied black and Hispanic equal access to the at-large seats, and which packed African–Americans into District 6 and District 8 to prevent a third black single-member district.

454. The City asks this Court to delay and "to just give the 10–4–1 a chance," even though this delay will probably be for some 1½–2 years (not just for the 6–9 months estimated by the City). The black plaintiffs and the Hispanic intervenor ask this Court to end the delay immediately, and to order an interim election to correct the faults of the 8–3 system. One Council Member agrees; Jim Buerger (Place 10) testified that, "if the 8–3 system has not been fair," then it would not even be fair to ask African–Americans and Hispanics to wait until "early 1992 to get relief from that system."[365]

---

**362.** The City's declaratory judgment suit was filed Sept. 5, 1978; the Attorney General, on Nov. 19, 1979, granted preclearance of a revised 8–3 system not involved in the suit; but the matter was not resolved until the D.C. Court dismissed the declaratory judgment suit on Dec. 2, 1979—and, after a 16–month delay, the elections were held in January 1980. See Findings of Fact 112–29, 134–35. See also Finding of Fact 189 at fn. 137.

**363.** Under § 5 of the Voting Rights Act, preclearance by the Attorney General—or by means of a declaratory judgment suit before a D.C. three-judge court—would not bar "any subsequent judicial action to enjoin the enforcement" of the 10–4–1 plan. See Finding of Fact 162.

**364.** Tr. V (27, 57) (Miers); TR. VIII (25–28) (Closing Arguments).

**365.** Tr. V (88) (Buerger).

455. On balance, it is clear that justice requires an interim City Council election. African–Americans were told to wait for the creation of a third black district in 1975, then again in 1982, then again in 1986—and this continued delay resulted in the "suicide mission" of Marvin Robinson in his 1983 Place 9 at-large race. Mexican–Americans were told to wait for a Hispanic Council seat in 1975, and again in 1982, and again in 1986, and—because of fear of a Hispanic lawsuit attacking the 8–3 system—were given white support for an at-large seat in 1987. With this perspective, *the delay requested by the City "to give the 10-4-1 a chance" is even longer than the 1½-2 year delay estimated by this Court; indeed, blacks and Hispanics in Dallas have been waiting for some 10–15 years for the voting rights to which they are so clearly entitled—but which have been denied them by the 8-3 system.*

456. But most of this 10–15 year delay has already happened, so why do African–Americans and Hispanics have to push so against the 8–3 system? Why can't they just wait for another 1–2 years, and give the 10–4–1 a chance? If asked, perhaps they would reply with an answer similar to the one Dr. Martin Luther King gave from the Birmingham jail: [366]

"But when you have seen ... the vast majority of your 20 million negro brothers smothering in an airtight cage of poverty in the midst of an affluent society; when you ... see the depressing clouds of inferiority begin to form in [the] little mental sky [of your 6–year old daughter] and see her begin to distort her little personality by unconsciously developing a bitterness toward white people; when you have to concoct an answer for a 5–year–old son asking in agonizing pathos, 'Daddy, why do white people treat colored people so mean?, ... when you're humiliated day in and day out by nagging signs reading 'white' and 'colored'; when your first name becomes 'nigger' and your middle name becomes 'boy' (however old you are) and your last name becomes 'John' and when your wife and mother are never given the respected title 'Mrs.'; when you are harried by day and haunted by night by the fact that you are a Negro, living constantly at tip-toe stance, never quite knowing what to expect next, and plagued with inner fears and outer resentments; when you are forever fighting a degenerating sense of 'nobodyness;' *then you will understand why we find it difficult to wait.*" [367]

457. *In no way will this Court tell African–Americans and Hispanics that they must wait any longer for their voting rights in the City of Dallas.* Therefore, an interim City Council election must be held as *soon as possible* in order to remedy the adverse effects of the 8–3 system—the denial of equal access to the City's political process—which African and Mexican–Americans have suffered in Dallas, for some 10–15 years.

458. When this Court refused to enjoin the May 1989 Council elections, it specifically warned the City that "if the plaintiffs do prevail at trial, a new City Council election can be ordered under a revised plan" after the CRC and the City council have completed their "opportunity to remedy the defects, if any, in [the] present 8–3 system." (Findings of Fact 219, 220). Contrary to the position it took in opposing the plaintiffs' request to enjoin the May 1989 elections (Finding of Fact 220), the City now argues that the 10–4–1 plan is not a "remedy" to correct any defects in the 8–3 system. Nevertheless, since neither the plaintiffs or the intervenor ask this Court to devise a court-ordered plan for the interim election, it is appropriate for the City to be given one more opportunity to correct the defects in the 8–3 system by means of a legislative plan for the interim election.

459. It would not be proper for this Court to tell the City council what number of single-member districts should be used in their interim election plan. However,

---

**366.** *Dallas Times Herald* (Jan. 14, 1990), p. A–21 (column by *Molly Ivins*).

**367.** This is not the first time that an opinion in a voting rights case has quoted Dr. Martin Luther King. See *Houston v. Haley,* 859 F.2d 341, at 343 fn. 1 (5th Cir.1988).

the plaintiffs have indicated that they "are willing to accept an interim election plan which ensures adequate African–American representation and participation during the interim by increasing the size of the council to 15 members and constituting the membership of the new, expanded council in the following way:[368]

"1) allowing the present members of the Council to serve until a final or other interim remedy plan is in effect, and

"2) adding four members to the Council by holding elections in four specially drawn single-member districts, three of which are 60%–65% African–American and one which is majority Hispanic.

460. Similarly, the Mexican–American intervenor has suggested an increase in "the Council size from 11 to 15 as has been approved by the voters"—and that, "in order to remedy past inequities, the four additional Council persons should be elected from single-member districts that would provide blacks and Hispanics an opportunity to elect representatives of their choice."[369]

461. Finally, for the reasons stated above, the City of Dallas may consider legislative plans using from 11 to 15 districts—all of which shall be single-member districts, except for the at-large, city-wide election of the mayor. (Findings of Fact 305–311).

### CONCLUSIONS OF LAW

1. The framework for analyzing claims of vote dilution by an at-large system under § 2 of the Voting Rights Act, 42 U.S.C. 1973, was set by Congress in the legislative history of the 1982 Amendments to the Voting Rights Act and by the U.S. Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

2. *Gingles* requires a three-part threshold for proving a § 2 violation. *First*, a plaintiff must prove that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; *second*, that the minority is politically cohesive; and *third*, that the majority votes sufficiently as a bloc usually to defeat the minority preferred candidate. *Gretna*, 834 F.2d at 497. The *Zimmer* factors are also relevant to the "totality of the circumstances" test upon which the final § 2 findings must be based. *Gretna*, 834 F.2d at 498.

3. *Gingles* did not specifically decide the framework for deciding a § 2 case alleging discriminatory apportionment of single-member districts. *Gingles*, 478 U.S. at 47 fn. 12, 106 S.Ct. at 2762. However, the legislative history of § 2 makes it clear that the same results test is to be applied in both at-large and single-district challenges. *Major v. Treen*, 574 F.Supp. 325 (E.D.La.1983). This case involves a challenge to City 8–3 election system combining three at-large seats with "packing" and "cracking" claims concerning some of the 8 single-member districts. Most of the *Zimmer* factors are equally relevant to both claims.

4. The City argues that the enactment of the 10–4–1 plan moots this case. However, the effects of the 8–3 continue. The present Council was elected under the 8–3 system and will continue to serve under the 8–3 for a period of time that is not known, but that could be at least 1½–2 years. (Finding of Fact 450–52). These continuing effects prevent the case from becoming moot. *Firefighters v. Stotts*, 467 U.S. 561, 570–572, 104 S.Ct. 2576, 2583–2584, 81 L.Ed.2d 483 (1984). The African–American plaintiffs and the Hispanic intervenor have

---

**368.** This type of interim election would, of course, be limited to part of the City Council. However, this is exactly the type of election that the City tried to hold in 1979—when it tried, *unsuccessfully*, to hold elections for the 3 at-large places by bifurcating them from the 8 single-member district seats. Findings of Fact 116–18.

**369.** Contrary to the City's arguments, this is not a situation where the City is being ordered to increase the size of its Council in order to accommodate the request (or need) for single-districts. *Westwego*, 872 F.2d at 1205, fn. 4; *Overton*, 871 F.2d at 543. Here, the City has already increased the size of the Council to 15 members with the 10–4–1 plan; therefore, the African–American plaintiffs and the Hispanic intervenors are entitled to urge the City's use of from 11–15 districts.

requested further relief from these continuing effects of the 8–3 system. Clearly, a special election to remedy the continuing effects of the 8–3 system is equitable relief within the power of a court which finds a § 2 violation. *Ketchum v. City Council of Chicago*, 630 F.Supp. 551, 564–568 (N.D.Ill. 1985).

5. All parties agree that this Court cannot rule on the legality of the 10–4–1 plan until it is precleared under § 5 of the Voting Rights Act. However, this does not prevent the Court from taking evidence relevant to the 10–4–1 plan and deferring a ruling until it has been "precleared" under § 5 of the Act. *Terrazas v. Clements*, 537 F.Supp. at 519.

6. The 8–3 system did receive § 5 preclearance, but that administrative finding is entitled to little weight in this subsequent § 2 case—particularly when that preclearance was issued before the new § 2 standards went into effect. *Major v. Treen*, 574 F.Supp. at 327.

7. The prior judicial finding in *Lipscomb* that the 8–3 is constitutional has no *res judicata* effect because of the 1982 amendments to the Voting Rights Act. *Kirksey v. City of Jackson*, 714 F.2d 42, 44 (5th Cir.1983)

8. The Fifth Circuit has given specific directions on several matters involving the evaluation of evidence in § 2 cases. These matters should not be relitigated in this case.

9. There is no requirement that the racially polarized voting evidence show that the minority group vote for its candidate be a majority vote. Bloc voting can be proved in part by showing that a *significant* number of minority group members usually vote for the same candidate or that the choice of a *significant* number of minority voters is defeated by a white bloc vote. *Gretna*, 834 F.2d at 501–502 (black candidate receiving less than a majority of the black vote).

10. As a general rule, racial bloc voting is to be determined from examining elections in which a minority candidate is running against a majority candidate. *Gretna*, 834 F.2d at 503–504. Even if a race involves a minority candidate, it should not

be considered if the minority candidate is not serious in the sense of gaining little support from any segment of the community. *Campos*, 840 F.2d at 1245 fn. 7.

11. Here, there was no evidence to support the City's reliance—and over emphasis—of particular white versus white races in its racially polarized voting analysis. *Collins v. City of Norfolk*, 883 F.2d 1232, 1238–1239 (4th Cir.1989).

12. A majority of the Supreme Court held, in *Gingles*, that minority group political cohesion can be shown by the same statistical evidence and analysis showing racially polarized or bloc voting. *Gingles*, 478 U.S. at 56, 100, 106 S.Ct. at 2769, 2792. Insofar as the *Monroe v. City of Woodville*, 881 F.2d 1327, 1331 (5th Cir.1989) holds otherwise, it is a single panel departure from *Gingles* and Fifth Circuit precedent. *Campos*, 840 F.2d 1240; *Gretna*, 834 F.2d 496; *Westwego*, 872 F.2d at 1208 fn. 7. Moreover, it is not necessary to reconcile *Woodville* given the facts of this case.

13. In addition to the statistically significant racially polarized voting that was demonstrated by plaintiffs, the ability of the African–American community to unite behind a single political platform of common goals and means is shown by that community's near unanimous cohesiveness on the complex issues of the powers of the police review board, the 10–4–1 referendum, and its admitted ability to coalesce around candidates espousing the common goals and means of the Democratic Party. This is also true with respect to the Mexican–American intervenor.

14. The evidence is clear that the 8–3 single-member district lines pack and crack the African–American community in Dallas. It is also is clear that, absent such packing and cracking, African–Americans would not be restricted to electing a candidate of their choice in only 2 of the 8 single-member districts. *Terrazas*, 537 F.Supp. at 542 (districts of 74% and 80% minority concentrations are illegally packed).

15. The three at-large places dilute the African–American and the Hispanic vote.

No black has won such a place since 1973 and no black has ever won such a place when opposed by a serious white candidate. No Hispanic has won an at-large place since 1973—with the atypical situation of the election of a Hispanic in 1987 with substantial white support—and no Hispanic has ever won an at-large place when opposed by a serious white candidate.

16. The black plaintiffs and the Hispanic intervenor have met their burden to show that both the 8–3 system impermissibly denies African–Americans and Mexican–Americans the equal opportunity to participate in the political process in Dallas.

17. Over the objection of plaintiffs, the City conducted Council elections under the 8–3 system in May of 1989 during the pendency of this litigation. This Court, following Fifth Circuit authority, denied plaintiffs' application for a preliminary injunction on the grounds that the Court had the power to completely remedy the effects of such an election should plaintiffs prevail on their challenge to the 8–3.

18. The 8–3 system discriminates against African–American and Hispanic voters in the City of Dallas and in doing so violates § 2 of the Voting Rights Act. The current Council, which will serve an extended and indefinite term absent relief by this Court, continues the effect of the discriminatory election system. Having met their burden, the African–American plaintiffs and the Hispanic intervenor are entitled to the relief of a special election. *Hogencamp v. Lee County Board of Education,* 722 F.2d 720, 722–723 (11th Cir. 1984); *Ketchum,* 551 F.Supp. at 5674.

## CONCLUSION

■ The 8–3 system for electing members of the City Council violates § 2 of the Voting Rights Act because it dilutes the votes of politically cohesive blacks and Hispanics in Dallas. Specifically:

(i) under the 8–3 system, African–Americans and Hispanics are denied access to the 3 at-large seats because they cannot raise—*from their own communities*—the enormous amount of money (at least $150–200,000) that is required for an effective at-large, city-wide campaign in Dallas; and

(ii) under the 8–3 system, blacks have been unfairly prohibited from electing more than two single-district Council Members by the "packing" of African–Americans into two districts with 75–87% concentration and 85–91% total minority population (Districts 6 and 8)—and by the "cracking" of the remaining African–American population in Dallas between Districts 1 and 7, to prevent the creation of a third black district.

An interim election must be held *as soon as possible* to remedy the continuing discriminatory effects of the 8–3 system—and to end, once and for all, the at-large election of all City Council members (except for the mayor of Dallas).

The City shall, within thirty (30) days from the date of this opinion, submit its legislative plan for this special interim election. This is obviously the duty of the City Council, because this Court is not—and it does not want to be—in the "plan-drawing business." However, if the Council fails to act responsibly, this Court will have no alternative but to take on the unwelcome task of devising a court-ordered plan for the interim election.

## ORDER

1. The trial record in this case shall be supplemented by the following exhibits, all of which are admitted into evidence (and all of which are cited in the Memorandum Opinion of March 28, 1990):

*Pls. Exh. 82A* (May 6 and May 20, 1989 elections and transmittal letter dated Feb. 15, 1990 from Michael M. Daniel)

*Cts. Exh. A–6* (Justice Department letter, dated October 16, 1989 to City Attorney Analeslie Muncy)

*Cts. Exh. A–7* (Defendant's Motion to Supplement Record and Neighborhood Improvement Program, Council Briefing, dated Feb. 7, 1990).

2. The Motion to Intervene Due to Personal Stake in Outcome of Controversy,

filed on Oct. 20, 1989, by Jurline Hollins, is
DENIED.